**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. <u>23-20271-CR-BLOOM/OTAZO-REYES</u>

18 U.S.C. § 1349
18 U.S.C. § 371
18 U.S.C. § 982

FILED BY___ *SAL* ___D.C.

*Jun 27, 2023*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami Magistrate

**UNITED STATES OF AMERICA**

**vs.**

**BRETT BLACKMAN,**
**GARY COX, and**
**GREGORY SCHRECK,**

> **Defendants.**
> _____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

### The Medicare Program

1.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each Medicare beneficiary was given a unique Medicare identification number.

4.      Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered, among other things, items and services supplied and provided by physicians, medical clinics, laboratories, durable medical equipment ("DME") suppliers, and other qualified health care providers, including office visits, minor surgical procedures, DME, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. Medicare Part C, also known as "Medicare Advantage," provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans ("Medicare Advantage Plans"), including health maintenance organizations and preferred provider organizations. Medicare Part D covered prescription drugs.

5.      Health care providers, such as physicians, DME suppliers, laboratories, and pharmacies, that supplied items and services to Medicare beneficiaries were referred to as "providers." Medicare providers were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for benefits, items, and services provided to beneficiaries.

6.      When seeking reimbursement from Medicare for provided benefits, items, and services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual. Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number or

Medicare Beneficiary Identifier; (b) the date on which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier.  Claims seeking reimbursement from Medicare could be submitted in hard copy or electronically.

7.     Medicare paid for items and services only if they were medically reasonable and necessary, eligible for reimbursement, and provided as represented.  Medicare did not pay for items and services that were procured through the payment of illegal kickbacks and bribes.

## Medicare Part B

8.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for items and services that were supplied and provided to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered item or service.

9.     To receive Medicare reimbursement, providers had to make the appropriate application to the MAC and execute a written provider agreement.  The Medicare provider enrollment application, CMS Form 855, was required to be signed by an authorized representative of the provider.  CMS Form 855 contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider].  The Medicare laws, regulations, and program instructions are available through the [MAC].  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute…).

10.     CMS Form 855 contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

### Medicare Part C – Medicare Advantage

11.     Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same items and services offered under Medicare Part A and Part B.  To be eligible to enroll in a Medicare Advantage Plan, an individual had to have been entitled to receive benefits under Medicare Part A and Part B.

12.     A number of private health insurance companies, along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to beneficiaries through various Medicare Advantage Plans.  These health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States, and often made payments directly to providers, rather than to the beneficiaries who received the health care benefits, items, and services.

13.     To obtain payment for items and services supplied and provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms to the beneficiary's Medicare Advantage Plan.   The claim forms were typically submitted electronically.

14.     When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, and complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare.  Providers also certified that the items and services being billed were medically necessary and were in fact provided as billed.

15.     The private health insurance companies offering Medicare Advantage Plans were paid a fixed rate per beneficiary per month by Medicare, regardless of the actual number or type of items and services the beneficiary received.  These payments by Medicare to the health insurance companies were known as "capitation" payments.   Thus, every month, CMS paid the health insurance companies a predetermined amount for each beneficiary who was enrolled in a Medicare Advantage Plan, regardless of whether the beneficiary utilized the plan's services that month.  CMS determined the per-beneficiary capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence.  CMS adjusted the capitation rates annually, taking into account each beneficiary's previous complaints, diagnoses, and treatments.

16.     Medicare Advantage Plans were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and "Federal health care programs," as defined by Title 42, United States Code, Section 1320a-7b(f).

### Medicare Part D

17.     To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan.  Medicare drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors."  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

18.     CMS compensated the Medicare sponsors for providing prescription drug benefits to beneficiaries.  CMS paid Medicare sponsors a monthly capitation fee for each beneficiary enrolled in the Medicare sponsors' plans.  In addition, in some cases where a Medicare sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's capitation fee, CMS reimbursed the Medicare sponsor for a portion of those additional expenses.

