# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 23-CR-20271-LEIBOWITZ

**UNITED STATES OF AMERICA,**

**v.**

**BRETT BLACKMAN,**

   **Defendant.**

_____/

## DEFENDANT BRETT BLACKMAN'S
## MOTION TO ENFORCE DUE PROCESS PROTECTION ACT

Defendant Brett Blackman moves to enforce the Due Process Protection Act and to compel the production of *Brady* and *Giglio* evidence. To protect Mr. Blackman's constitutional rights to due process and a fair trial, Mr. Blackman moves for an order to compel the government to (1) identify and (2) disclose all exculpatory and impeaching materials in its possession sufficiently in advance of trial.

## PROCEDURAL AND FACTUAL BACKGROUND

On June 27, 2023, a federal grand jury returned a three-count Indictment against Mr. Blackman and others. On February 20, 2024, a federal grand jury returned a six-count Superseding Indictment against the Defendants. Doc. 76. The Superseding Indictment contains three separate

conspiracies:  Count 1 in the Superseding Indictment charges Mr. Blackman with an overarching, multi-object conspiracy to commit health care fraud and wire fraud; Count 5 in the Superseding Indictment charges Mr. Blackman with a separate multi-object conspiracy to pay and receive health care kickbacks; and Count 6 charges yet a third, multi-object conspiracy, this time to defraud the United States and make false statements in health care matters.  Mr. Blackman and others are scheduled for trial on May 5, 2025.

## **LEGAL ARGUMENT**

Due Process requires the government to produce "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see* Fed. R. Crim. Pr. 5(f). The prosecution must *identify* and provide exculpatory evidence to the defense. *Brady,* 373 U.S. at 86-87.[1] This obligation includes evidence that casts a shadow of doubt on a government witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

The duty to disclose favorable evidence to an accused is an affirmative one that extends "to material evidence...known to the prosecutor." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).  The government cannot

---

[1] *See also Emmett v. Rickets*, 397 F. Supp. 1025, 1043 (N.D. Ga. 1975) (holding that a prosecutor "retains the constitutional obligation of initially screening the materials before him and handing over to the defense those items to which the defense is unquestionably entitled under *Brady*.")

hide Brady material as an exculpatory needle in a haystack of discovery materials. *See United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part and vacated in part on other grounds*, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed. 619 (2010); *see also United States v. Hsia*, 24 F.Supp.2d 14, 29-30 (D.D.C. 1998) ("The Government cannot meet its Brady obligations by providing…600,000 documents and then claiming that [the defendant] should have been able to find the exculplatory information[.]").

There is no requirement that the *Brady* information be in document format or that it be verified, corroborated, or admissible. *See Wright v. Hopper* 169 F.3d 695, 703, n.1 (11th Cir. 1999). Exculpatory or impeachment information must be disclosed to the defense even if it was never memorialized. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2nd Cir. 2007). The government's disclosure obligations even extend to exculpatory or impeachment information communicated to the government by counsel for potential witnesses. *United States v. Triumph Capital Group, Inc.* 544 F.3d 149, 161-65 (2d. Cir. 2008). Thus, if the government learns about exculpatory information (orally or in writing) even from counsel for a potential witness or cooperator, it must be presented to the defense.

The purpose of disclosing *Brady* materials is to ensure that defendants receive fair trials. *Brady*, 373 U.S. at 87. Disclosure should generally occur

before trial. *United States v, Nagro*, 147 F.3d 875, 881 (9th Cir. 1998). Delaying disclosure serves no legitimate purpose other than to gain a tactical advantage at trial or potentially misleading the Court as to the strength or correctness of the government's factual submissions in its pretrial pleadings. *Brady* and *Giglio* material must therefore be disclosed in a timely manner.

Fulfillment of these requirements is exactly what Mr. Blackman requests, nothing more and nothing less. In this case, the government has produced tens of millions of documents in over thirty discovery productions. While the government has offered to conduct searches of discovery based on specific search requests provided by the defense, other than plea agreements and related filings for cooperating witnesses, the government has not specifically identified a single email, text message, or other document in discovery that it believes constitutes *Brady* or *Giglio* material.  In essence, the government has turned over haystacks of material in discovery and encouraged the defense to find the exculpatory needles.  That is simply not enough to ensure Mr. Blackman a fair trial. After all, in a criminal prosecution, it is the Government's interest "not [to] win a case but ensure that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

Given the breadth of the indictment, the length of the investigation and the various government agencies that participated, counsel for Mr. Blackman has concerns that *Brady* and *Giglio* material has not been timely identified to the defense. Accordingly, counsel for Mr. Blackman requests that the Court order the government to produce the following *Brady* and *Giglio* materials. These requests are not general in nature but instead are specific and designed to ensure Mr. Blackman receives a fair trial:

1. Copies of all pretrial services reports and presentence reports for any government witness.  It is the understanding of counsel for Mr. Blackman that numerous government witnesses have been prosecuted federally, and therefore pretrial services reports and presentence reports were prepared for each of these cooperating witnesses.  Counsel for Mr. Blackman contends that the content of these reports likely contains Jencks Act material, *Brady* material and *Giglio* material and should therefore be produced.

