**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CR-20271-DSL**

**UNITED STATES OF AMERICA**

**v.**

**BRETT BLACKMAN and**
**GARY COX,**

     **Defendants**.

_____/

**GOVERNMENT'S OPPOSITION TO DEFENSE MOTIONS *IN LIMINE***

  The United States respectfully opposes the following motions for *in limine* rulings on evidentiary issues and for discovery filed by Defendants Brett Blackman and Gary Cox:

1) Defendant Blackman's motion for a bill of particulars [D.E. 161];

2) Defendant Blackman's motion for *Brady* evidence and to enforce the Due Process Protection Act [D.E. 160];

3) Defendant Blackman's motion *in limine* regarding various evidentiary issues [D.E. 162]; and

4) Defendant Blackman's motion for a *James* hearing regarding coconspirator statements [D.E. 163].

Defendant Cox joined in each of these motions. [D.E. 164, 165, 166, and 169.] For the following reasons, the Court should deny these motions.

**PROCEDURAL BACKGROUND**

  On June 27, 2023, a federal grand jury returned a three-count Indictment against the Defendants [D.E. 1]. On February 20, 2024, a federal grand jury returned a six-count Superseding

Indictment against the Defendants [D.E. 76]. Count 1 of the Superseding Indictment charges the Defendants with a health care fraud and wire fraud conspiracy; Counts 2–4 charge health care fraud; Count 5 charges an illegal health care kickback conspiracy; and Count 6 charges conspiracy to defraud the United States and make false statements. *Id.* The Defendants are scheduled to begin trial on May 5, 2025.

The Government provided extensive discovery detailing the evidence it intends to offer at trial, and any potentially exculpatory or witness impeachment information. Over 11 million records have been produced to the Defendants, including: emails, cell phone images, and computer data obtained through search warrants; Medicare claims data, doctors' orders and other medical records for hundreds of thousands of patients; financial records; material provided by cooperating witnesses; recordings; investigative reports; and documents acquired by the Government in other related matters. The Government produced interview reports from potential trial witnesses including documents shown to the witnesses. In total, the Government produced over 1,200 interview reports. The Government also sought to organize the discovery into searchable formats, including by producing load-ready files when possible so that the Defendants could review the discovery in e-discovery platforms. The Government provided a curated set of all interview reports generated during the investigation to date on the Defendants' request. The Government further indexed all discovery and provided logs with its productions to aid the defense review. Finally, the Government has responded to numerous, specific discovery requests, including requests to search for specific documents and information. In sum, the Government produced organized, extensive, curated, and user-friendly discovery—above-and-beyond its obligations—to aid the Defendants in their trial preparation.

## FACTUAL BACKGROUND

The allegations in the Superseding Indictment against the Defendants involve a complex scheme relating to telemedicine, orthotic braces, pain creams, and health insurance claims for hundreds of thousands of patients. [D.E. 76.] The Defendants operated an internet-based platform called DMERx that was used by dozens of purported telemedicine companies, telemarketing companies, and durable medical equipment ("DME") suppliers. The Defendants programmed the platform to generate false and fraudulent doctors' orders for orthotic braces and prescriptions for creams that the platform's users bought and sold in exchange for kickbacks and bribes and used to bill Medicare and other insurers.

Defendant Gary Cox created PMDRx in approximately 2014 to assist medical professionals in the creation of orders for power mobility chairs, and at times he called it DMERx. DMERx began generating orders for DME braces and later prescriptions for pain creams. In approximately September 2017, HealthSplash, Inc. purchased PMDRx/DMERx. Defendant Blackman was the owner and Chief Executive Officer of HealthSplash, and Cox remained with the company after the acquisition as a board member.

The Defendants recruited numerous coconspirators into their scheme. They solicited owners of telemedicine companies, marketing companies, pharmacies, and DME suppliers to join the DMERx platform so that they could exchange beneficiary information to create prescriptions and doctors' orders for DME in exchange for kickbacks and bribes. For instance, marketing companies solicited Medicare beneficiary information—including Medicare or insurance numbers—using deceptive television advertisements and mailers. Using the DMERx portal, these marketing companies transferred the information to telemedicine companies who paid telemedicine medical professionals to sign orders and prescriptions for medical products

containing the beneficiary information, including Medicare or insurance numbers. The marketing companies paid the telemedicine companies a kickback for the signed orders. After the order was signed by a medical professional, DMERx would transfer the order or prescription containing the beneficiaries' information to a DME supplier or pharmacy that was pre-assigned by the marketing company. The DME supplier or pharmacy would bill Medicare or another federal health care program for the medical products. For arranging each of these kickback transactions, the Defendants charged each of the participants $5 per order or prescription.

The Defendants did not just own and operate DMERx—they were also active participants in generating, selling, and billing Medicare for prescriptions and orders. In fact, the Defendants and their coconspirators orchestrated the fraud from the very beginning. They operated a marketing company called National Center for Pain ("NCP"), which sent deceptive mailers to Medicare beneficiaries indicating that Medicare had determined that the beneficiaries were eligible for a DME brace. Through NCP, they solicited Medicare beneficiaries' information including Medicare and other insurance numbers and sold this information to other marketing companies on the DMERx platform. They sold this information to their coconspirators, including some of the largest users of the DMERx platform, to generate orders for braces and prescriptions for creams, among other things. The Defendants also owned a DME supplier, PME Home Health, that billed Medicare directly for DME orders purchased and signed by medical professionals through DMERx. In addition, the Defendants and their coconspirators directly sold prescriptions for pain creams that were generated through the DMERx portal in exchange for a kickback and bribe from pharmacies.

Altogether this scheme resulted in over $1 billion in fraudulent claims to Medicare for DME and prescription pain creams that were medically unnecessary and whose prescriptions and orders were procured through the payment of kickbacks and bribes. Medicare paid more than $360

million to the various DME suppliers and pharmacies who obtained orders through DMERx as a result of these fraudulent claims.

## THE DEFENDANTS' MOTIONS SHOULD BE DENIED

**I.      The Defendants' Motions for a Bill of Particulars Should be Denied [D.E. 161, 169]**

The Defendants seek a "bill of particulars setting forth the identity of any known, indicted or unindicted coconspirators referenced in the Superseding Indictment." On February 28, 2025, the Government provided the Defendants with a list of individuals for whom the Government intends to offer evidence of coconspirator statements in furtherance of a conspiracy under Federal Rule of Evidence 801(d)(2)(E). Thus, the Defendants' request is moot. To the extent the Defendants seek additional information through these motions, the request should be denied as an inappropriate fishing expedition.

