**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  23-CR-20271-LEIBOWITZ**

UNITED STATES OF AMERICA,

            Plaintiff,

v.

BRETT BLACKMAN,

            Defendant.

_____/

## MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33

Brett Blackman moves, pursuant to Fed. R. Crim. P. 33, and the Fifth and Sixth Amendments, for a new trial.  Under Rule 33(a), the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Whether a new trial is in "the interest of justice" is a broad standard. *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) ("That is a broad standard.  It is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous.").  The Court has discretion to reevaluate its prior rulings even if those rulings were not legally erroneous, ***and to evaluate the sufficiency of the evidence on a standard less demanding than Rule 29***. *Id*. (emphasis added).

A court may grant a new trial "even where the defect does not constitute reversible error, or even legal error at all." *United States v. Llorca-Meneses*, No. 2:17cr38-MHT, 2018 WL 5924515, at \*2 (M.D. Ala. Nov. 13, 2018) (citing *Vicaria*). Further, the cumulative effect of multiple errors can prejudice the defendant's right to a fair trial, even if the individual errors alone are not reversible. *See id.*; *see also United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) ("Even if we were to find any of the above errors, standing alone, to be harmless, their cumulative effect . . . was clearly prejudicial and combined to deprive Petracelli of a fair trial.").  A new trial is likewise appropriate where unfairly prejudicial evidence may have induced the jury to decide the case on an improper basis.  *See United States v. Thomas*, 321 F.3d 627, 636-37 (7th Cir. 2003) (ordering new trial where propensity-laden evidence was not harmless in a case otherwise dependent on inference); *United States v. Elizondo*, 277 F. Supp. 2d 691, 703-04 (S.D. Tex. 2002)

1

(granting new trial where erroneous admission of highly prejudicial evidence was not harmless). *See also United States v. Rafiekian,* 68 F.4th 177 (4th Cir. 2023) (affirming order of new trial in a foreign agent case that resulted in conviction because the evidence was entirely circumstantial and required a number of inferences). Blackman renews all prior motions and objections and further states as follows.

## I.      The weight of the evidence compels a new trial

On a Rule 33 motion based on the weight of the evidence, the Court need not view the evidence in the light most favorable to the verdict. *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985); *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005). The Court "may weigh the evidence and consider the credibility of the witnesses." *Martinez*, 763 F.2d at 1312. If "despite the abstract sufficiency of the evidence," the evidence "preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the Court may set aside the verdict and grant a new trial. *Id*. "The government is entitled to rely on circumstantial evidence, but it is not entitled to special deference when it does so." *Id*. at 190. Blackman incorporates all arguments made in his contemporaneously filed motion for a judgment of acquittal and requests in the alternative that this Court order a new trial on Counts 1, 5, and 6.

## II.      The jury language barrier warrants a new trial.

A new trial is warranted based on the jury foreperson's mid-deliberation request that the jury instructions be provided in both English and Spanish due to a language barrier in the deliberation room. 28 U.S.C. § 1865 provides that jurors cannot be "unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form"; and cannot be "unable to speak the English language." This requirement is constitutional in nature. During voir dire, and due to the complex regulatory nature of the case, the defense requested further colloquy of the panel regarding English language proficiency; these requests were denied. After the disclosure by the foreperson, the jury was polled in English; one juror relayed that she relied on other jurors to explain something to her. The interests of justice warrant a new trial based on this juror's mid-deliberation disclosure that she relied on other jurors to understand case materials. Another juror, when asked if the English proceedings "causes a problem for you in understanding," replied: "Okay. Yes, I understand." Tr.Day15:30. The questioning of the jury (in English) was insufficient to identify language issues given the complex nature of the case and highly technical language in both evidence and instructions.

2

The jury language issues that occurred undermine confidence in the verdict and creates a substantial risk that instructions, evidence, and language in the indictment was either not adequately understood by jurors or translated to jurors by other jurors.  The problem is exacerbated by the fact that the foreperson's initial statement indicated that there were *multiple* and not just one juror in the deliberation room for whom language was a problem—yet only one juror admitted that to be the case.  The colloquy demonstrated that at least one juror could not understand the case materials without assistance; the statement from the foreperson revealed that there were potentially more.  *Cf. United States v. Pineda*, 743 F.3d 213, 218 (affirming removal of juror based on language; "While Vega's language abilities did not change overnight, it became apparent that his ability to communicate with the other jurors and to understand the trial proceedings were inadequate"; noting English language proficiency is essential for a juror to "come to an independent judgment"); *United States v. Campbell*, 544 F.3d 577, 582 (5th Cir. 2008) (affirming removal of juror in part due to "numerous notes from the jury stating they were unable to effectively communicate with Ramirez").  The interests of justice compel a new trial because the language barriers undermine the unanimity and validity of the verdict and create a substantial risk that Blackman was convicted in violation of his constitutional right to a unanimous verdict by 12 jurors who met the requirements of 28 USC § 1865 and who each came to an independent judgment.

### III.    A new trial is warranted because the jury was improperly instructed as to deliberate ignorance in a case where the *mens rea* for every count was willfulness.

The deliberate ignorance instruction was both legally and factually unsupported in this case. Legally, the instruction should not have been given here because each of the crimes charged in the indictment require a *mens rea* of willfulness; the indictment charged only conspiracy and aiding-and-abetting crimes.  A deliberate ignorance instruction is incompatible with the proof required for willfulness.  Willfulness requires specific intent to violate the law.  It cannot be satisfied via deliberate ignorance.  The effect of the deliberate ignorance instruction here was to water down the *mens rea* to knowingly—or, worse, recklessly, *see e.g. United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991) (even in knowledge cases where instruction could be appropriate, "[t]he danger of overly liberal use of such an instruction in an inappropriate case is that juries will convict on a basis akin to a standard that the defendant *should* have known the conduct was illegal")—and to invite the jury to convict without finding the essential *mens rea* element of willfulness.

The deliberate ignorance instruction in this case was also factually unsupported.  There was no evidence of any purposeful contrivance on the part of Mr. Blackman; the evidence cited by the government failed to establish purposeful contrivance.  The Eleventh Circuit has explained that the deliberate ignorance instruction is improper when the actual knowledge theory of the government is the real subject.  *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008).

IV.     **A new trial is warranted due to closing argument error**

a.  **The government argued an exhibit that was not admitted in evidence.**

In defense's closing argument, counsel argued that the government's evidence was unreliable because dozens of the medical records the government introduced into evidence—claiming the records came from the use of the DMERx software and were used to submit Medicare claims—were not found in the spreadsheets containing the universe of DMERx-related Medicare claims made by the government's own witness (GX 437–441). One of the patients the defense pointed out to the jury who did not appear in the government's Medicare claims spreadsheets (GX 437–441) was Andrew Session. In rebuttal, the government stated defense counsel was not only wrong, but was intentionally misleading the jury by pointing the jury to the wrong exhibits, calling its argument a "charade." Closing Tr. at 54–55. The government further characterized defense's argument that dozens of the patients in the medical records did not appear in the spreadsheet of corresponding Medicare claims as a "distraction" and that the jury could follow the fraud because it was right in front of them. *Id*. at 55. The government cited as proof of both the defense's deception and the reliability of its own evidence, government exhibit 408. The government stated:

> And perhaps the biggest charade of all, Ms. Wilson got up before you and she said that Andrew Sessions was not in the Medicare data. But you saw evidence of this. . . . And [defense counsel] pointed you to the wrong data. The data is cited clearly on here as Government's Exhibit 408.