19.     Medicare's drug plans were administered by pharmacy benefit managers ("PBMs"), which adjudicated and processed payment for prescription drug claims submitted by eligible pharmacies.  PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

20.     A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Part D drug plan or with a PBM.  Pharmacies entered into contractual agreements with PBMs either directly or indirectly.  If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers.  By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

21.     Upon receiving prescriptions and dispensing drugs in accordance with them, pharmacies submitted claims to Medicare or to PBMs for the dispensed prescription drugs.  Medicare and PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

22.     Under the Social Security Act, Medicare covered Part D drugs that were dispensed upon a valid prescription and for a "medically accepted indication."  42 U.S.C. § 1395w-102(e).

23.     To prevent fraud, waste, and abuse, Medicare and PBMs required pharmacies to collect applicable copayments from beneficiaries prior to or soon after the medication was provided.  Copayments could not be systematically waived or reduced.  Consistent copayment collection was a fraud prevention measure, as copayments gave beneficiaries financial incentive to reject medications that were not medically necessary or had little or no value to beneficiaries' treatment.

24.     Medicare drug plans were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b), and "Federal health care programs," as defined by Title 42, United States Code, Section 1320a-7b(f).

### Durable Medical Equipment

25.     Medicare Part B covered an individual's access to DME, such as off-the-shelf ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces"). Off-the-shelf braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

26.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and ordered by a licensed physician or other qualified health care provider.

### CHAMPVA

27.     The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the United States Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability.

28.     In general, CHAMPVA covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to another health care benefit program, including Medicare, and reimbursed costs that the primary health care benefit program did not cover. For Medicare beneficiaries with CHAMPVA coverage, health care

claims were first sent to Medicare for processing, and then Medicare electronically forwarded claims to CHAMPVA.

29.     CHAMPVA was a "health care benefit program," as defined by Title 18, United States Code, § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, § 1320a-7b(f).

**The Defendants, Relevant Entities, and Relevant Individuals**

30.     HealthSplash, Inc. ("HealthSplash") was a corporation incorporated under the laws of Kansas with its principal place of business in Overland Park, Kansas.

31.     Power Mobility Doctor Rx, LLC ("PMDRx") was a limited liability company formed under the laws of Arizona with its principal place of business in Glendale, Arizona that purported to provide documentation and compliance services for Medicare suppliers of DME products. PMDRx at times did business as DMERx.  PMDRx was acquired by HealthSplash in or around September 2017.

32.     All-Med Health Care, Inc., d/b/a PME Home Health ("PME Home Health") was a corporation incorporated under the laws of Arizona with its principal place of business in Phoenix, Arizona.  PME Home Health was a DME supplier.

33.     National Center for Pain, LLC ("National Center for Pain") was a limited liability company formed under the laws of Wyoming with its principal place of business in Spring Hill, Florida.

34.     Defendant **BRETT BLACKMAN** was a resident of Johnson County, Kansas, the Chief Executive Officer ("CEO") of HealthSplash, and an operator and manager of PME Home Health and National Center for Pain.

35.     Defendant **GARY COX** was a resident of Maricopa County, Arizona, a director of

HealthSplash, the CEO of PMDRx, and the president of PME Home Health.

36.     Defendant **GREGORY SCHRECK** was a resident of Johnson County, Kansas, and a vice president of HealthSplash.

37.     Toni De Lanoy was a resident of Destin, Florida, and a vice president of PMDRx and HealthSplash.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

1.     The General Allegations section of this Indictment is hereby re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around at least February 2015, and continuing through in or around October 2020, in Miami-Dade and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**BRETT BLACKMAN,**
**GARY COX, and**
**GREGORY SCHRECK,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, Toni De Lanoy, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, CHAMPVA, and other health care benefit programs ("Federal Health Care Plans"), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves and others by, among other things: (a) identifying individuals who qualified for benefits under Federal Health Care Plans (collectively, "beneficiaries"); (b) targeting beneficiaries through mail and telemarketing campaigns, which promised free or low-cost products, including braces, prescription creams, and other items; (c) generating doctors' orders and prescriptions (collectively, "doctors' orders") that were used to submit false and fraudulent claims to Federal Health Care Plans; (d) selling doctors' orders to DME suppliers, pharmacies, and telemarketing companies in exchange for kickbacks and bribes; (e) executing sham contracts and sham invoices to conceal the sale of doctors' orders in exchange for kickbacks and bribes; (f) submitting and causing the submission of false and fraudulent claims to Federal Health Care Plans for items that were ordered without regard to medical necessity and were ineligible for

reimbursement; and (g) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.      **BRETT BLACKMAN, GARY COX**, and **GREGORY SCHRECK** owned, controlled, and operated PMDRx, HealthSplash, and the DMERx platform, which was an internet-based platform that the defendants programmed to generate false and fraudulent doctors' orders for practitioners paid by purported telemedicine companies to sign.