2. All statements by any cooperator or by his or her counsel, whether memorialized in writing or not, indicating or tending to show the cooperator was not aware of any scheme to defraud, did not believe there was such a scheme, believed that the cooperator's conduct was legal, and/or believed that the relationship between the cooperator

5

and Healthsplash, DMERX, or Brett Blackman was legitimate. This request includes any notes taken by any member of the government team during any meeting, telephone call or discussion with counsel for the cooperator; any documents or other materials presented by the cooperator or his counsel to support such claim; any email or other written communications from counsel claiming in substance that the cooperator was not guilty or other lacked criminal intent; any PowerPoint presentation or other presentations provided by the cooperator or his or her counsel to support his claim; or any other similar document.  This includes any memorandum, report or other document from any "attorney proffers" provided by attorneys for any potential government witnesses in this matter.

3. All communications or documents concerning or reflecting presentations, proffers, or other statements, whether memorialized or not, made to the government team, by counsel for any cooperator or any other individual or entity, defending the cooperator's conduct, justifying the cooperator's conduct, suggesting the cooperator's conduct was legal, changing the cooperator's version of events related to the scheme charged in this case, or that may tend to exculpate Mr. Blackman, affect the weight or credibility of the

evidence presented against Mr. Blackman, or affect the weight or credibility of any cooperator. This request includes any notes taken by any member of the government team during any meeting, telephone call or discussion with counsel for the cooperator.

4. Any and all information, in whatever form, that the healthcare providers who ordered Durable Medical Equipment or other medical products at issue in this case were told by individuals other than Mr. Blackman or anyone employed at Healthsplash, DMERX, PME Home Health, or National Center for Pain, that the health care providers did not need to speak with or have an encounter with a patient in order to order Durable Medical Equipment or other medical products.

5. Any and all training materials prepared by Mr. Blackman or others at Healthsplash or DMERX, and provided to any of the healthcare providers, marketers, telemedicine operators or anyone else that used Healthsplash or DMERX, that explained how to use these platforms, the requirements for determining medical necessity, the need for an encounter with a patient, or anything else about the proper use of the platforms.

6. Any and all information, in whatever form, that healthcare providers, marketers, telemedicine operators or anyone else that used Healthsplash or DMERX knowingly and intentionally ignored or refused to comply with the training materials prepared by Mr. Blackman or others at Healthsplash or DMERX, and/or knowingly and intentionally ignored or refused to comply with that guidance which explained how to use these platforms, the requirements for determining medical necessity, the need for an encounter with a patient, or anything else about the proper use of the platforms.

7. Any and all information, in whatever form, that healthcare providers that used Healthsplash or DMERX knowingly and intentionally ignored or refused to comply with guidance provided by Mr. Blackman or others at Healthsplash or DMERX to not share their log-in or password information for access to Healthsplash or DMERX platforms, and shared their log-in and password information with others, including family members, friends, marketers, telemedicine operators or other individuals.

8. Any and all compliance policies, training policies, compliance committee meeting minutes, board meeting minutes, or other internal documents from Healthsplash or DMERX concerning:

enforcement of medical necessity requirements; improving or enhancing compliance practices at Healthplash or DMERX; interactions between and among Healthsplash or DMERX compliance personnel and Healthsplash or DMERX clients concerning compliance; or any other document from Healthsplash or DMERX about the importance of legal compliance.