A bill of particulars is intended only "to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (quoting *United States* v. *Cole*, 755 F.2d 748, 760 (11th Cir. 1985)); *see also United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981) ("The purpose of a bill of particulars is to inform the defendant of the charge in sufficient detail to enable adequate defense preparation and to minimize surprise at trial.").

"A defendant's constitutional right to know the offense with which he is charged must be distinguished from the defendant's need to know the evidentiary details establishing the facts of such offense which may be satisfied by a bill of particulars." *United States v. Mainieri*, 691 F. Supp. 1394, 1396 (S.D. Fla. 1988). A defendant may not "seek a bill of particulars as a tool for procuring generalized discovery, information that is available from other sources, or a

comprehensive preview of the Government's trial proof or theories." *United States v. Fla. W. Int'l Airways, Inc.*, No. 10-20864-CR, 2011 U.S. Dist. LEXIS 156009, at *3 (S.D. Fla. Sept. 13, 2011) (citing *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986)); *see also Colson*, 662 F.2d at 1391; *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980); *United States v. Kilrain*, 566 F.2d 979, 985 (5th Cir. 1978); *Elso v. United States*, No. 07-21313, 2010 U.S. Dist. LEXIS 144563, at *84 (S.D. Fla. Dec. 17, 2010) (a bill of particulars may not be used "to determine in advance the government's proof"). "Full discovery also obviates the need for a bill of particulars." *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979). It is inappropriate to request a bill of particulars identifying unindicted coconspirators. *Colson*, 662 F.2d at 1391 (affirming denial of motion for bill of particulars seeking "the identity of unindicted coconspirators and the dates and locations of conduct in furtherance of the alleged conspiracy"); *see also United States v. Scrushy*, No. CR-03-BE-530-S, 2004 U.S. Dist. LEXIS 30219, at *25 (N.D. Ala. Mar.3, 2004) (denying bill of particulars to identify coconspirators where request sought "mere discovery, not facts essential to an element of the charged offense missing from the indictment").

To the extent the Defendants seek only the identities of the coconspirators for whom the Government intends to offer statements under Rule 801(d)(2)(E), their motions should be denied as moot because the Government provided the Defendants with a list of those coconspirators today. Moreover, for the coconspirators who were interviewed by law enforcement, the Government provided the Defendants with interview reports that detail statements they provided. As to other coconspirators who were not interviewed, the Government provided searchable emails and other documents that contain these conspirators' statements which the Government may offer as Rule 801(d)(2)(E) statements. No rule requires the Government to curate this evidence and provide the Defendants with an advanced, play-by-play account of its expected evidence and trial strategy.

Accordingly, the Defendants' motions for a bill of particulars should be denied [D.E. 161, 169].

## II.     The Defendants' Motions to Enforce the Due Process Protections Act Should be Denied [D.E. 160 and 165]

The Defendants present the Court with a list of nine requests they characterize as "*Brady*" and a series of other requests regarding two potential witnesses. The requests, which largely ask the Government to identify among the discovery specific subsets of information for the Defendants, should be denied.

"There is no general constitutional right to discovery in a criminal case, and *Brady [v. Maryland]* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also United States v. Allen*, 416 Fed. Appx. 875, 879 (11th Cir. 2011) ("The *Brady* rule is not an evidentiary rule that grants broad discovery powers to a defendant.") (internal quotations and citations omitted). When the Government meets or exceeds its disclosure obligations, a defendant has no cause to complain about the volume of the United States' production. *United States v. Jordan*, 316 F.3d 1215, 1253 (11th Cir. 2003).

Similarly, "[n]othing in [Federal] Rule [of Criminal Procedure] 16(a)(1)(e) requires the Government to identify the various subsets of evidence it produces pursuant to that rule." *United States v. Perraud*, No. 09-60129, 2009 U.S. Dist. LEXIS 123150, at *29-30 (S.D. Fla. Dec. 24, 2009) (denying motion requiring "the United States to identify expressly the evidence that the Government intends to use in its case in chief and the evidence that is material to preparing the defense"); *see also Scrushy*, 2004 U.S. Dist. LEXIS 30219, at *7 ("Rule 16(a)(1)(E)(ii) does not require the Government to specify from among the universe of discovery documents produced to defendant which of those documents it intends to rely upon at trial.").

The Jencks Act, 18 U.S.C. § 3500, also "does not authorize fishing expeditions," and the

defendant bears the burden of establishing the existence of specific "statements" within the meaning of the Jencks Act before the Court may order their production. *United States v. Delgado*, 56 F.3d 1357, 1364 (11th Cir. 1995) (citing *United States v. Graves*, 428 F.2d 196, 199 (5th Cir. 1970)). Moreover, the Jencks Act does not require the Government to produce witness statements until after the witness has testified on direct examination. Furthermore, impeachment material subject to *Giglio* must be disclosed "in sufficient time to permit the defendant to make effective use of that material at trial." *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993); *see also United States v. Martinez*, 941 F.2d 295, 301 (5th Cir. 1991) ("[A] *Giglio* violation does not occur when the matter was disclosed to the defense before the end of the trial.").

The Defendants issued a generalized complaint that the Government has "turned over haystacks of material in discovery and encouraged the defense to find the exculpatory needles." [D.E. 160 at 4.] However, "*Brady* and its progeny permit the government to make information within its control available for inspection by the defense and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed." *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005), as amended (Mar. 8, 2005). The Defendants' reliance on *United States v. Skilling* is unavailing. In *Skilling*, the defendant contended that the Government's discovery practice, which he described as an "open file" of several hundred million pages of documents, "resulted in the effective concealment of a huge quantity of exculpatory evidence." 554 F.3d 529, 576 (5th Cir. 2009), *aff'd in part and reversed in part on other grounds,* 561 U.S. 358 (2010). Skilling argued that the Government "suppressed evidence in violation of *Brady*" because it "never directed Skilling to a single *Brady* document contained in the open file." *Id*. In rejecting the defendant's claim, the Fifth Circuit observed that "[a]s a general rule, the government is under no duty to direct a defendant to

8

exculpatory evidence within a larger mass of disclosed evidence." *Id*. (citing cases). The Court also held that "where potentially exculpatory information is available to the defendant through an exercise of due diligence, there is no suppression for the purposes of *Brady*." *Id*.