Closing Tr. at 54–55. However, government exhibit 408 was never admitted into evidence. *See* DE 461 at 11.

Accusing defense counsel of fraud is improper in isolation, *see infra*, but particularly where the basis for that accusation is facts not in evidence.  By urging the jury to convict Mr. Blackman on an exhibit not in evidence, the government violated Mr. Blackman's right to a fair trial, warranting a new trial. The Eleventh Circuit has made clear that "[a] prosecutor may

not go beyond the evidence before the jury during closing argument," *United States v. Jones*, 166 F.4th 92, 101 (11th Cir. 2026) (citing *United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990)); *see also United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) ("prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may draw from it and the impermissible practice of arguing suggestions beyond the evidence"). Indeed, the prohibition against a prosecutor breaching the bounds of admitted evidence in closing argument "is as longstanding as it is clear, stretching back nearly 50 years." *Id.*; *see also United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir. Unit B 1981) ("[A] prosecutor is prohibited from seeking to obtain a conviction by going beyond the evidence before the jury."); *United States v. Cole*, 755 F.2d 748, 767 (11th Cir. 1985) ("The legal metes and bounds of a prosecutor's argument are defined by the evidence before the jury. Thus, a prosecutor must limit his comments to admissible evidence."); *United States v. Martinez*, 96 F.3d 473, 476 (11th Cir. 1996) ("Lawyers know that argument to the jury must be based solely on the evidence admitted at trial."). A prosecutor doing so is prosecutorial misconduct when it affects the substantial rights of the defendant. *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) ("To find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.") (citing *United States v. Walther,* 867 F.2d 1334, 1341 (11th Cir.)). *See also Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983) (characterizing closing limitation as a "fundamental principle").

In *Jones*, the Eleventh Circuit vacated the conviction where the prosecutor in closing argument referred to an exhibit that had not been admitted into evidence and told the jury that the exhibit was "all they needed to know" to convict. *United States v. Jones*, 166 F.4th 92, 101 (11th Cir. 2026). Not only did the Eleventh Circuit find this was error, it found the error was plain. The Court stated that the prosecutor's use of the unadmitted exhibit "was in direct contravention of our precedent. The prosecutor wasn't assisting the jury in analyzing, evaluating, and applying the evidence, wasn't suggesting conclusions that the jury should draw from the record evidence, and wasn't indicating the government's opinion. Rather, he was expressly urging the jury to convict [defendant] on the basis of extra-record evidence. The error was patent." *Id.* at 102–03.

Like in *Jones*, the government's urging the jury to convict Mr. Blackman on the basis of extra-record evidence violated Mr. Blackman's right to a fair trial and was misconduct affecting Mr. Blackman's substantial rights. The government used the unadmitted exhibit to argue its evidence was indeed reliable, claiming it had an exhibit that proved what it was saying was correct. The defense had revealed to the jury a significant hole in the government's entire theory and presentation. As one element of its case, the government had to establish beyond a reasonable doubt that the records used to make claims to Medicare came from the use of the DMERx software. The government had witnesses identify DMERx records by saying they looked like records from the platform, usually noting the formatting. This was how the government established the essential link between the medical records it introduced and the Medicare claims ultimately made. Defense showed the jury that link was false, revealing that even of the relatively few medical records the government introduced as exhibits, dozens could not be tied to a Medicare claim in the government's own exhibits, government exhibits 437 – 441, and others had clearly been modified. For example, the defense revealed that *none* of the patients whose medical records with pharmacy orders the government introduced appeared in the government exhibit containing the universe of Medicare claims for pharmacy products made that matched up to patients in DMERx's system. *Compare* GX 316–319 to GX 448. The same applied to at least dozens of the patients from the medical records with brace orders the government admitted. *Compare* GX 301–303, 305–315 to GX 437–441. Consequently, the government's entire presentation to the jury regarding the medical records were from the DMERx platform and those records were the basis for the Medicare claim was unreliable. The government then pointed to this unadmitted exhibit, GX 408, to argue that there was indeed an exhibit that established this link—that showed the medical records came from DMERx and were used to make Medicare claims. It also claimed this unadmitted exhibit showed the entire defense presentation was a "charade" and that the defense was trying to point the jury to the wrong exhibits. In other words, the government told the jury that this unadmitted exhibit showed the entire defense was unreliable and misleading. Consequently, should this Court grant a new trial; the appellate court in analogous instances has said it had "little trouble concluding that the prosecutor's remarks prejudicially affected [Mr. Blackman's] substantial rights." *Id*. at 102 (internal quotations omitted).

6

The government's use of an unadmitted exhibit was also improper bolstering. The test for improper bolstering is "whether the prosecutor's words might reasonably have led the jury to believe that the government possessed extrinsic evidence, not presented to the jury, that convinced the prosecutor of the defendant's guilt." *United States v. Hilton*, 772 F.2d 783, 787 (11th Cir. 1985). That is what the government did here. A new trial is warranted.

**b.  The government improperly bolstered its own investigation by arguing that mass arrests of DMERx clients was proof of Blackman's guilt**

The government committed further error during its closing argument by using the arrest of "90 percent" of the DMERx clients in April 2019 as substantive  proof of Mr. Blackman's guilt. The government presented government exhibits showing a timeline of aggregated claims to Medicare and told the jury:

And this is an important slide to keep in mind that you are looking at here, ladies and gentlemen, because this is how fraud works.  If you look at the billion dollars that was billed to Medicare by using DMERx, you see the continuum of fraud here. You see the peaks and then you see the valley. And I'll explain what's happening here. As they are entering the contracts, and generating more clients of DMERx, the billings are, of course, going up. But then in April 2019, what happens? It falls off of a cliff. Not by ten percent, not by 50 percent. Over 90 percent of DMERx's business gone. . . . We all remember what happened in April 2019, because witness after witness after witness explained what was happening. They were getting arrested. The jig was up. And DMERx's revenue went through the floor.
Closing Tr. at 98–99.

The defense objected on grounds of bolstering and vouching, but the Court overruled the objection. *Id*. at 99. The government then went on, quoting from text messages in which government witness Chintan Anjaria discussed the April 2019 arrests, telling the jury that the telemedicine companies were not responding "because they are involved" in the fraud. The government quoted texts about the arrests and investigation of specific players—Sunrise Medical, Murdock Consulting, Web Doctors Plus, Integrated Support Plus, Willie McNeal—arguing to the jury, "Does that sound like a legitimate business to you, ladies and gentlemen?" Id. at 100. The government kept going, using the texts to show that Herb Kimble (who did not testify and who was never established by even a preponderance to be a co-conspirator of Blackman) was "in the middle of it all" and that once these fraudulent players were out of the game, DMERx's revenue crashed. *Id*.   Such argument is improper bolstering and vouching. The test for improper bolstering is "whether the prosecutor's words might reasonably have led the jury to believe that the government possessed extrinsic evidence, not presented to the jury, that convinced the prosecutor

of the defendant's guilt." *United States v. Hilton*, 772 F.2d 783, 787 (11th Cir. 1985). Similarly, vouching "occurs either when the prosecutor places the prestige of the government behind a witness, or indicates that information not presented to the jury supports the witness's testimony." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). The same principle extends to vouching for or bolstering a government investigation: a prosecutor may not imply that the government's own investigation, arrest, or charging decisions corroborate or prove the defendant's guilt. To do so imports the institutional credibility of law enforcement as substantive evidence of guilt. Moreover, one person's guilt may not be used as substantive evidence of the guilt of another. *United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974) (holding evidence of one's guilty plea or conviction cannot be used as substantive evidence against defendant).