5.      **BRETT BLACKMAN** and his co-conspirators at National Center for Pain and at various telemarketing companies targeted hundreds of thousands of beneficiaries on behalf of DME suppliers and pharmacies.  The beneficiaries were targeted to provide their personally identifiable information and accept braces, pain creams, and other items through misleading mailers, television advertisements, and calls from offshore call centers.  Co-conspirators at DME suppliers and pharmacies instructed the telemarketing companies to solicit beneficiaries for the braces, pain creams, and other items that received the highest reimbursement from Federal Health Care Plans.

6.      **BRETT BLACKMAN, GARY COX, GREGORY SCHRECK**, Toni De Lanoy, and others offered to connect DME suppliers, pharmacies, and telemarketing companies with telemedicine companies using the DMERx platform that would accept illegal kickbacks and bribes in exchange for arranging for the ordering of braces, pain creams, and other items for these recruited beneficiaries.

7.      **BRETT BLACKMAN, GARY COX, GREGORY SCHRECK**, Toni De Lanoy, and others received payments in exchange for connecting these parties, coordinating these illegal

kickback transactions, and referring the completed doctors' orders to the DME suppliers, pharmacies, and telemarketing companies.

8.     **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, Toni De Lanoy, and others obtained beneficiary information from the DME suppliers, pharmacies, and telemarketing companies in order to transfer it to telemedicine companies through the DMERx platform.

9.     **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, Toni De Lanoy, and others used the beneficiary information to create false and fraudulent standard form language for doctors' orders on the DMERx platform that the telemedicine companies were required to use, and which falsely represented that medical practitioners had examined and treated the beneficiaries.

10.     **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, Toni De Lanoy, and others designed the false and fraudulent doctors' orders to maximize reimbursement from the Federal Health Care Plans; defeat audits conducted by the Federal Health Care Plans; and conceal and disguise the scheme.

11.     **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, Toni De Lanoy, and others recruited co-conspirators at purported telemedicine companies, including purported telemedicine companies located in the Southern District of Florida, to pay practitioners to sign the false and fraudulent doctors' orders on the DMERx platform and arrange for the doctors' orders to be transferred to DME suppliers, pharmacies, and telemarketing companies that were clients of PMDRx and HealthSplash.  The practitioners signed the false and fraudulent orders without regard to medical necessity and based on a brief telephone call with the beneficiary or no interaction with the beneficiary at all.

12.     **BRETT BLACKMAN** and **GARY COX**, through PME Home Health, and co-

conspirators at DME suppliers, pharmacies, and telemarketing companies, including DME suppliers located in the Southern District of Florida, paid illegal kickbacks and bribes to co-conspirators at purported telemedicine companies in exchange for signed doctors' orders.

13.      Co-conspirators at DME suppliers, pharmacies, and telemarketing companies, including companies located in the Southern District of Florida, paid **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, Toni De Lanoy, and others illegal kickbacks and bribes in exchange for signed doctors' orders obtained from the DMERx platform, which were then used to submit claims to Federal Health Care Plans.

14.      **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, and others concealed and disguised the scheme, including by entering into sham contracts and agreements that falsely concealed the purpose, nature, and scope of arrangements between and among PMDRx, HealthSplash, DME suppliers, pharmacies, telemarketing companies, and purported telemedicine companies.

15.      **BRETT BLACKMAN**, **GARY COX**, **GREGORY SCHRECK**, and their co-conspirators caused Federal Health Care Plans to be billed in excess of approximately $1,963,000,000 for DME and prescription drugs that were procured through the payment of kickbacks and bribes, medically unnecessary, and ineligible for reimbursement.  Federal Health Care Plans paid DME suppliers and pharmacies in excess of approximately $639,000,000 based on those false and fraudulent claims.