9. Information, in whatever form, whether oral or in writing, in the possession, custody or control of the government that:

   a. The Durable Medical Equipment and other healthcare services billed to the Federal Health Care Programs at issue in this case were in fact reimbursable by the Federal Health Care Programs;

   b. Statements made by Brett Blackman to others that he believed that the Durable Medical Equipment and other healthcare services at issue in this case that were billed to the Federal Health Care Programs were in fact reimbursable by the Federal Health Care Programs;

   c. The Durable Medical Equipment and other health care products at issue in this case were medically necessary;

d.  Statements made by Brett Blackman to others that he believed the Durable Medical Equipment at issue in this case was medically necessary;

e.  Statements by Brett Blackman to others that he believed it was legal to order Durable Medical Equipment through the use of telemedicine;

f.  Statements by any government witness that the witness believed it was legal to order Durable Medical Equipment through the use of telemedicine;

g.  Statements, communications or other documents, conveyed to Mr. Blackman or any government witness, that the operations of Healthsplash, DMERX, PME Home Health, National Center for Pain, have been reviewed and approved by lawyers;

h.  Any and all information reflecting that the contracts between and among Healthsplash, DMERX, PME Home Health, National Center for Pain, and any other entity, were compliant and not violative of any law, including the federal antikickback statute;

10

i.  Statements by government cooperators, in words or in substance, orally or in writing, that the operations of their businesses were compliant and following all regulations, including federal and state anti-kickback statutes, telemedicine rules, regulations and laws;

j.  Any and all statements by any telemedicine doctor who approved any Durable Medical Equipment or other product at issue in this case that they believed that their conduct in ordering, approving and authorizing the produce was lawful, consistent with the usual course of medical practice, and compliant with federal and/or state telemedicine rules, regulations and laws;

k.  Brett Blackman's statements to others, in words or in substance, that people doing business with Healthsplash, DMERX, PME Home Health, National Center for Pain, must comply with all state and federal laws; and

l.  Brett Blackman's statements to others, in words or in substance that he believed that his conduct and/or the conduct of Healthsplash, DMERX, PME Home Health, National Center for Pain, was legal or compliant.

In addition to these specific *Brady* requests, counsel for Mr. Blackman requests certain *Giglio* material related to potential government witnesses. Without limiting this request to just these witnesses, Mr. Blackman's makes the following specific requests for *Giglio* material related to certain government witnesses and requests similar material related to any other government witnesses:

1. INFORMATION ABOUT KEATON LANGSTON. The government has identified Keaton Langston, who pleaded guilty in the District of New Jersey, as a potential witness for the government in this matter. Through investigative efforts, counsel for Mr. Blackman has located news media coverage that suggests Mr. Langston has provided false and fraudulent information to the government.[2]  Among other things, the media coverage revealed that Mr. Langston purportedly:

- lied to Department of Justice investigators during the course of a Department of Justice investigation relating to himself;

---

[2] *See* "Guns, Lies and Audiotape:  How Biden's Family Ties could lead to another pardon", *Politico*, by Ben Schreckinger, December 4, 2024; *see also* "Biden said his pardon of family was to shield them from Trump.  That's not the full story," *Politico*, by Ben Schreckinger, January 20, 2025. Counsel for Mr. Blackman provided electronic copies of this media coverage to the government and can provide a copy to the Court upon request.

- that there is a recording of him admitting that he lied to the Department of Justice;

- that he boasted that he "gifted a gun to a Cngressman, bought himself a gold Rolex once owned by the gangster Whitey Bulger, partied at the Naval Observatory and took to describing himself as Joe Biden's "godson.";

- that he vented about his plea negotiations and the pressures of feeling caught between his father, the Justice Department, and the President's brother;

- that he only pled to "cover" for his father, and only after receiving some sort of assurance from a person he described as "the senator in Alabama;"

- that he was not truthful with federal investigators about Jim Biden; and,

- purportedly received, directly or indirectly, a guarantee of a pardon.

On January 23, 2025, because of the allegations in this media coverage, counsel for Mr. Blackman requested copies of any such recordings and transcripts of those recordings; copies of any reports of interview of Mr. Langston related to any of these claims; copies of any written (paper or electronic) correspondence by anyone on behalf of Mr. Langston and the

Office of the Pardon Attorney, the White House, or any Justice Department entity; any and all correspondence between counsel for Mr. Langston and the government relating or concerning plea negotiations and the plea offer conveyed to Mr. Langston and the plea agreement reached with Mr. Langston; any notes or reports of interview prepared in connection with any meeting between Mr. Langston, Mr. Langston's counsel, and a Department of Justice prosecutor in which Mr. Langston's counsel attempted to persuade prosecutors to not criminally charge Mr. Langston; any false statements or material omissions made by Mr. Langston during any meetings with government agents or prosecutors; and any other similar materials related to Mr. Langston.

Separately, counsel for Mr. Blackman requested any and all information related to the violation of Mr. Langston's bond conditions that led to him being placed in inpatient treatment, and any correspondence between counsel for Mr. Langston and the government in which counsel for Mr. Langston requests any benefits for Mr. Langston in connection with this violation, including any requests that Mr. Langston not be arrested or remanded to the custody of the United States Marshal pending sentence.