Similarly, the Court in *Warshak* rejected a claim that the Government "shrugged off its obligations under *Brady* by simply handing over millions of pages of evidence and forcing the defense to find any exculpatory information contained therein." *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010) (the electronic evidence produced to the defense filled three "tera-drives" spanning 17 million pages). Any argument that the Government is "obliged to sift fastidiously through the evidence . . . in an attempt to locate anything favorable to the defense," comes up "empty." *Id.*; *see also Rhoades v. Henry*, 638 F.3d 1027, 1039 (9th Cir. 2011) ("Rhoades points to no authority requiring the prosecution to single out a particular segment of a videotape [produced in discovery], and we decline to impose one."). Thus, the Court should reject any claim that the Government has not complied with its discovery obligations because of the volume of the discovery in this matter.

The Government will address each of the Defendants' requests individually and acknowledges that it is aware of, and has complied with, its discovery obligations under the Rules of Criminal Procedure, *Brady*, *Giglio*, and their progeny.

### A.    Copies of Presentence Investigative Reports and Pretrial Services Reports for Witnesses

The Defendants' request for presentence investigative reports ("PSRs") and Pretrial Services reports should be denied.

First, PSRs are not considered within the Government's (*i.e.*, prosecution team's) possession. *See United States v. Brazel*, 102 F3d. 1120, 1150 (11th Cir. 1997) ("Within the possession, custody, or control of the government does not include possession of a federal court

or probation officer.") (citation omitted); *United States v. Trevino*, 556 F.2d 1265, 1270-71 (5th Cir. 1977) (holding that a PSR generally is not considered to be in the government's possession for purposes of *Brady* material); *United States v. Perez-Lopez*, 262 Fed. Appx. 974, 982 (11th Cir. 2008) (upholding a district court's ruling that a defendant could not use a PSR to impeach a witness because it was sealed and the witness did not sign anything agreeing to its accuracy); *see also United States v. Gomez*, 323 F.3d 1305, 1307 (11th Cir. 2003) (noting that control over documents like PSRs is a discretionary matter with the district court). The Government is aware of its obligations under *Brady* and *Giglio* and has begun the process of unsealing and producing information related to sentencing to the extent it is in the Government's possession and control, and to the extent the information is discoverable.

Second, the Government is not in possession and control of the bulk of the Pretrial Services reports that the Defendants request. As the Court knows, the standard practice is for Pretrial Services to ask for the return of their reports. The Government will review any Pretrial Services reports in its possession for discoverable information and timely produce it to the Defendants.

**B. Statements of Cooperating Witnesses**

The Defendants request statements "tending to show the cooperator was not aware of any scheme to defraud, did not believe there was such a scheme, believed that the cooperator's conduct was legal, and/or believed that the relationship between the cooperator and HealthSplash, DMERX, or Brett Blackman was legitimate." The Government's practice is to document substantive statements of a potential witness in interview reports and provide those reports to the Defendants. To date, the Government has provided over 1,200 interview reports containing statements of potential witnesses in this case. The Government also provided email communications between Government attorneys and cooperators' attorneys, when appropriate, to

produce discoverable information. The Defendants have not indicated that they believe there are undisclosed statements of witnesses that are discoverable, and the Government is not aware of any. Thus, the motion should be denied. *See Delgado*, 56 F.3d at 1364.

### C.  Statements of Attorneys for Cooperating Witnesses

The Defendants seek statements of cooperating witnesses' attorneys defending cooperators' conduct, suggesting that the conduct was legal, or changing the cooperators' versions of events. Essentially, the Defendants seek statements made during the negotiation of plea agreements, but they provide no authority for this request and overreach the bounds of *Brady* and *Giglio*. Thus, these requests should be denied.[1] *See, e.g., United States v. Miller*, 250 F.R.D. 588, 593 (D. Kan. 2008) (denying request for draft agreements and holding that the defendants were entitled only to final plea agreements, proffer letters, and immunity agreements).

Plea discussions between prosecutors and defense attorneys are by their nature part of a negotiation process that cannot be deemed statements of a cooperating witness. *See, e.g., United States v. Singhal*, 876 F. Supp. 2d 82, 104 (D.D.C. 2012) ("[T]he Court also denies Singhal's Motion to compel the government to produce all documents reflecting the government's communications with [the cooperating witness's] attorneys, as this information is not material to the defense's preparation of its case under Rule 16."); *United States v. Buske*, 2011 WL 2912707 at *4 (E.D. Wis. July 18, 2011) ("[D]isclosure of communications regarding 'the negotiation process' by which any immunity or leniency agreements were reached would be unnecessary so long as the final agreements between [the witnesses] and the government were fully and accurately

---

[1] The Defendants' citation to *United States v. Triumph Capital Grp., Inc.* misses the mark. 544 F.3d 149, 161–62 (2d Cir. 2008) (concluding failure to disclose agent's proffer notes constituted *Brady* violation because proffer notes were "materially different" from the description of the proffer in the disclosed FBI report and there was "reasonable probability" that disclosure might have given the jury reasonable doubt as to defendant's culpability). Here, the Government has voluntarily produced and disclosed all known agent notes.

reflected in the plea agreements and proffer letters defendant already had. Preliminary versions of such agreements may confuse more than enlighten[.]"). The statements made by defense attorneys during plea negotiations are preliminary in nature and may differ from what the cooperating witness truly believed or said, and thus they cannot be said to be statements of the witness, *Brady*, or *Giglio*. *See United States v. Vorley*, 1:18-cr-35 (N.D. Ill. Sept. 5, 2020), ECF No. 305 (granting United States' request that draft settlement communications between counsel, including draft plea agreements, are not discoverable and noting that "draft plea agreements are not statements of the defendant"); *cf. United States v. Thomas*, 97 F.3d 1499, 1502 (D.C. Cir. 1996) ("[T]he author may reserve judgment about his draft until he reviews it in final, signifying his approval only when he affixes his signature to the completed document. If so, only the final document qualifies as a statement under § 3500(e)(1)." (internal citation omitted)).