Here, the government's argument that "the jig was up" because "witness after witness" was "getting arrested" does exactly that. It tells the jury that the government's investigative conclusion—i.e., that the platform users were using the platform for fraud—was itself evidence that Mr. Blackman was guilty. Another's arrest, however, does not prove that Mr. Blackman was part of a criminal scheme, let alone that he built a platform specifically to facilitate it. Similarly, the government's argument that the mass collapse of DMERx's business in April 2019—caused, it argued, by the arrests of its customers—proved that the platform was built for crime improperly leveraged law-enforcement action as substantive evidence. The arrests no more prove the platform's purpose than a law enforcement investigation, standing alone, would prove guilt. The interests of justice warrant a new trial.

      **c. The government improperly used the FTC settlement as evidence of substantive guilt and propensity, improperly suggested to the jury that Blackman had violated the settlement, and referenced facts about the settlement not in evidence**

Prior to trial, the Court allowed the admission of certain evidence related to Mr. Blackman's prior settlement with the Federal Trade Commission for a limited purpose. While the government's theory of relevance was everchanging, it unquestionably agreed that it was not admitting evidence of a settlement for the facts of the settlement. Instead testimony about conversations witnesses had with Mr. Blackman about the settlement were admitted "for what the witness is doing because of that conversation." Tr. Apr. 29, 2026 at 134. It was also admitted under Fed. R. 404(b), although the specific purpose under 404(b) was never clarified other than it was for Mr. Blackman's "state

of mind." No evidence was admitted at trial concerning the actual terms of the FTC settlement, what specific prohibitions it contained, or the factual basis for those prohibitions.

But no witness testified to doing anything after the conversation based on what they learned from Mr. Blackman. And then the government did exactly what it told the Court it would not do: argued that the FTC settlement prohibited Mr. Blackman from participating in any form of telemarketing. In both the initial and rebuttal closing arguments, the government repeatedly argued to the jury that this settlement prohibited Mr. Blackman from participating in any telemarketing, and that Mr. Blackman did so anyway was substantive evidence that he was committing fraud. Such argument violated Fed. R. Evid. 404(b) and 403 and Mr. Blackman's right to due process and was a material variance from the indictment.

In the initial closing, the government argued first, about government witness Toni Delanoy, that after Mr. Blackman told her of the existence of the settlement, "She looks it up on her own [the FTC settlement] and finds out that he's banned for life from telemarketing. And she was concerned because she knew what was up, and she knew they were doing something wrong." Closing Tr. at 102:3–6. In the rebuttal, the government went further, directly arguing the facts of the FTC settlement that were never admitted into evidence: "The FTC had banned Brett Blackman from owning or participating in telemarketing activities. He wasn't even allowed to do it, and that's why his name wasn't on the companies." Rebuttal Tr. at 51. It went further, arguing later, "NCP, which he wasn't allowed to own because of the FTC." Rebuttal Tr. at 58. NCP was not engaged in telemarketing; it was a direct mail company. Nor did Blackman own it. Nor were the terms of the settlement admitted.

The government used the evidence of the FTC settlement far beyond the limited purpose for which it was admitted, using it as substantive evidence of guilt by arguing that (1) Mr. Blackman had actually been prohibited from telemarketing, and (2) his covert participation in telemarketing enterprises was itself evidence of the fraud charged. Further, any evidence of any issue with the FTC was not admitted to prove the substantive terms of the settlement or what it actually prohibited. But in closing argument, the government argued to the jury that the FTC settlement actually banned Mr. Blackman from telemarketing and that he was actually prohibited from owning the companies. That is a fundamentally different use of the evidence.

Second, and more fundamentally, the government argued facts not in evidence. The specific content of the FTC settlement—what it required, what it prohibited, what conduct it covered—was

never introduced into evidence. No settlement document was admitted. No witness testified to its terms. No expert explained its scope. This was because it was not being admitted for the fact of the settlement or what it held. Yet in closing, the government told the jury as established fact that the settlement banned Mr. Blackman "for life" from telemarketing and that he "wasn't even allowed" to own those companies. A prosecutor in closing argument is confined to the evidence before the jury. *United States v. Iglesias*, 915 F.2d 1524 (11th Cir. 1990). Arguing the specific prohibitions of a document that was never admitted is arguing facts outside the record, violating Blackman's right to a fair trial.

This prejudice is exacerbated by the fact that the settlement made no such prohibition. The settlement did not include a complete ban on telemarketing as the government and its witnesses described it. The settlement defined telemarketing as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call, whether or not covered by the Telemarketing Sales Rule, 16 C.F.R. Part 310; provided however, that 'Telemarketing' shall not include the acts or practices described in 310 C.F.R. § 310.6(b)(3)." By the plain text of the agreement, telemarketing that was not done to induce the recipient to purchase a good or service or make a charitable contribution was not included in the ban. Further, telemarketing included in § 310.6(b)(3) was not prohibited. The government's claim to the jury that the settlement banned Mr. Blackman for life from participating in any telemarketing was simply false.

Furthermore, the conduct the government alleged in this case does not fall under the ban in the settlement. The fliers sent out to mailing lists by National Center for Pain were not to induce the recipient to purchase a good or service or make a charitable contribution. The fliers were asking whether people needed a knee or back brace to help manage pain. And the government's own evidence at trial showed the telemarketing was not asking the patients to purchase braces, but that the point was to have Medicare or other insurance pay for the braces. Additionally, it only prohibited telemarketing that involved more than one interstate telephone call. Consequently, if it only involved one interstate telephone call and any remaining were within the state, such was not prohibited by the settlement. And finally, National Center for Pain did not make phone calls, but rather sent out fliers. It did not engage in telemarketing. By the plain terms of the settlement agreement, Mr. Blackman's owning, managing, or participating in NCP as the government alleged

did not violate the settlement. At the very least, it is not clear that the settlement prohibited Mr. Blackman from owning, operating, or working with National Center for Pain or PME Homehealth, as the government claimed it did. That the government argued to the jury Mr. Blackman was prohibited from participating in all telemarketing for life when it was aware of the real terms of the settlement was alone government misconduct warranting a new trial.

The prejudice was substantial. "Extrinsic evidence of other crimes, wrongs, or acts is inherently prejudicial to the defendant." *United States v. Sterling*, 738 F.3d 228, 238 (11th Cir. 2013) (quotation marks omitted). This is because when faced with such evidence, "the jury may convict the defendant not for the offense charged but for the extrinsic offense." *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir. 1978); see also *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977) ("A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is. The reason for this rule is that it is likely that the defendant will be seriously prejudiced by the admission of evidence indicating that he has committed other crimes."). The government used the claimed telemarketing prohibition to explain why Mr. Blackman's name was absent from corporate documents—turning the FTC evidence from impeachment of his credibility into affirmative proof of fraudulent intent and guilt on the substantive counts.