All in violation of Title 18, United States Code, Section 1349.

**COUNT 2**
**Conspiracy to Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around at least February 2015, and continuing through in or around October 2020, in Miami-Dade and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**BRETT BLACKMAN,**
**GARY COX, and**
**GREGORY SCHRECK,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine conspire, confederate, and agree with each other, Toni De Lanoy, and with others known and unknown to the Grand Jury to:

a.      violate Title 42, United States Code, Section 1320a-7b(b)(2)(A) and (B), by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to: (A) refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, the Federal Health Care Plans; and (B) purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, the Federal Health Care Plans.

b.      violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) and (B), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for: (A) referring an

individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care benefit program, that is, the Federal Health Care Plans; and (B) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, that is, the Federal Health Care Plans.

### Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (a) creating false and fraudulent doctors' orders for DME, prescription creams, and other medical items for beneficiaries; (b) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for signed doctors' orders for DME, prescription creams, and other medical items for beneficiaries; (c) submitting and causing the submission of claims to Federal Health Care Plans for products that were medically unnecessary, ineligible for reimbursement, and procured through the payment of kickbacks and bribes; (d) concealing and causing the concealment of kickbacks and bribes; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

4.      The Manner and Means section of Count 1 is hereby re-alleged and incorporated as though fully set forth herein as a description of the Manner and Means of the conspiracy.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed in the Southern District of Florida, and elsewhere, one of the following overt acts, among others:

1.      On or about March 10, 2015, a co-conspirator emailed **BRETT BLACKMAN** stating, "We can still run PME. We will take the calls to hit the 50 [doctors' orders] per week, but we have to renegotiate the price. We need to be at $150 instead of $125. We made this price up before we took any of the calls and knew how they converted and what the real cost was. If you want to do this we still can at the new price of $150. If you agree to this we can start this week." **BRETT BLACKMAN** responded, "That works. Lets g[i]ve it a shot. We will work towards 40 DOs[.]"

2.      On or about April 27, 2015, a co-conspirator emailed **BRETT BLACKMAN** sham invoices addressed to PME Home Health that stated that PME Home Health was being billed for "marketing and advertising."  However, the email attaching the invoices states that the invoices were for doctors' orders.

3.      On or about November 9, 2016, **GARY COX** connected a company that used the DMERx platform with a telemarketer that could provide "leads."

4.      On or about December 5, 2017, **GREGORY SCHRECK** signed a Supplier Data Coordination Agreement on behalf of HealthSplash with a DME supplier.

5.      On or about December 12, 2017, **GREGORY SCHRECK** signed a Supplier Data Coordination Agreement on behalf of HealthSplash with a DME supplier.

6.      On January 16, 2018, **GREGORY SCHRECK** referred a telemedicine company to a DME supplier that complained that another telemedicine company was not "getting the patients scripted within 24 hours."

7.      On or about May 6, 2018, **GREGORY SCHRECK** signed a Supplier Data Coordination Agreement on behalf of HealthSplash with a DME supplier.

8.      On or about September 21, 2018, a DME supplier transferred or caused to be transferred approximately $9,530 to a purported telemedicine company owner in exchange for doctors' orders transmitted through the DMERx platform.

9.      On or about October 9, 2018, a DME supplier transferred or caused to be transferred approximately $9,200 to a purported telemedicine company owner in exchange for doctors' orders transmitted through the DMERx platform.

10.     On or about October 25, 2018, **GREGORY SCHRECK** signed a Supplier Data Coordination Agreement on behalf of HealthSplash with a DME supplier.

11.     On or about January 2, 2019, a purported telemedicine company owner located in the Southern District of Florida transferred or caused to be transferred approximately $20,460 to HealthSplash.

12.     On or about January 3, 2019, a telemarketing company owner wired or caused to be wired approximately $85,900 to HealthSplash.

13.     On or about January 23, 2019, a purported telemedicine company owner located in the Southern District of Florida transferred or caused to be transferred approximately $3,230 to HealthSplash.