In response to this request, the government provided a 302 report of interview dated January 13, 2025, in which agents ask Mr. Langston about

the December 2024 Politico article. Despite references to audio recordings and other specifics in the article, Mr. Langston denies the accusations in the article.  In providing the report, the government also stated it did not possess any recordings.

Given the serious allegations in these two articles, in which a reporter explains that he has recordings of Mr. Langston openly discussing how he lied in his interviews with the Department of Justice, was otherwise deceitful in reaching his plea agreement and the other allegations that plainly discredit anything Mr. Langston might say, counsel for Mr. Blackman renews his request for the aforementioned *Brady* and *Giglio* material with the Court.

2. INFORMATION ABOUT HERB KIMBLE.  The government originally identified Herb Kimble, who plead guilty in the District of South Carolina, as a potential witness for the government in this matter. Kimble was purportedly the leader of a $800 million healthcare fraud scheme who was inexplicably allowed to plead to a plea agreement that would have allowed Mr. Kimble to pay a $40 million fine and receive a sentence of probation. Before reaching his plea agreement, Mr. Kimble proactively cooperated with the government, conducted covert recordings with others, and paid kickbacks, all pursuant to a grant of otherwise illegal activity authority by the government.

For unknown reasons, Mr. Kimble failed to appear at his sentencing in the District of South Carolina and is now considered an international fugitive. Although Mr. Kimble is not expected to be a trial witness in this case, the government has indicated that it intends to introduce unidentified statements of Mr. Kimble into evidence at trial pursuant Fed. R. Evid. 801(d)(2)(E).  As more fully set forth in counsel for Mr. Blackman's Motion in Limine, Mr. Blackman is entitled to impeach Mr. Kimble during this trial as if Mr. Kimble was testifying on the stand pursuant to Fed. R. Evid. 806. Thus, counsel for Mr. Blackman makes the following request for *Brady* and *Giglio* material related to Mr. Kimble:

A.  Any and all communications between the government and counsel for Mr. Kimble that led to the plea agreement reached on his behalf;

B. Any and all communications between the government and counsel for Mr. Kimble concerning his repeated failure to appear at sentencing;

C. Any and all communications between the government and counsel for Mr. Kimble concerning revising or terminating his plea agreement;

D. Any and all communications between Mr. Kimble or his lawyers and the government concerning efforts to conduct covert recordings of

Mr. Blackman.  If no such efforts to record Mr. Blackman occurred during Mr. Kimble's proactive cooperation, counsel for Mr. Blackman requests that the government disclose that in response to this Motion.

E.  Any and all communications between Mr. Kimble or his lawyers and the government in January and February 2019 about payments made to Healthsplash.  If there were no such communications, counsel for Mr. Blackman requests that the government disclose that in response to this Motion.

F.  Provide a copy of any agreement, email or document, granting Mr. Kimble illegal activity authority during the covert part of Mr. Kimble's cooperation.

G.  Provide a copy of any reports detailing the specific illegal activity approved and authorized by law enforcement during the covert part of Mr. Kimble's cooperation.

H. Provide a copy of any report detailing any unauthorized illegal activity during the covert part of Mr. Kimble's cooperation.

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9**

Counsel has conferred with Counsel for the government pursuant to Local Rule 88.9 in a good faith effort to resolve the issues raised in this

motion. The government states it opposes the Due Process Protection Act Motion.

## **CONCLUSION**

For these reasons, Defendant Brett Blackman moves the Court to enforce the Due Process Protection Act and to compel the production of *Brady* and *Giglio* evidence. To protect Mr. Blackman's constitutional rights to due process and a fair trial, Mr. Blackman moves for an order to compel the government to (1) identify and (2) disclose all exculpatory and impeaching materials in its possession sufficiently in advance of trial.

Respectfully submitted this 14th day of February, 2025.

Respectfully Submitted,
*/s/Richard C. Klugh, Esq.*
Richard C. Klugh, Esq.
FL Bar No. 305294
KLUGH WILSON, LLC
40 N.W. 3rd Street, PH-1
Miami, Florida  33128
Tel. (305) 536-1191
Fax (305) 536-2170
E-mail:  Rklugh@Klughlaw.com

*/s/ Brian T. Rafferty*
BRIAN T. RAFFERTY
Georgia Bar No. 311903
RAFFERTY LAW, LLC
1575 Johnson Road NE
Atlanta, Georgia 30306
(912) 658-0912
brian@raffertylawfirm.com

Counsel for Defendant Brett Blackman