Furthermore, as a policy matter, courts have recognized that "requiring production of the substance of such communications with counsel, and/or draft agreements, could have a chilling effect on plea negotiations." *United States v. Weaver*, 992 F. Supp. 2d 152, 158 (E.D.N.Y. 2014) (denying defense motion to compel production of "the oral and written inducements, correspondence, negotiations, and proffers—both with the witnesses and the witness's counsel— that resulted in the witness's ultimate cooperation, as well as any changes in the witness's story along the way," and holding that "[i]n the unlikely event that there is unanticipated testimony at trial from a cooperating witness that is somehow inconsistent with plea negotiation material, the government will produce the inconsistent statement then").

Because attorney plea negotiations cannot be said to be *Brady*, *Giglio,* or Jencks Act statements, they are not discoverable. Furthermore, the Government is not aware of attorney proffers of the kind the Defendants seek in their motions. For these reasons, the Defendants'

12

request for attorneys' statements should be denied.

### D.  Various Requests for Exculpatory Evidence

The Defendants request several categories of evidence that are arguably relevant to the charges in the Superseding Indictment and any potential defenses. [*See* D.E. 160 at 7-11.] The Government is aware of its discovery obligations under the Federal Rules of Criminal Procedure, *Brady*, *Giglio*, and their progeny, and it has complied with these obligations. The Government produced the requested materials to the extent they are in its possession, and it is not obligated to curate materials for the defense. *See, e.g., Pelullo*, 399 F.3d 212 (holding government not obligated to "ferret out" exculpatory materials). The Government also notes that although it is not obligated to do so, it has taken extensive efforts to respond to the Defendants' questions regarding discovery and, as noted above, has organized the discovery in a searchable, user-friendly way.

For instance, the Government provided voluminous materials that would be responsive to the Defendants' request for "[a]ny and all compliance policies, training policies, compliance committee meeting minutes, board meeting minutes, or other internal documents from HealthSplash or DMERX concerning: enforcement of medical necessity requirements; improving or enhancing compliance practices at Healthplash (sic) or DMERX; interactions between and among HealthSplash or DMERX compliance personnel and HealthSplash or DMERX clients concerning compliance; or any other document from HealthSplash or DMERX about the importance of legal compliance." Running a simple search through the discovery materials for documents responsive to "DMERX compliance personnel" resulted in 247 documents including a June 19, 2017, email from Defendant Cox noting in part "Compliance and integrity of the assessment and documentation process for DME items is a top priority for DMERX." [HEALTHSPLASH-DOJ8-0000510162.] The Government also produced a November 5, 2016,

email from Defendant Cox in which he states, in part, "[i]t is our goal to assure compliance at every level of the prescribing process in order to minimize audit issues." [HEALTHSPLASH-DOJ8-0000510084.] The Government produced numerous copies of a third document, a prospective investor presentation, that describes various HealthSplash executives' roles and noted that over "the last eight years, Brett [Blackman] has shifted his attention to the healthcare industry. He successfully expanded medical compliance documentation technology company, PMDRX, into DMERX to expand compliance offers." [GOOG-HEALTHSPLASH-0000062528.] Thus, to the extent the Defendants believe that discussions about compliance may be exculpatory, the Government has produced this information in volumes.

The Defendants also seek information regarding whether the "operation of HealthSplash, DMERX, PME Home Health, and National Center for Pain, have been reviewed or approved by lawyers." [D.E. 160 at 10.] The Defendants are aware that at least two attorneys were involved in HealthSplash's operations because the Government and the Defendants have been negotiating waivers so that the Government may interview these attorneys, which the Government has invited defense counsel to join. And of course, the Government produced voluminous communications involving attorneys including an October 31, 2017, email from Defendant Cox copying Defendant Blackman with the subject line "FW: DMERX – Compliance Concerns.DOCX" in which Cox discussed an attorney's comments on a document related to the non-compliance of one of the telemedicine companies on DMERx. [GOOG-HEALTHSPLASH-0000000190.] The Government also produced a letter from an attorney to Defendant Blackman on January 29, 2018, with the subject "Opinion Letter" in which the attorney discusses the details of HealthSplash's operations and seeks a written list of facts from Blackman. [GOOG-HEALTHSPLASH-0000001059.] Thus, to the extent attorney review of DMERx and HealthSplash operations are exculpatory, the

Government has produced this information.

These are but a few examples of the volumes of discovery responsive to the Defendants' instant requests. The Defendants do not provide any support for their belief that the Government has not produced any of the requested evidence. They also do not point to any additional sources of information they think may not have been searched or reviewed. Thus, the Defendants' failures to point to any information that is missing from the discovery is sufficient to deny these requests.

### E.  Information Regarding Keaton Langston

The Defendants request additional information regarding Mr. Langston, but Defendant Blackman notes in his submission that the Government responded to his request for information as to Mr. Langston. The Government is aware of its obligations under the Federal Rules of Criminal Procedure, *Brady*, *Giglio*, and their progeny, and has complied with these obligations and will continue to do so. The Defendants have pointed to no deficiency in the discovery regarding Mr. Langston.[2] To the extent the Government comes into possession of discoverable information regarding Mr. Langston, it will produce it to the Defendants expeditiously. The requests regarding Mr. Langston should be denied as moot.

### F.  Information Regarding Herb Kimble

The Defendants seek extensive discovery regarding Herb Kimble—a coconspirator involved in the scheme—despite the fact that the Government has stated it does not intend to call him to testify at trial. If the Government introduces certain of Kimble's statements under Federal Rule of Evidence 801(d)(2)(E), the Defendants state they may impeach his statements under Federal Rule of Evidence 806.

---

[2] Defendant Blackman references an alleged bail violation regarding Mr. Langston. As noted above, the Government is generally not in possession of Pretrial Services reports, however the Government has requested information from the prosecution team that charged Mr. Langston regarding any alleged bail violations and will produce any discoverable information when it comes into the Government's possession.

Without specifying how the information might be used under Rule 806, the Defendants make eight requests for Kimble information:

1) Any and all communications between the Government and counsel for Mr. Kimble that led to the plea agreement reached on his behalf;

2) Any and all communications between the Government and counsel for Mr. Kimble concerning his repeated failure to appear at sentencing;

3) Any and all communications between the Government and counsel for Mr. Kimble concerning revising or terminating his plea agreement;

4) Any and all communications between Mr. Kimble or his lawyers and the Government concerning efforts to conduct covert recordings of Mr. Blackman. If no such efforts to record Mr. Blackman occurred during Mr. Kimble's proactive cooperation, counsel for Mr. Blackman requests that the Government disclose that in response to this Motion.