But the prejudice was not limited to the jury believing Mr. Blackman had previously done something warranting an FTC settlement banning him for life from all telemarketing and that Mr. Blackman *by the charged conduct* violated that FTC order. But the government also used its claim that Mr. Blackman had violated an FTC order to vary from the indictment, conflating the fraud charged with telemarketing fraud and suggesting to the jury that Mr. Blackman violating the FTC order by being a telemarketer was part of the fraud charged. In its opening statement, the government told the jury that Mr. Blackman was a telemarketer ("Brett Blackman, the defendant, was a telemarketer") and that the evidence would show that "the telemedicine doctors were an extension of Mr. Blackman's telemarketing fraud scam." Tr. Apr. 21, 2026 at 62. The government then argued in closing that "the reality is that Mr. Blackman orchestrated, constructed, and carried out a massive telemarketing fraud. And you saw the evidence of that. You saw witness after witness testify about that telemarketing fraud." Tr. May 12, 2026 at 48.

Blackman was not charged with telemarketing fraud; the core of the fraud allegations was a telemedicine and medical necessity theory. This was a fatal variance. When given the ability to

introduce evidence about Mr. Blackman having a history of the FTC, the government shifted its theory of guilt from the indictment and made it one about Mr. Blackman committing telemarketing fraud. The government blew beyond the limited purpose of Mr. Blackman telling Ms. De Lanoy and Mr. Schreck that he had a prior issue with the FTC to arguing that 1) Mr. Blackman was a telemarketer, 2) he had a prior order from the FTC that prohibited him from engaging in any form of telemarketing for life, 2) he violated that order by participating in HealthSplash and National Center for Pain operations, and 3) by doing so he committed telemarketing fraud that makes him guilty of the crimes charged in this case.

The government compounded the variance and resulting prejudice by eliciting unnoticed expert testimony without any foundation that Medicare does not allow the use of overseas call centers. Tr. Apr. 21, 2026 at 128. Not only was such statement false (see Mr. Blackman's proposed jury instruction, DE 455 at 37), but it was a conclusion from the government's expert witness for which the government provided no notice and thus, defense could not challenge such a false claim in advance of trial. Further, this Court denied defense's request for a jury instruction that there was no Medicare regulation prohibiting use of an overseas call center. But such false and unnoticed testimony played into the government's variance that Mr. Blackman was committing telemarketing fraud, not healthcare or wire fraud in the ways outlined in the indictment.

Such was an improper variance, violated the Court's order about the limited purpose for which any testimony about the FTC was admitted, was an improper argument of facts not in evidence, and violated Fed. R. Evid. 404 and Mr. Blackman's right to a fair trial. Additionally, the government's characterization of Blackman as a "telemarketer" combined with its advancing a propensity theory in argument to the jury was inaccurate; as was the government's incorrect contentions in closing that work with National Center for Pain violated the settlement when in fact it did not.  This amounts to improper characterization of the evidence warranting a new trial. *Cf. United States v. Blakely*, 14 F.3d 1557, 1560-61 (11th Cir. 1994) (prosecutor must refrain from improper characterization of defendant that is calculated to produce a wrongful conviction).

### d. The government improperly used the Leard memorandum as substantive evidence that the structure of HealthSplash violated the Anti-Kickback Statute

This Court allowed the government to admit GX 633, a legal opinion memorandum from Mr. Blackman's former lawyer Denise Leard for the limited purpose of giving context to some unidentified statements of Mr. Blackman. Tr. Apr. 22, 2016 at 8, 141. However, those statements

from Mr. Blackman about the opinion letter never materialized and the purpose shifted to showing Mr. Blackman's state of mind. *Id*. at 144.

Throughout its closing argument, however, the government used Ms. Leard's memo far beyond either limited purpose. The government argued that the memo was evidence that the payment arrangements Mr. Blackman created with DMERx were illegal kickbacks. The government first read directly from the memo, "And here is government's exhibit 633, the memo that [Denise Leard] wrote him, and I'll read a portion to you. 'The proposed arrangement in its current form poses a risk of violating the antikickback statute.'" Closing Tr. at 86:22–25. The government then later argued that Mr. Blackman "knew it was illegal" because of Ms. Leard's advice. Id. at 111.

In these arguments, the government improperly used the memo as evidence that the arrangement actually violated the anti-kickback statute. Mr. Blackman "knowing it was illegal" because of Ms. Leard's memo necessarily requires an initial conclusion that the memo was indeed correct that the arrangement was illegal. Neither the rules of evidence nor due process allowed the memo to come in for the truth of the matter asserted, as this Court recognized. Yet that was precisely what the government used it for. It was not just about Mr. Blackman's intent, but the government used it to show that it established the arrangement constituted illegal kickbacks and Mr. Blackman proceeded anyway. Such use violated the rules of evidence and Mr. Blackman's right to due process and a fair trial.

Making the matter worse, the evidence established that the structure analyzed by Ms. Leard in her memo was not the structure under which Mr. Blackman operated HealthSplash. But the government still used the memo as evidence that the payment arrangement of HealthSplash constituted illegal kickbacks.

> **e. The government improperly varied from the indictment by arguing that Blackman committed fraud because HealthSplash was not doing "normal healthcare"**

The indictment charged Mr. Blackman with healthcare fraud and wire fraud, based on specific factual allegations.  The indictment did not charge Mr. Blackman with conspiring to commit health care and wire fraud by conspiring to provide abnormal or substandard health care. The indictment could not allege such because that is not a federal crime. But that is precisely what the government argued repeatedly in closing. It argued that the DMEs picking the HCPCS codes that would appear on the software platform was not "normal health care. When have you gone to your pharmacy and

13

had the pharmacists decide what drugs you get?" Closing Tr. at 50. It argued, "But you saw the evidence. Was this normal health care? Was the video that HealthSplash created as the dog and pony show a normal health care video . . . .?" Closing Tr. at 55. It later again argued, "Was this normal health care?" *Id*.

The Eleventh Circuit has clearly established that "a variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990). Here, the government's argument that the conduct was criminal because it was not a normal standard or a normal arrangement for health care introduced a materially different theory of fraud than was charged. Indeed, varying from "normal health care" is not a crime. Providing subpar healthcare is not a crime. The indictment charged that specific claims were false because the underlying medical encounters were fabricated. It did not charge that the business model itself was criminal because it departed from conventional medicine or that the physicians were providing substandard care or lack of patient choice. By arguing that the jury could convict because the business model and the mode of operation was not "normal," the government invited a conviction on a theory never presented to or voted on by the grand jury, or that is even a crime, violating Mr. Blackman's due process rights. This prejudiced Blackman; as the acquittal on the material false statement object of Count 6 and the substantive healthcare fraud counts illustrate, the jury rejected the government's core medical necessity theories of fraud.