14.     On or about February 7, 2019, a telemarketing company owner wired or caused to be wired approximately $93,915 to HealthSplash.

All in violation of Title 18, United States Code, Section 371.

## COUNT 3
### Conspiracy to Defraud the United States and Make False Statements in Connection with Health Care Matters
### (18 U.S.C. § 371)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around at least February 2015, and continuing through in or around October 2020, in Miami-Dade and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

### BRETT BLACKMAN,
### GARY COX, and
### GREGORY SCHRECK,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine conspire, confederate, and agree with each other, Toni De Lanoy, and with others known and unknown to the Grand Jury to:

a.     defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of departments and agencies of the United States in their administration and oversight of the Federal Health Care Plans; and

b.     violate Title 18, United States Codes, Section 1035 by knowingly and willfully making materially false, fictious, and fraudulent statements and misrepresentations and using materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services.

### Purpose of the Conspiracy

3.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (a) creating false and fraudulent doctors' orders for DME,

prescription creams, and other medical items for beneficiaries; (b) submitting and causing the submission of claims to Federal Health Care Plans for products that were medically unnecessary and ineligible for reimbursement; and (c) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Manner and Means of the Conspiracy

4.      The Manner and Means section of Count 1 is hereby re-alleged and incorporated as though fully set forth herein as a description of the Manner and Means of the conspiracy.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed in the Southern District of Florida, and elsewhere, one of the following overt acts, among others:

1.      On or about October 11, 2016, **GARY COX** directed an employee of PMDRx to change the language in the DMERx platform's template doctor's order from "Based on my conversation with and assessment of this patient, I am ordering the . . . " to "Based on my examination and assessment of this patient, I am ordering . . . " noting that "[e]veryone is trying to take the focus off the fact that these [are] telephone consults which the current language might do."

2.      On or about October 19, 2016, **GARY COX** emailed **BRETT BLACKMAN** stating that a telemarketer who used the DMERx platform wanted "the Telemed encounter preference" to be "omitted" from the final doctor's order because it "will raise a red flag for CMS in an audit and [a]uditors then scrutinize the documents more intensely." **BRETT BLACKMAN** replied approving the removal of the references to telemedicine.

3.      On or about July 5, 2018, **GREGORY SCHRECK** forwarded an email to Toni De Lanoy and another HealthSplash employee noting, "please review email below and inform me of

next steps if any." The forwarded email advised **GREGORY SCHRECK** that for beneficiaries who ordered braces through one purported telemedicine company, "[m]any of our patience have reported not getting any Telephone consult from the telemedicine group. So we usually call her patients back to let them know what braces they'll be receiving, only do that they're telling us they have not spoken to anyone in the theme of alarming so I wanted to bring this attention." [sic throughout.]

4.     On or about September 10, 2018, a DME supplier submitted to Medicare a "MEDICARE DME Redetermination Request Form" stating "PLEASE SEE ATTACHED ALL MEDICALLY NECESSARY DOCUMENTATION FOR THE BRACE PROVIDED TO PATIENT INCLUDED ARE EXAM NOTES SHOWING PATIENTS [sic] CONDITION AND MEDICAL NECESSITY FOR THE BRACES PER" per Medicare contractor guidance. The form attached a DMERx platform doctor's order signed by a purported telemedicine provider for a Medicare beneficiary.

5.     On or about October 5, 2018, a co-conspirator who owned and operated a telemarketing company emailed Toni De Lanoy the name of a new DME supplier and the name of a telemedicine company he would use to sign doctors' orders, noting that the doctors' orders "GO TO MARKETING TEAM, THEN GET SENT TO SUPPLIER."

6.     On or about January 22, 2019, a co-conspirator who owned a telemedicine company emailed **GREGORY SCHRECK** and Toni De Lanoy stating, "[t]he questions that you are asking the doctors to complete cannot be completed unless the patient is in the office. You have replaced the subject telemedicine questions with a face to face template."