5) Any and all communications between Mr. Kimble or his lawyers and the Government in January and February 2019 about payments made to HealthSplash. If there were no such communications, counsel for Mr. Blackman requests that the government disclose that in response to this Motion.

6) Provide a copy of any agreement, email or document, granting Mr. Kimble illegal activity authority during the covert part of Mr. Kimble's cooperation.

7) Provide a copy of any reports detailing the specific illegal activity approved and authorized by law enforcement during the covert part of Mr. Kimble's cooperation.

8) Provide a copy of any report detailing any unauthorized illegal activity during the covert part of Mr. Kimble's cooperation.

Rule 806 is not a blank check for impeachment, however, and the Defendants' motions should be denied to the extent they seek information that may not be used to impeach Kimble and is not otherwise discoverable.

Rule 806 has been recognized by the Eleventh Circuit to permit the introduction of a declarant's prior statements when those statements are *squarely inconsistent* with a statement of the declarant that the Government offered into evidence. For example, in *Grant*, the Eleventh

Circuit agreed that an affidavit from the declarant stating in part that he had lied to undercover agents was admissible when that lie concerned some of the very same statements that the Government elicited through the agent at trial. *United States v. Grant*, 256 F.3d 1146, 1153 (11th Cir. 2001) ("If Wilson [declarant] had been called as a witness and testified, for example, that he was taking the cocaine he was buying to his partner to test and evaluate it, his affidavit statements indicating that he had lied to the agents when he told them he had a partner would surely be admissible."). In short, "[t]he test is whether the out-of-court statement would have been admissible for impeachment purposes had the coconspirator statements been delivered from the witness stand by the coconspirator himself, not as hearsay about what he said during the conspiracy . . . . " *Id.* at 1154.

Rule 806 does not grant an unfettered license to conduct a mini-trial regarding the declarant or to convert a trial about a defendant's conduct into a trial about the declarant. The Eleventh Circuit has recognized obvious and common-sense limits to the impeachment that may be offered under Rule 806. *See United States v. Rodriguez*, 259 F. App'x 270, 274 (11th Cir. 2007) (excluding "post-indictment, conclusory, self-serving statements made in anticipation of litigation, when the affiants had significant incentive to make false exculpatory statements").

Furthermore, evidence offered under Rule 806 must be offered only for impeachment purposes or, once the declarant's credibility has been attacked, to support the declarant's credibility. In other words, the statement offered under Rule 806 "must be inconsistent with the statement already in evidence." *Rodriguez,* 259 F. App'x at 274; *see also Grant*, 256 F.3d. at 1156 ("Rule 806 [makes] . . . statements admissible for impeachment purposes, and the point of admitting inconsistent statements to impeach is not to show that they are true, but to aid the jury in deciding whether the witness is credible . . . . "). Thus, the Rule does not permit the defense to

17

launder in otherwise irrelevant or inadmissible evidence in support of their theory of the case or their case-in-chief. *Grant*, 256 F.3d at 1155 ("The evidence of the affidavit statements could do no more than impeach and could not provide a complete defense if the government requested the limiting instruction to which it would have been entitled."). Similarly, Rule 806 applies only if hearsay statements or statements admissible under Rule 801(d)(2)(C), (D), or (E) are introduced. It does not apply merely because evidence about a non-testifying coconspirator is introduced. *See United States v. Watson*, 611 F. App'x 647, 660 (11th Cir. 2015) ("Because no hearsay statement . . . was admitted in evidence, Rule 806 did not allow [the defendant] to attack the credibility of [the declarant] . . . .").

Finally, even if evidence may be admissible under Rule 806, the Court must still weigh the prejudice of such evidence, if any, against its probative value. The Court may properly exclude Rule 806 evidence if its probative value is substantially outweighed by the danger of unfair prejudice under Rule 403. *See Rodriguez*, 259 F. App'x at 275 ("Under the Federal Rules of Evidence, all evidence is subject to the probative-prejudicial balancing test of Rule 403.") (upholding district court's decision to exclude Rule 806 evidence under Rule 403).

The Government has provided substantial discovery regarding Herb Kimble, including reports of all his interviews and investigative activity. The Defendants are now requesting statements from his attorneys, from investigators, and from prosecutors—in fact only requests 4 and 5 refer to any statements by Kimble, and none of those statements can be used under Rule 806. Request 4 seeks communications among Kimble, his attorneys, and the Government regarding alleged covert recordings. The Government notes it possesses no audio recordings of the Defendants. In any event, the Defendants do not explain how these statements might in any way impeach statements made by Kimble in furtherance of a conspiracy with the Defendants. Similarly,

request 5 seeks communications among Kimble, his lawyers, and Government attorneys regarding payments made to HealthSplash in January and February 2019. It is not clear how any of these statements might impeach statements made by Kimble in furtherance of the conspiracy. The Government will not offer statements of Kimble regarding the payments made by Kimble's marketing company to HealthSplash in 2019 under Rule 801(d)(2)(E). Thus, any statements Kimble made regarding these payments may not be used for impeachment purposes.

For these reasons, the Court should deny the Defendants' requests for discovery regarding Herb Kimble.

### III.   Defendants' Motion *in Limine* Should be Denied [D.E. 162]

The Defendants move (1) to exclude questions speculating about Defendant Blackman's knowledge [D.E. 162 at 3-4]; (2) to exclude testimony about Defendant Blackman's character [D.E. 162 at 4-5]; and (3) to permit impeachment of coconspirators pursuant to Federal Rule of Evidence 806 [D.E. 162 at 5-6].