### f. The government's characterization of defense arguments in closing amounted to improper attack on defense counsel.

In opening rebuttal closing, the government said: "Ladies and gentlemen the defense has just *orchestrated a skilled charade* . . . But the reality is that Blackman *orchestrated*, constructed, and carried out a massive telemedicine fraud." Closing Tr. 47-48 (emphasis added). After using parallel language to refer to defense counsel's argument and the defendant's alleged criminal conduct, the government repeated to use the term "charade" to accuse the defense of fraud throughout its rebuttal closing. *See, e.g. id*. at 48 (nothing *laid the defense charade bare* like Mr. Cirri's testimony) (emphasis added); *id*. at 52-53 ("That's not where the red herrings stop. Ms. Wilson also said . . ."); *id*. at 54 ("perhaps the *biggest charade of all, Ms. Wilson* got up before you and she said Andrew Sessions was not in the Medicare data"); *id*. at 55 ("you don't have to pay attention to the *distraction*"). And, making matters worse, the government *referred to counsel*

*as defendants*: "Now, defendants also just blamed the doctors for the lack of security on the platform." *Id*. at 54. *Cf. United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) ("By repeatedly characterizing defense counsel as a 'witness' . . . the prosecutor was urging the jury to ignore defense counsel's entirely legitimate role as an advocate"). The government also improperly attacked defense's cross-examination of a witness, stating "that really shows the level they went to." Tr.Closing:48.

Such arguments attacking defense counsel are improper. The accusations of deception and a "charade" were particularly improper here, in a fraud prosecution, because they had the effect of conveying to the jury that the defense is defrauding them—and making matters worse, the government's rebuttal to one of the purported "charades" was to reference an exhibit *that was not even in evidence*. *See supra*. The government accused defense counsel of misleading the jury, saying "she pointed you to the wrong data," and then referenced GX 408, which was not in evidence. *Id*. at 55. A prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). This argument tactic amounted to reverse vouching, denigrated the defense, and caused substantial prejudice to Blackman in a split-verdict case. The interests of justice compel a new trial. *Cf. People v. Unger*, 278 Mich. App. 210 (2008) ("a prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury" in case where prosecutor used the terms "red herrings" and "smoke and mirrors" . . . When the prosecutor argues that the defense counsel himself is intentionally trying to mislead the jury, he is in effect stating that defense counsel does not believe his own client. This argument undermines the defendant's presumption of innocence") (citation omitted).

**V.   A new trial is warranted because the jury was given an alternative means for guilt on Count 5 where the government did not pursue that theory and its own evidence negated it.**

In the indictment, the government alleged that Mr. Blackman violated 18 U.S.C. § 371 by soliciting or receiving and paying or offering illegal kickbacks or bribes. DE 76 at 17. The government then presented in its opening statement that Mr. Blackman had engaged or conspired to engage in bribes. It stated that Mr. Blackman "defrauded Medicare using a massive telemarketing scam fueled by lies, *bribes*, and 1.3 million false prescriptions." Tr. Apr. 21, 2026, at 58 (emphasis added). It claimed telemedicine doctors were "bribed." *Id*. at 61; that Mr. Blackman "used DMERx to pay and receive illegal kickbacks and bribes," (*id*. at 62); that Mr.

Blackman "agreed with telemarketing companies to sell the false prescriptions—the false brace prescriptions in exchange for illegal kickbacks and bribes," (*Id*. at 63); that "doctors were bribed to sign," (*id*. at 65); that through Mr. Blackman's software patients were "always prescribed an expensive brace through a fraudulent prescription that was bribed and paid for," (*id*. at 67); "Telemedicine companies, telemarketers, and brace companies, they all paid or received bribes" (*id*. at 68); Mr. Blackman "and his co-conspirators took the DMERx braces and billed Medicare for millions of dollars using the same process of fraudulent, bribed, and paid brace prescriptions" (*id*. at 69); "For the defendant's fraud factory and the doctors that he and his co-conspirators bribed, it was always one thing," (*id*. at 71); "These lies were all designed to hide that the defendant orchestrated a fraud based on the ecosystem of bribes between the brace companies, the foreign telemarketers, and telemedicine companies," (*id*. at 72); a government witness "bribed telemedicine doctors by paying their companies to obtain signatures on the prescriptions so that Medicare would pay for them," (*id*. at 74); "You will also hear from a telemedicine company owner who acted these bribes from foreign call centers," (*id*. at 74); "Mr. Blackman would choose where the beneficiaries went where their telemedicine bribes doctors," (*id*. at 75).

Defense counsel objected as the government had not alleged facts that constituted bribes in the indictment (as opposed to kickbacks, a distinct term), and had not in any of its filings in response to the defense pretrial motions, including motions to dismiss and for bill of particulars, indicated that it had intended to pursue guilt based on a theory that Mr. Blackman had conspired to pay or receive bribes. *Id*. at 107. Nor did the discovery support a claim Mr. Blackman engaged in bribes. This Court overruled the objection, stated the government had not opened on bribes and ruled that the jury instructions would be about kickbacks and would not address bribes. *Id*. at 108.

However, the jury was instructed it could convict for a bribe without being told what a bribe is, as distinct from a kickback. The jury instructions for Count 5 read (over defense objection to give the defense-requested instruction):

> Count 5 charges the Defendant with conspiring to violate provisions of federal law, which makes it a crime for anyone to offer, pay, solicit, or receive remuneration—including a kickback or bribe—in connection with items covered in whole or in part by a Federal health care program.
>
> The elements of the crime that is the first object of the conspiracy charged in Count 5, offering and paying illegal kickbacks and bribes, are as follows:

(1) a person offered or paid any remuneration, including a kickback or bribe, directly or indirectly, overtly or covertly, in cash or in kind;

(2) the offer or payment of remuneration was to induce a person to:

- refer an individual to a person for the furnishing or arranging for the furnishing of any item for which payment may be made in whole or in part under a Federal health care program; or
- purchase, order, or arrange for or recommend purchasing or ordering, any item for which payment may be made in whole or in part under a Federal health care program; and

(3) the person acted knowingly and willfully.

The elements of the crime that is the second object of the conspiracy charged in Count 5, soliciting and receiving illegal kickbacks and bribes, are as follows:

(1) a person solicited or received any remuneration, including a kickback or bribe, directly or indirectly, overtly or covertly, in cash or in kind;

(2) the solicitation or receipt of remuneration was in return for

- referring an individual to a person for the furnishing or arranging for the furnishing of any item for which payment may be made in whole or in part under a Federal health care program; or
- purchasing, ordering, or arranging for or recommending purchasing or ordering, any good or item for which payment may be made in whole or in part under a Federal health care program; and

(3) the person acted knowingly and willfully.

The only or primary purpose of the remuneration (kickback or bribe) need not be to induce the referral of a person or the purchase, order, or arrangement for or recommendation of the purchase or order, of any item for which payment may be made in whole and in part under a federal health care program. It is sufficient if one of the purposes of offering or paying the remuneration was to induce the referral of a person or the purchase, order, or arrangement for or recommendation of the purchase or order, of any item for which payment may be made in whole and in part under a federal health care program. DE 463 at 29–30.

The interests of justice warrant a new trial. A bribe is not a kickback; they are different both legally and factually. That the statute lists both indicates they encompass different conduct. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'") (quoting *United States v. Menasche,* 348 U.S. 528, 538–539 (1955); *see also* Jury Instructions in *United States v. Esformes*, 16-CR-20549-RNS, DE 1216 at 16 ("As used in these instructions, the term "kickback" means the return of a portion of the original payment. As used in these instructions, the term "bribe" means the corrupt transfer of anything of

17

value from one person or entity to another person or entity to accomplish some unlawful result or to accomplish some lawful result by some unlawful means.").