7.     On or about March 5, 2019, a medical practitioner working for a purported telemedicine company signed a knee brace order in the DMERx platform writing that:

Pivot Shift test is positive (patient's knee gives out while pivoting or twisting indicating joint laxity) for knee(s): left.  Pivot Shift test is negative for knee(s): right.  One-legged Stand test is positive for knee(s): left.  One-legged Stand test is negative for knee(s): right.

The medical practitioner did not perform a Pivot Shift test or one-legged Stand test on the patient.

A DME supplier billed Medicare $1,200.24 for the claims based on this order.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS
### (18 U.S.C. §§ 982(a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendants, **BRETT BLACKMAN, GARY COX**, and **GREGORY SCHRECK**, have an interest.

2.      Upon conviction of a violation, or a conspiracy to commit a violation, of Title 18, United States Code, Sections 371, 1035, and 1349, and Title 42, United States Code, Sections 1320a-7b(b)(1)(A), 1320a-7b(b)(2)(A), 1320a-7b(b)(1)(B), and 1320a-7(b)(2)(B), as alleged in this Indictment, the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation pursuant to Title 18, United States Code, Section 982(a)(7).

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

> a.   cannot be located upon the exercise of due diligence;
>
> b.   has been transferred or sold to, or deposited with, a third party;
>
> c.   has been placed beyond the jurisdiction of the court;
>
> d.   has been substantially diminished in value; or
>
> e.   has been commingled with other property which cannot be divided without

difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of Title

21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures outlined

at Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code,

Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

_____
MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON, CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
DARREN C. HALVERSON
ANDREA SAVDIE
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

**CASE NO.:** _____

v.

BRETT BLACKMAN, et al.,

                          /
              Defendants.

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☒ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No_____
   List language and/or dialect: _____

4. This case will take __11__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I    ☐ 0 to  5 days         ☐ Petty
   II   ☐ 6 to 10 days         ☐ Minor
   III  ☒ 11 to 20 days        ☐ Misdemeanor
   IV   ☐ 21 to 60 days        ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No_____
   If yes, Judge _____   Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) No_____
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No_____
   If yes, Judge _____   Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No_____

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No_____

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No_____

15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No_____

By: _____

              Andrea Savdie
              DOJ Trial Attorney
              Court ID No.   A5502799

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:   BRETT BLACKMAN

**Case No**:

Count #1:

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Term of Imprisonment: Twenty (20) Years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: Three (3) Years**
* **Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

Count # 2:

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371
* **Max. Term of Imprisonment: Five (5) Years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: Three (3) Years**
* **Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

Count # 3:

Conspiracy to Defraud the United States and Make False Statements in Connection with Health Care Matters

Title 18, United States Code, Section 371
* **Max. Term of Imprisonment: Five (5) Years**
* **Mandatory Min. Term of Imprisonment (if applicable): N/A**
* **Max. Supervised Release: Three (3) Years**
* **Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**:  GARY COX

**Case No**:

Count #1:

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349
**\* Max. Term of Imprisonment: Twenty (20) Years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) Years**
**\* Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

Count # 2:

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371
**\* Max. Term of Imprisonment: Five (5) Years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) Years**
**\* Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

Count # 3:

Conspiracy to Defraud the United States and Make False Statements in Connection with Health Care Matters

Title 18, United States Code, Section 371
**\* Max. Term of Imprisonment: Five (5) Years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) Years**
**\* Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name**:  GREGORY SCHRECK

**Case No**:

Count #1:

Conspiracy to Commit Health Care Fraud and Wire Fraud

Title 18, United States Code, Section 1349
**\* Max. Term of Imprisonment: Twenty (20) Years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) Years**
**\* Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

Count # 2:

Conspiracy to Pay and Receive Health Care Kickbacks

Title 18, United States Code, Section 371
**\* Max. Term of Imprisonment: Five (5) Years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) Years**
**\* Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

Count # 3:

Conspiracy to Defraud the United States and Make False Statements in Connection with Health Care Matters

Title 18, United States Code, Section 371
**\* Max. Term of Imprisonment: Five (5) Years**
**\* Mandatory Min. Term of Imprisonment (if applicable): N/A**
**\* Max. Supervised Release: Three (3) Years**
**\* Max. Fine: $250,000 or Twice the Gross Gain or Loss Resulting from the Offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**