### A.  Certain Questions about Blackman's Knowledge are Permissible

The Defendants provide no support for the sweeping assertion that "the government should be barred from asking witnesses questions directly about whether Mr. Blackman knew certain things." (DE 162 at 3). The Defendants also argue that witnesses should not be permitted to testify that they believe the Defendants committed fraud because this calls for an opinion as to the "ultimate question." The motion incorrectly assumes that the Government will ask impermissible questions during trial based on questions asked during interviews. The Government is aware of the rules of evidence and will not seek to elicit improper testimony, including asking witnesses to speculate what may have been in the Defendants' minds. However, as Defendant Blackman notes, knowledge and intent are critical issues in any fraud case. Moreover, the rules of evidence

19

specifically allow for lay witnesses to state an opinion as to the "ultimate issue." Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). Therefore, the Government may elicit testimony and offer evidence that demonstrates directly and circumstantially the Defendants' knowledge, including through documents the Defendants were in positions to know about, documents reviewed by the witness, emails, and testimony about witness's communications with and observations of the Defendants. It is not speculation for a witness to draw a conclusion based on interactions and communications with the Defendants, or what others have conveyed to them about the Defendants. This is true even if the witness draws a conclusion or an opinion that the Defendants engaged in a fraud or a scam. *See United States v. Hoffecker*, 530 F.3d 137, 171 (3d Cir. 2008) (court did not abuse discretion in allowing lay opinion that defendant engaged in a "scam"). The Defendants' motion should be denied.

## B.  The Government May Rebut Character Evidence Offered by the Defendants

The Defendants again provide no legal support for the contention that Government witnesses' testimony about Defendant Blackman's character or what a witness learned about Defendant Blackman's reputation are impermissible. [D.E. 162 at 4-5.] The Government recognizes there are limited circumstances in which character evidence is admissible and does not intend to seek to introduce improper evidence of the Defendants' character. However, if either Defendant places his character in issue, either through cross-examination or through his own witnesses should he choose to present them, the Government may rebut that evidence. *See United States v. Mill*s, 704 F.2d 1553, 1563 (11th Cir. 1983). Additionally, Defendant incorrectly argues that witnesses cannot offer "legal conclusions or opinions that Mr. Blackman engaged in intentional fraud." [D.E. 162 at 4.] As noted above, Federal Rule of Evidence 704(a) provides that an opinion is proper even when it "embraces an ultimate issue." *See also United States v. Sotis*, 89

F.4th 862, 876 (11th Cir. 2023). Therefore, Government witnesses can testify to their communications, observations, and conclusions based on those observations. The Defendants' motion should be denied.

### C.  The Defendants' Ability to Impeach Through Rule 806 Must Be Properly Based

The Defendants state that should the Court allow statements of coconspirators pursuant to Fed. R. Evid. 801(d)(2)(E), the Defendants "intend[] to impeach those declarants, whether they testify at trial or not, pursuant to Fed. R. Evid. 806." [D.E. 162 at 5.] The Government has addressed this above at section II.F and reasserts here that without more than the general reservation by defense, the Government can only set out the parameters in which such impeachment material would be permissible. Here, the Defendants do not assert the method in which they would seek to impeach. The Government moves to preclude the improper use of Rule 806 to launder in inadmissible hearsay for substantive purposes. For example, agent notes or communications are typically not statements of the declarant and do not necessarily constitute prior inconsistent statements of the declarant. Likewise, recordings of the declarant may or may not constitute proper impeachment of the declarant. As in *Rodriguez*, any such recordings or prior statements must be statements that are inconsistent with the statement already in evidence, not merely self-serving hearsay that supports the Defendants' substantive case. The Government respectfully requests that the Defendants be ordered to produce any recordings or transcripts[3] on which they intend to rely, including for impeachment purposes and/or under Rule 806. The Government further requests that the Defendants be precluded from improperly using Rule 806 to admit irrelevant, prejudicial evidence or inadmissible hearsay.

---

[3] The Court's pretrial scheduling order [D.E. 130] requires that counsel exchange proposed transcripts no later than one week before the Final Pretrial Conference.

IV.     **Defendants' Motion for a *James* Hearing Should be Denied [D.E. 163]**

The Defendants request that this Court conduct a separate pre-trial hearing to consider the evidentiary foundation for each statement of coconspirators that may be offered at trial. As the Defendants acknowledge, under the law in the Eleventh Circuit, such a hearing is unnecessary.[4] Here it is not only not required but would be burdensome. A pre-trial hearing to consider the foundation for every coconspirator statement is likely to become a mini-trial and unnecessarily prolong pre-trial litigation. The Government has already provided a list of potential cooperating witnesses on August 23, 2024, along with an index to their interview reports and related materials with a bespoke production for the ease of counsel (Production 34, November 13, 2024). Prior to filing this response, the Government produced a list of coconspirators to assist the defense in preparation for trial. There will be ample opportunity for the Court to resolve any objections to admissibility of evidence—should there be any—and to safeguard the Defendants' right to a fair trial during the ordinary course of the trial. Therefore, the Defendants' motion should be denied.

A.     **Legal Standard**

Statements that would otherwise be hearsay are admissible if they are made by a coconspirator of a party during the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). The Rule does not provide an exception to the rule against hearsay; rather, statements of coconspirators are not hearsay where the Government establishes, by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy. *United States v. James*, 590 F.2d 575 (5th Cir. 1979) *cert. denied,* 442 U.S. 917,

---

[4] The Defendants' proposed "compromise" requiring the Government to identify all coconspirator statements 45 days before trial is not practical nor required for the reasons set forth herein.

(1979), *overruled in part by Bourjaily v. United States,* 483 U.S. 171, (1987); *United States v. Magluta*, 418 F.3d 1166, 1177-78 (11th Cir. 2005); *United States v. Miles*, 290 F.3d 1341 (11th Cir. 2002); *United States v. Castleberry*, 116 F.3d 1384 (11th Cir. 1997); *United States v. Sanchez*, 722 F.2d 1501, 1508 (11th Cir. 1984) (quoting *James*, 590 F.2d at 58). The rule expressly permits the Court to consider the coconspirator statements themselves, along with independent outside evidence, to determine whether a conspiracy existed. *Bourjaily*, 483 U.S. 171 (1987); *United States v. Byrom*, 910 F. 2d 725 (11th Cir. 1990).

The Supreme Court has recognized the relevance and weight that statements of coconspirators provide to the factfinder. "Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court." *United States v. Inadi*, 475 U.S. 387, 106 S. Ct. 1121, 1126 (1986). The Eleventh Circuit applies a liberal standard in determining whether a statement is made in furtherance of a conspiracy. *United States v. Bazemore*, 41 F.3d 1431 (11th Cir. 1994); *United States v. Thompson*, 976 F.2d 666 (11th Cir. 1992). Also, the Eleventh Circuit favors admission of coconspirator declarations where the Government assures the Court that the statement will be connected to a conspiracy later in the trial. *United States v. Wenxia Man,* 891 F.3d 1253, 1271-72 (11th Cir. 2018); *United States v. Hasner*, 340 F.3d 1261, 1275 (11th Cir. 2003).