Thus, the government improperly argued in opening that Mr. Blackman conspired to pay and receive bribes and that he committed fraud by paying bribes, when it had no evidence that he did so. Then, this Court instructed the jury that it could convict Mr. Blackman of Count 5 for finding that he conspired to offer and pay or solicit and receive bribes, when the government had introduced no evidence of bribes and the Court had previously overruled defense objections to the government's opening statement claiming Mr. Blackman had engaged in bribes by stating it would not instruct the jury on bribes. DE 463 at 29. Doing so allowed the jury to convict Mr. Blackman on a completely unsupported theory, violating Mr. Blackman's right to a fair trial and due process. *See United States v. Fontenot*, 483 F.2d 315, 322 (5th Cir. 1973) (stating it is error to submit to jury overt act as to which there is no proof).  Particularly where bribes has a colloquial meaning, if the jury was instructed it could convict on the finding of a bribe, it needed to be separately instructed as to how a bribe is defined as a criminal statutory matter and what distinguishes a bribe from a kickback.  The government's arguing to the jury a theory for which it introduced no evidence to support also warrants granting a new trial.

**VI.    A new trial is warranted based on late disclosure of materials containing *Brady*, *Jencks*, and *Giglio***

Defense moved to exclude multiple government witnesses or in the alternative for the Court to grant a continuance due to the government's late disclosure of numerous witness statements, all of which were made prior to the trial of codefendant Gary Cox in May 2025. DE 418.  Defense counsel had requested a continuance and did not have sufficient time to review the statements in advance of trial, along with all the other tasks preparing for trial. Defense outlined in its motion that it suspected that the statements included Brady and Giglio but did not have time to review them for such before or during the trial. After review defense counsel has identified Brady, Giglio, and Jencks evidence that the government should have provided in a timely manner in the following statements:

- Chintan Anjaria: Owned marketing and DME companies; testified for the government
    - Statement from January 18, 2024:  Anjaria stated that after April 2019, he continued to use telemedicine to obtain orders for braces. He also stated that he used a different portal, Quivvy. He also stated in the May 31, 2024 statement that he was using this portal in 2020, during the time charged in the indictment. This statement

*directly contradicts* his testimony that he only used DMERx. Tr. May 6, 2026, at 115 (Q: Did you use another portal? A: No. DMERx portal.).

- o   Statement from January 18, 2024: Anjara stated that the person who operated Quivvy—Frank Michelin—showed him a legal opinion letter that stated they were operating legally. This contradicts Anjaria's testimony and the government's theory that Anjaria believed he was doing something illegal, an element the government was required to prove for every conspiracy charged. If Anjaria did not make an agreement to do something he *knew* was illegal, then he did not form a conspiracy. Not only was defense counsel unable to use this in the trial, because of the late disclosure, defense counsel did not have time to request or compel the letter Anjaria was shown.

- o   Statement from May 31, 2024: Anjaria stated, after he was arrested, he messaged an alleged coconspirator under the FBI's direction. This directly contradicts his statements in cross-examination that law enforcement never asked him to contact anyone as part of his work as a confidential human source and that he only responded if someone contacted him. *See* Tr. May 6, 2025, at 89–92.

- Michelle Cuttino – nurse practitioner who worked for Advantage Choice Care; listed as a government witness but not called

   - o   Statement from April 22, 2025: She stated she was paid by Advantage Choice Care $20 per patient whether she approved the order or not. This directly contradicts the government's presentation throughout the trial that the doctors were paid to sign the orders, as opposed to being paid to evaluate a patient. *See*, *e.g.*, govt. opening statement, Tr. Apr. 21, at 24:185–24:237: "Telemed doctors who weren't even treating the patients were bribed, paid kickbacks to sign these prescriptions so that Medicare would pay the defendant and his co-conspirators for those unnecessary braces."; *id*.: ". . . the doctors were bribed to sign."

   - o   Statement from April 22, 2025: She stated that Jean Wilson at Advantage Choice Care told her to call the patients. This directly contradicts the government's argument that Advantage Choice Care told or pressured the medical providers not to contact the patients and that Jean Wilson was signing brace orders without contacting the patients.

   - o   Statement from April 22, 2025: She stated she had no evidence of anyone using her login to sign orders. This directly contradicts the government's claim that Advantage Choice Care was using their medical providers' logins to sign the orders for them.

   - o   Statement from April 22, 2025: She stated she approved about 65% of the orders assigned to her. This directly contradicts the government's claim that medical professionals were just rubber-stamping the orders and that 98–100 percent of the

19

evaluations resulted in an order for a brace. *See, e.g.*, Trial testimony Chris Cirri, Toni DeLanoy.

o Statement from April 22, 2025: She stated that at the time of her conduct, "it wasn't completely clear where the line was but in hindsight, [she] realized medical necessity was not something that could be determined telephonically." This negates the government's claim of a conspiracy—if the coconspirator did not join in an agreement to do something knowing it was illegal, then there was no conspiracy.

- Joseph DeCorso – physician who signed brace orders; listed as a government witness but not called

  o Statement from May 24, 2023: He stated that in the beginning, he used a company named Phone.com to call patients. Even by March of 2019 he was still speaking with some patients. This directly contradicts the government's claim that the doctors—specifically DeCorso, who was the doctor targeted by the undercover agent—were not calling the patients.

- Pamela Edwin – employee at Sunrise Medical; listed as a government witness but not called
  o Statement of March 1, 2024: She stated that Sunrise Medical never signed DME orders as the ordering physician because there was a separate password to enable the physician's signature. This directly contradicts the government's claim that the telemed companies were having people sign the brace orders for the doctor.

  o Statement of March 18, 2024: This statement revealed that there is a recorded phone call of Edwin and a doctor in which she told the doctor that Sunrise Medical used in-house nurses to evaluate the patient before sending the documentation to the doctor for signature. That recording was not contained within the 3500 materials identified by the government pertaining to Pamela Edwin. Ms. Edwin confirmed in the April 26, 2024 statement that she told Dr. Matthew Craig that nurses at Sunrise Medical were reviewing the medical orders that would be sent to him. She said this because she believed at the time that Locum Tenems (a staffing agency for medical professionals) had nurses reviewing the orders. She also stated in the April 26 interview that Steve Kahn, the owner of the telemedicine company, told Dr. David Young that nurses were reviewing the orders. This contradicts the government's claim that doctors were signing orders for braces knowing no one but a call center agent had spoken to the patient. Instead, it shows that even when the doctors did not call the patients themselves, they believed that a medical professional had already spoken to the patient, something acceptable in the medical field and a situation for which Medicare regulations specifically allow a claim from such an evaluation to be paid. This would have undermined the government's argument that Mr. Blackman knew of the fraud because certain healthcare providers were signing too many orders on a single day: if doctors believed that nurses had already spoken to the patient and reviewed the file, the doctor could appropriately review the medical record and simply sign the order the nurse recommended.