A pre-trial determination of the admissibility of coconspirator statements is not required in the Eleventh Circuit. *United States v. Holland*, 117 F.4th 1352, 1360 (11th Cir. 2024) ("nothing in *James* contemplates a pretrial hearing to assess whether an out-of-court declarant or party is guilty of a crime"); *see also United States v. Cross*, 928 F.2d 1030, 1052, n.71 (11th Cir. 1991) (rejecting an argument that the district court should have conducted a hearing prior to the

introduction of a  coconspirator statements at trial); *United States v. Khoury*, 901 F.2d 948, 971 (11th Cir. 1990) (noting that holding a pre-trial *James* hearing is not necessary); *Sanchez*, 722 F.2d at 1508 ("A separate *James* hearing prior to the presentation of the government's case in chief . . . is not required."); *United States v. Pepe*, 747 F.2d 632 (11th Cir. 1984) (although the district court held a 13-day *James* hearing, a court may decline to hold a *James* hearing if it is impractical); *United States v. Roe*, 670 F.2d 956, 962 (11th Cir. 1983) (rejecting "defendants' argument that the district court's failure to conduct a hearing outside the presence of the jury before admitting the challenged statements" constituted error); *United States v. Rodriguez*, 694 F.2d 251, 225 (11th Cir. 1982) (holding that "the trial court did not abuse its discretion in denying the [*James*] hearing and admitting the evidence subject to being connected up").

In *Roe*, the Court explained that *James* merely "established the 'preferred order of proof' concerning the admission of coconspirator statements." 670 F.2d at 962. Further, the *Roe* court noted that *James* itself does not indicate that such a hearing is absolutely essential. *Id*. "The *James* court made clear that if the district court concludes that a hearing is not reasonably practical, the district court could admit the statements subject to the government's 'connecting them up' with enough independent evidence by the end of trial." *Id*. (*quoting James*, 590 F.2d at 582).

In *Cross*, the Court explained that "it [is] sufficient that the district court admit[] [the challenged statements] on the government's assurance that they [will] be connected to a conspiracy, and that the court rule[] at the close of the government's case that the evidence [is] admissible." *Cross*, 928 F.2d at 1052, n.71; *see also Sanchez*, 722 F.2d at 1508 (affirming admission of coconspirator statements where court found conditions for criteria were found "[a]t the conclusion of the government's case"); *United States v. Van Hemelryck*, 945 F.2d 1493, 1498

24

("The district court has discretion to admit the statements subject to proof of [admissibility] during the course of trial.").

Moreover, the Court need not make any express findings that a conspiracy existed, and that the statements were made in furtherance of a particular conspiracy. Instead, a court's admission of coconspirator statements under Fed. R. Evid. 801(d)(2)(E) operates as an implicit finding that the criteria for admission of the statement are satisfied. *United States v. Miles*, 290 F.3d 1341, 1352 (11th Cir.2002) (affirming admission of coconspirator statements and finding that the district court "implicitly found that [the declarant's] statement was made in the course of, and in furtherance of, a conspiracy"); *see also Holland*, 117 F.4th at1354 (statements are admissible if "made during and in furtherance of a joint venture that included an opposing party").

The Defendants' request for a *James* hearing is particularly problematic where such a hearing could easily turn into a mini-trial. Especially here, where dozens of individuals participated in the conspiracy, any pre-trial hearing would be lengthy and involve cross-examination of the Government's witnesses. Courts have explicitly denied motions for a *James* hearing to avoid a waste of judicial resources.[5] *See United States v. Patel*, No. 19-cr-80181-RAR (S.D. Fla. Oct. 27, 2022) [D.E. 313] (denying the defendant's motion for a *James* hearing, ruling that the court would make evidentiary decisions on coconspirator statements at trial and noting that such a ruling "will avoid the need for lengthy mini-trials and allow for the efficient presentation of evidence, thereby promoting judicial economy"); *United States v. Carver, et al.*, 22-CR-80022 (S.D. Fla. Nov. 21, 2022) [D.E. 457] (denying the defendants' motion for a *James* hearing and ruling that in a case

---

[5] Consistent with its practice during discovery in this case, the Government will be available to meet and confer with defense counsel regarding any concerns under Rule 801(d)(2)(E) or any other objections to the Government's proposed exhibits or potential testimony. In addition to its witness list provided no later than 3 weeks before trial, the Government intends to notify defense counsel each night during trial of which witnesses it intends to call the following day. This practice will allow the parties time to identify any evidence to which they object before it is offered by the Government.

with a "wide-ranging and complex conspiracy . . . holding a *James* hearing most assuredly would yield a lengthy mini-trial, unnecessarily consuming judicial resources and requiring unnecessary duplication of efforts"); *see also United States v. McGregor,* No. 2:10CR186-MHT, 2011 WL 978794, at *2 (M.D. Ala. Mar. 18, 2011) (denying motion for *James* hearing in complex case with voluminous discovery where the Government explained that "holding a pretrial *James* hearing is no longer the norm in the Eleventh Circuit and that it would be more efficient to admit the statements, subject to their being connected up by the close of the government's evidence"); *United States v. Savage*, No. CRIM.A. 07-550-03, 2012 WL 5866068, at *4 (E.D. Pa. Nov. 20, 2012) (noting how "conducting *James* hearings in complex conspiracy cases is not the preferred practice since there is a concern that hearings will result in 'mini-trials'"); *United States v. Cheatham,* 500 F. Supp. 2d 528, 537 (W.D. Pa. 2007) (denying the defendant's request for a *James* hearing because hearing in "complex eight person conspiracy and a seventeen count indictment" would have "most certainly" turned into a "mini-trial.").