- Michael Petron – government accounting expert

  - Statement from December 22, 2022: He stated that work for DOJ makes up 50–75% of his company's client services work. This could have been used to impeach him on bias given DOJ makes up such a significant portion of his business.

  - Relatedly, nor did the government produce the testimony of their expert Michal Petron from a 2026 trial in the Southern District of Florida, *United States v. Rivera*, S.D. Fla. No. 22-cr-20552. The expert disclosure was never updated with this testimony; defense found it independently.

- Jodi Sullivan – government pharmacy expert; testified at trial
  - Statement of January 16, 2021: In reviewing FDA indication for another drug (not involved in this case), recognizes that regulatory indication might be "arguably broad in nature, and speculated that a provider might attempt to argue that a given patient had such a condition." This illustrates more broadly that medical necessity is not an exact science and helps impeach as to her opinions on medical necessity reached without ever speaking to patients or doctors.

  - Statement of February 18, 2022: Suggests audits are random, contradicting government's arguments that audits are evidence of wrongdoing; "PBMs [Pharmacy Benefit Managers] will usually pick claims to audit annually. For example, they may pull ten contracts and conduct an audit."

  - Statement of February 25, 2025: Indicates that she bases her opinion on "fraud, waste, and abuse trainings"; undermining her purported expertise on what is actually required ("Sullivan has reviewed some fraud, waste, and abuse trainings that she may need to discuss. Sullivan pulled current and older versions of the trainings").

- Jean Wilson – owner of telemedicine company Advantage Choice Care, a primary piece of the government's case; cooperating; listed as a government witness but not called

  - Statement from February 2, 2025: She stated she pled guilty because "she did not meet the standard of care." This is not a crime. Consequently, she did not agree to join a conspiracy to do something she knew was illegal, negating the government's theory on the conspiracy charges, the only charges of which Mr. Blackman was convicted.

  - Statement from February 2, 2025: She stated that Advantage Choice Care had a protocol—the medical provider was to make three separate attempts to call a patient and document the attempts. If the patient wasn't reached, then nothing could be done. The providers were responsible for contacting the patient and for determining medical necessity. She also stated that she was certain she told providers they needed to call the patients. This directly contradicts the government's claim that the medical providers, and specifically providers at Advantage Choice Care, were told

not to contact the patients, and in fact did not contact or evaluate the patient, but merely signed orders for braces.

o Statement from February 2, 2025: She stated providers at Advantage Choice Care were compensated $20–30 per patient assessed, not per order signed. This contradicts the government's claim that medical providers were being paid to sign the orders, specifically medical providers at Advantage Choice Care.

o Statement from February 2, 2025: She stated Wilson did not use providers electronic signatures to order braces; she was busy and did not have time to do their jobs. She stated that she was "certain" she did not pressure anyone to sign orders they did not want to sign, and that she did not change or overwrite any brace orders or decisions. She also stated she did not use anyone else's username and password. This directly contradicts a major piece of the government's case: that Jean Wilson at Advantage Choice Care—one of Mr. Blackman's biggest customers—was using medical providers' logins to sign brace orders, and that they were pressuring medical providers to sign higher volumes of orders.

- Willie McNeal: owned a telemedicine company; testified for the government
  o Statement of April 1, 2024: McNeal states that doctors were not paid if they denied a brace *and they had not called the patient*, which contradicts the government's theory that doctors were not calling patients. McNeal states that patient calls were occurring over a VOIP service—either Freedom Voice or Phone.com, illustrating that doctor-patient interactions occurred off the platform and were not monitored by the platform. He indicates that after doctors signed orders, they were supposed to be returned back to the DMERx platform; he testified that he was downloading the orders early and selling them off-platform.

- Mindy Breitman—owned a Medicare billing company; testified for the government

  o Statement from August 21, 2023: Breitman testified at trial as to one mass conspiracy; that she was conspiring with all industry players including software companies. She was permitted to authenticate DMERx orders based on recognizing them; however, the 302 indicates that she was sent doctors' orders from other parties. Additionally, the 302 indicates that she was working with individuals who generated their own leads and who falsified signatures off the websites. The absence of DMERx being mentioned in these orders falls under *Brady* and *Giglio*: it demonstrates that industry-wide misconduct (which the government attributed to DMERx) was happening *off of the platform* and the external cooperators who testified were committing their crimes without the platform. The 302 also atttaches 102 pages of text messages between Breitman and an industry player which does not appear to ever reference DMERx, undermining her claim that DMERx was central to her fraud scheme. The text messages also reveal her advising a third party to "stay out of" introducing people, reflecting intent to comply with her understanding of the law and undermining her intent to commit a crime and thus the essential element of conspiratorial agreement. The text messages reveal that

Mindy Breitman was holding herself out as a billing expert professional (which gives industry players confidence in her and undermines theories of a fraud conspiracy) and reveal her lack of connection to DMERx.  She also notes that Medicare "may deny things incorrectly for entitlement" and later confirms that "Medicare denied one in error."  As a whole, the 302 undermines the government's view of a single conspiracy with DMERx as the hub.

- o  Statement of April 24, 2025: Similarly reveals lack of involvement of DMERx, undermining the government's view of an industry-wide conspiracy with DMERx as the "hub" and contradicting its assertion of a single mass conspiracy.  Breitman states in this 302 that a DME she worked with was purchasing doctors' orders directly from marketers, undermining the government's view of the software "hub" connecting all the industry spokes.  She stated that the DMEs got "replacement Dos for any orders that could not be billed," further illustrating misconduct off platform and undermining the government's hub theory.  The statement demonstrates the lack of involvement of anyone at DMERx in any of Breitman's crime.  References people who "did not operate legitimate DMEs," which furthers a defense theory that the individual industry players were committing misconduct as Blackman would have no way of knowing whether a particular platform user was "legitimate" or not. She indicates that the DMEs she worked with were purchasing Doctors Orders per brace—again reflecting off-platform financial transactions that do not involve Healthsplash.  As a whole, contradicts the government's notion of a mass industry-wide conspiracy with HealthSplash as the hub.

- o  Relatedly, the government did not produce 302s related to the employee at  the DME at Silent Hill from whom Mindy Breitman received orders (the individual who would have sent her the orders subject to the audit).  The only purely Silent Hill defendant who went to trial, Dr. Lawrence Alexander, was acquitted of an 18 U.S.C. 371 conspiracy charging conspiracy to defraud and kickbacks charges (despite the government telling the Court otherwise during the charge conference at the Gary Cox trial[1]); 302s related to the Silent Hill employee who provided the doctors orders to Mindy Breitman in response to the audit were not produced in discovery.  Though the jury acquitted on the Silent Hill substantive counts (consistent with the Lawrence Alexander verdict), the government argued (but did not charge) that the Silent Hill audits formed the basis for the Count 6 conspiracy-to-defraud on which the jury convicted.

More broadly, the late-disclosed interviews undermine the government's view of a single conspiracy with DMERx as the hub; undermine the government's view of willful illegality;

---

[1] The government told the Court at the Gary Cox charge conference that "we heard about Silent Hill, which was the DME company.  The owner of that company, Mr. Epstein, was convicted at trial here in the Southern District of Florida."  Cox Tr.Charge Conference:33.  The government apparently was referring to a Middle District of Florida case—not Silent Hill.  *See https://www.justice.gov/usao-mdfl/pr/two-sentenced-federal-prison-health-care-fraud*. Lawrence Alexander was acquitted of fraud and kickback allegations and convicted only of an 18 U.S.C. 1035 count due to erroneous ownership information on a *change-of-hours* form.  *United States v. Alexander*, S.D. Fla. No. 23-12282.

and undermine the government's view of willful kickback conspiracy. These materials predated the first trial in this matter and should have been produced prior to that trial.