## B. A Pre-Trial *James* Hearing is Unnecessary and Would Likely Become a Lengthy Mini-Trial, Wasting Judicial Resources

As an initial matter, the Government understands the Federal Rules of Evidence,  including the necessary foundation to admit coconspirator statements under Rule 801(d)(2)(E), and will act in good faith to offer statements supported by the necessary foundation or those that can be admitted conditionally. In this case, the Defendants have been on notice since the original indictment was returned—nearly two years ago—about the details of the alleged conspiracies. As set forth above, the Government produced voluminous materials in compliance with its discovery obligations in no fewer than 36 separate discovery productions since August 4, 2023. Early production of witness

interview reports began on August 8, 2023.[6]

On February 28, 2025, the Government produced in correspondence to defense counsel a list of potential coconspirators. It also produced a preliminary cooperating witness list on August 23, 2024. Although it was not obligated to do so, the early production of this material is intended to assist the defense in preparing for trial and avoid surprise. Therefore, in receipt of the unusual and early production of interview reports, *Jencks* materials, and lists of coconspirators and trial witnesses, defense counsel are able to focus their review of the interview reports and discovery materials pertaining to those coconspirators on the witness list. More importantly, there have been more than a dozen cooperating defendants who have pleaded guilty in connection with their participation in the conspiracies alleged in the Superseding Indictment. Thus, defense counsel are able to focus their pre-trial preparation on these cooperating defendants to ascertain the existence of any coconspirator declarations. The Government has responded to multiple *ad ho*c inquiries from defense counsel related to the cooperating witnesses, which demonstrates that the early identification and production is enabling the defense to prepare.

The Government anticipates that the first cooperating defendant who testifies at trial will be able to describe the overall conspiracy to defraud Medicare and the scheme to pay and receive bribes and kickbacks, describe Defendants' roles in the conspiracy, and identify many of the coconspirators. This testimony, followed by testimony of other cooperating defendants, will establish the existence of the conspiracy early in the trial and facilitate the Court's consideration of the necessary foundation to admit coconspirator statements. Then, it will be easy for the Court and counsel to see that the coconspirator statements being introduced are in furtherance of that conspiracy.

---

[6] The Government is preparing for trial and meeting with witnesses. The Government expects to generate additional interview reports as part of this process, which will be disclosed to the Defendants promptly.

The Government anticipates that the coconspirator statements to be admitted at trial will consist of documents and oral statements. The documents will take the form of emails and other documents that have been produced to the Defendants in discovery and will be identified on the Government's exhibit list prior to trial.[7] Oral coconspirator statements may include, for example: discussions with the Defendants about how DMERx was established; discussions about compliance concerns and how they were handled; communications with DME suppliers and marketers about how DMERX worked and the benefits to using the platform; pitches to potential investors about HealthSplash 2.0 (or SplashRx); discussions among DMERx officers and employees, marketers, and telemedicine personnel concerning their activities and payments of bribes and kickbacks in furtherance of the conspiracy; and discussions among coconspirators about how to manage problems and their efforts to conceal their fraudulent activities or launder the proceeds. Therefore, it is easy to see that oral statements in these general categories were made in furtherance of the conspiracy.

As such, this Court should deny the Defendants' motion for a pre-trial *James* hearing and rule on the admissibility of coconspirator statements at trial. Many courts take this reasonable and resource-saving approach. *See United States v. Tyson*, No. CR 315-013, 2016 WL 1180202, *1 (S.D. Ga. March 25, 2016) (denying the motion for a pre-trial *James* hearing and explaining that "[a]s the need for a *James* hearing is lessened in light of [*Bourjaily v. United States*, 483 U.S. 171, 181 (1987)], and in the interest of judicial economy" the determination of the admissibility of coconspirator statements will be made at trial); *United States v. Cox*, 2007 WL 1173059, No. 5:07-CR-09 (WDO), at *1 (M.D. Ga. April 18, 2017)

---

[7] Pursuant to the Court's Pretrial Scheduling Order [D.E. 130], the parties are to file proposed witness and exhibit lists no later than one week before the Final Pretrial Conference. Based on the current schedule, that deadline is April 11, 2025, three weeks before trial.

(ruling "[t]he Court will decline to hold a pretrial *James* hearing but will instead await the presentation of the Government's evidence at trial and determine then whether the Government has 'connected up' the statements to the alleged conspiracy"); *United States v. Leaks* 2013 WL 5538718, No. 1:13-CR-15 (WLS) (M.D. Ga. Oct. 7, 2013) (denying motion for pre-trial *James* hearing and noting that "[i]nstead, the Court will rule on the admissibility of coconspirator statements at trial").

Likewise, this Court should allow the Government to "connect up" any statements that it seeks to introduce at trial and determine admissibility of those statements at the close of the Government's case-in-chief. Finally, the Defendants make passing reference to Rule 806 [D.E. 163 at 6] and contend that without identification of coconspirator statements they cannot prepare impeachment materials. That is not the purpose of a *James* hearing. *See United States v Perry*, 624 F.2d 29, 31 (5th Cir. 1980) (purpose of a *James* hearing is "to establish the existence, or nonexistence, of the predicates for the admission of a coconspirator's extrajudicial declaration before the declaration is made known to the jury").[8] None of the concerns or blanket allegations raised by the Defendants in their motions warrant a pre-trial *James* hearing. The Defendants' request for the Court to conduct a mini-trial should be denied.

---

[8] The Defendants' offer of an alternative—that the Government produce coconspirator statements 45 days prior to trial—seeks what amounts to an inappropriate bill of particulars. As noted above, a bill of particulars is not appropriate as a discovery tool to obtain a detailed, play-by-play of the Government's case, nor should it operate as a method for the Defendants to obtain an advanced preview of coconspirator statements to prepare Rule 806 impeachment materials.

## **CONCLUSION**

For the reasons stated above, the Government respectfully requests that the Court deny

the Defendants' motions in their entirety.

Dated: February 28, 2025

                            Respectfully submitted,

                         HAYDEN P. O'BYRNE
                         UNITED STATES ATTORNEY

                         GLENN S. LEON, CHIEF
                         U.S. DEPARTMENT OF JUSTICE
                         CRIMINAL DIVISION, FRAUD SECTION

By:     */s/ Darren C. Halverson*
                         DARREN C. HALVERSON
                         Trial Attorney
                         Florida Special Bar No. A5503082
                         United States Department of Justice
                         Criminal Division, Fraud Section
                         1400 New York Avenue, N.W.
                         Washington, D.C. 20005
                         Tel: (202) 880-2233
                         Email: darren.halverson@usdoj.gov

                         JENNIFER E. BURNS
                         Trial Attorney
                         United States Department of Justice
                         Criminal Division, Fraud Section
                         Email: jennifer.burns@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on February 28, 2025, I electronically filed the foregoing

document via the Court's CM/ECF system.

<u>/s/ Darren C. Halverson</u>
Trial Attorney
U.S. Department of Justice