The government also did not produce ahead of trial the contract between Dr. Hoover's company and the federal government. When the government produced the contract on the second day of trial after it was ordered to do so, following the Daubert hearing on the first day of trial, amounts were redacted; this blocked out key impeachment evidence. Moreover, the contract is 560 pages. Even with the Court's moving Dr. Hoover's testimony to later in the trial, defense did not have time to review it closely to glean useful information from it after it was produced on April 21, 2026.

The government is required to disclose *Brady* material in sufficient time for the defendant to "use the favorable material effectively in the preparation and presentation of its case," *United States v. Pollack,* 534 F.2d 964, 973 (D.C.Cir.). Further, "[t]he government cannot hide Brady material as an exculpatory needle in a haystack of discovery materials." *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (SDNY 2013). In other words, "[t]he Government cannot meet its *Brady* obligations by providing . . . 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information . . . ." *United States v. Hsia*, 24 F.Supp.2d 14, 29–30 (D.D.C.1998). But that is precisely what the government did here. In a smaller trial with limited discovery, perhaps these violations would not warrant a new trial. But that is not the case here. The government here provided over 80 discovery productions containing millions of documents and thousands of recordings, totaling over 3 terabytes of discovery. Burying exculpatory evidence in 3 terabytes of data by not describing the source (e.g. cooperating witness, search warrant return, etc.) or content in the government discovery index, telling the coordinating discovery attorney the productions containing the evidence were not important such that they were not loaded into the discovery review software, only identifying it in the 3500 materials by a Bates number that did not exist anywhere else, including in the index, or not including it in the 3500 materials at all, or providing it for the first time too close to trial for the defense to review (where the Court acknowledged the defense could not possibly review all discovery ahead of the trial date), is the equivalent of failing to provide the material at all. The disclosure issues warrant a new trial under the interest-of-justice standard.

24

**VII.     The jury instructions and the government's argument confused the charge on Count 6, creating multiplicity problems that warrant a judgment of acquittal**

Count 6 charged a conspiracy to defraud and to make materially false statements, in violation of 18 USC 371.  Blackman was acquitted of the material false statements object, after the government argued in rebuttal closing that Count 6 was just "a false statements conspiracy." Tr. Day 14:59.  The government argued false statements at the Rule 29 hearing and in rebuttal closing; in the government's first closing, it argued evasion of audits based on substantive counts 2 and 4 (which were not charged in Count 6 of the indictment and thus materially varied from the indictment).  The confusion of the issue and of the theory based on the government's argument which strayed from the count, combined with the government's eleventh-hour request (the morning of closing arguments) for the conspiracy-to-defraud instruction, where it had initially requested only the false statements instruction and where the defense requested an election as to the pattern 371 instruction, contributed to the confusion and caused substantial prejudice to Blackman especially in light of the defective theories argued regarding telemarketing, lack of patient choice, vulnerable patients, and seeking to avoid regulatory scrutiny as *res ipsa* proof of fraudulent conduct.

As to the conspiracy-to-defraud object, the indictment charged that Mr. Blackman conspired to "defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of departments and agencies of the United States in their administration and oversight of the Federal Health Care Plans."  It charged merely obstruction.  It did not charge the financial component of 18 U.S.C. 371; in other words, it did not allege that Mr. Blackman conspired to "cheat the government out of property and money."  The Eleventh Circuit held in *United States v. Elbeblawy*, 899 F.3d 925, 938-39 (11th Cir. 2018), where the issue was not preserved as here, that the district court did not constructively amend the indictment in broadening the bases for conviction in this manner.  In this instance, the prejudice, resulting confusion, and multiplicity issues—particularly in light of how the government argued the case to the jury—caused substantial prejudice and warrant a new trial on Count 6.

The problem with the broadening the bases that occurred here over defense objection and a request to elect was that the "cheat the government out of money or property" prong (where the government argued *only false statements* in rebuttal closing and argued a theory of defraud that deviated from the indictment in its first closing argument) created the substantial risk that once the

jury reached a verdict on Count 1, it thought that it needed to reach the same result on Count 6. Without clarification and without any particular argument as to "cheat the government out of money" but rather multiplicitous argument regarding substantive counts on which the jury was acquitted, there is a substantial risk that the jury determined Count 6 based solely on its conviction on Count 1 and did not reach an independent verdict on Count 6. The way the government argued the case to the jury and its request at the very last minute to add the conspiracy-to-defraud instruction (without proposing it in writing) heightened the confusion and thus the prejudice. The interests of justice compel a new trial.

### VIII. The government's improper use of the Fed.R.Evid. 801(d)(2)(e) exception warrants a new trial

The government does not satisfy the Fed.R.Evid. 801(d)(2)(e) exception merely by identifying names on a bill of particulars and asserting that those individuals are co-conspirators. Rather, the government "must establish by a preponderance of the evidence: (1) that a conspiracy existed, (2) that the defendant and the declarant were members of the conspiracy, and (3) that the statement was made during and in furtherance of the conspiracy. *United States v. Van Hemelryck*, 945 F.2d 1493, 1497-98 (11th Cir. 1991). The government relied *extensively* on hearsay statements of people unconnected to Blackman or for whom these requirements were not met without ever making this requisite showing; in so doing, it stretched the Rule 801(d)(2)(e) exception to its breaking point. The evidence did not reveal *any* conspiracy between Blackman and the declarants whose statements were admitted under this exception, many of whom had never met Blackman and had no interaction with them.

Separately, the government relied on *United States v. Holland*, 117 F.4th 1352, 1361 (11th Cir. 2024) to introduce statements of people whom even the government did not assert were part of a criminal conspiracy but rather a joint venture with Blackman. *United States v. Holland* did not overrule *Van Hemelryck*. There are limits to the co-conspirator statement exception, and those limits were far exceeded here. *Holland* did not work a sea change in the law, giving the government license to admit any statement of any colleague—and it certainly did not speak to whether the government meets the exception simply by identifying someone as a co-conspirator who is *not* in a joint venture with the defendant. Co-conspirator statements are admitted subject to the three-part test in *Van Hemelryck*, which was not satisfied with respect to the 801(d)(2)(e) statements admitted at trial.

## IX.     Conclusion

For the foregoing reasons, a new trial is warranted on Counts 1, 5, and 6 of the indictment.


Respectfully submitted,

BY: /s/ Jenny Wilson
    Jenny Wilson
    Florida Bar No. 1031758
    40 NW 3rd St, PH 1
    Miami, Florida 33138
    Tel: (305) 536-1191
    E-mail: jenny@klughwilson.com

    /s/Julie Holt
    Julie Holt
    Florida Bar No.: 95997
    Julie Holt Law PLLC
    40 NW 3rd Street PH 1
    Miami, Florida 33128
    Tel: (786) 505-4240
    julie@julieholtlaw.com