**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  23-CR-20271-LEIBOWITZ**

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BRETT BLACKMAN,

        Defendant.

_____/

## MOTION FOR A JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29(C)

Brett Blackman, through undersigned counsel, hereby moves for a judgment of acquittal under Fed. R. Crim. P. 29(c).  Blackman contests the government's proof as to each and every essential element of the offenses of conviction.  In addition to his general dispute with the evidence on each element of the offenses of conviction, Blackman submits specific grounds for relief detailed below, and more broadly urges the Court to find that as to each essential element of each count on which the jury returned a guilty verdict, there was a lack of proof sufficient to meet the government's burden.

### I.      Legal Standard

Rule 29(c) enables defendants, after a jury has returned its verdict, to raise grounds for acquittal whether or not a prior motion was made or grounds for acquittal were raised at trial.  In the intense moments of a trial, arguments for acquittal are often abridged or omitted.  Accordingly, the post-trial motion for judgment of acquittal offers the defendant a further opportunity to show— and the Court upon reflection to consider whether—the government failed to satisfy its burden of proof.  Rule 29(c) motions are governed by the tests for substantial evidence sufficient to convince a reasonable jury that the government proved all the essential elements of the charged offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  While the government need not exclude every reasonable hypothesis of innocence, a verdict cannot stand on an uncertain foundation.  *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989).  This principle is especially important in cases involving a regulatory scheme.  *See, e.g., United States v. Whiteside*, 285 F.3d

1345, 1351 (11th Cir. 2002) (reversing health care false statement conviction where regulations and administrative authority did not 'clearly answer' the dispositive elemental question regarding reporting of information).

In reviewing a motion under Rule 29(c), "a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction." *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). The district court must view the evidence in the light most favorable to the government, resolve any conflicts in the evidence and must accept all ***reasonable*** inferences that tend to support the government's case. *Id*. (emphasis added). However, "the Supreme Court has never squarely held that the inference standing alone will support a guilty verdict without the existence of corroborating evidence or circumstances." *Cosby v. Jones*, 682 F.2d 1373, 1380 (11th Cir. 1982). *See also United States v. Villegas,* 911 F.2d 623, 628-31 (11th Cir. 1990) (inference must be more than mere possibility); *United States v. Awan*, 966 F.2d 1415, 1434-35 (11th Cir. 2019) (stretched inferences are not proof); *United States v. Lopez-Ramirez*, 68 F.3d 438, 440-41 (11th Cir. 1995) ("reasonable" and not "speculative" inferences are required). Evidence is insufficient where it is "wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989).

Further, if the verdict is supportable on one ground but legally invalid on another, "and it is impossible to tell which ground the jury selected," the verdict must be set aside. *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds in Burks v. United States*, 437 U.S. 1 (1978). Judgment of acquittal motions present questions of law which are later reviewed *de novo* on appeal. *United States v. Myrie*, 479 F. App'x 898, 902 (11th Cir. 2012). If the record reveals a "lack of substantial evidence from which a factfinder could find guilt beyond a reasonable doubt," the appellate court will reverse. *United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994). In support of this motion, Mr. Blackman renews all prior motions and objections and states as follows.

## I. A JUDGMENT OF ACQUITTAL SHOULD BE ENTERED ON COUNT 1, WHICH CHARGED CONSPIRACY TO COMMIT HEALTHCARE FRAUD AND WIRE FRAUD

### A. The government failed to prove a conspiracy to commit healthcare fraud or wire fraud

The government charged *one* massive industry-wide conspiracy in Count 1 of the indictment. Its charge of conspiracy alleged that Mr. Blackman, as owner of the

2

DMERx/Healthsplash software conspiracy, joined a *single* industry-wide healthcare and wire fraud conspiracy, starting in 2015 and continuing through, in, or around October of 2020. The government took the position at trial that anyone who ever used the DMERx platform—*even prior to Mr. Blackman's purchasing it*—was an alleged co-conspirator. To sustain the conviction, the government needed to introduce substantial evidence of guilt that this five-and-a-half-year, multi-company illegal agreement existed—and that Mr. Blackman knowingly and willfully joined it with the intent to further its unlawful objects. *United States v. Chandler*, 888 F.3d 796, 805 (11th Cir. 2004). As the jury was instructed, Mr. Blackman must have known of the illegal purpose of the alleged conspiracy. Proof that Mr. Blackman did business with people who committed fraud is not enough, as the jury recognized in rejecting all of the substantive healthcare fraud counts (which incorporated the allegations of the Count 1 conspiracy). Additionally, Mr. Blackman's purported knowledge of any illegality was undermined by the proof at trial that companies were improperly using the DMERx/HealthSplash platform, contradicting government assertions that Blackman entered into an economically irrational agreement with such individuals. Acquiring a business whose customers may include people who are committing fraud does not establish proof of any illegality on the part of the business owner, whom the evidence at trial revealed took a hands-off role in the day-to-day operations of the company. An intent to generate revenue via a business does not supply proof of an intent to generate the law.

The government's proof of conspiracy rested on the testimony of cooperating witnesses who, facing fraud indictments and decades in prison, agreed to testify at trial and say they conspired with *a software platform*. Most of the cooperating witnesses had never met Blackman or said they had only met him in passing. The cooperators' own testimony reveals the absence of any single unified agreement, particularly any that Mr. Blackman joined.

Where an indictment charges a single conspiracy, but the proof establishes only multiple, separate conspiracies—none of which is the conspiracy charged, and none which implicates the defendant in an agreement to violate the law—a defendant is entitled to a judgment of acquittal because the essential element of membership in the charged agreement has not been satisfied. *Kotteakos v. United States*, 328 U.S. 750 (1946).

The government failed to prove a core agreement among the conspirators named in the indictment. And everything else it offered—the people who did not work for HealthSplash and almost all of whom had never met or interacted with Mr. Blackman—established at most what

3

*Kotteakos* precludes: separate spokes with no rim and no hub.  The verdict cannot be sustained on the theory that the software platform was the hub, particularly where prescriptions generated via the platform were based on users' own inputs; where a *platform* has no guilty mind and cannot agree to do anything; where claims were not submitted to Medicare via the platform; and where the co-conspirators admitted to using the platform in a way it was not intended to be used.  Indeed, the government's own witnesses—Denise Leard, a former attorney for Mr. Blackman and HealthSplash—testified that there was nothing illegal about the *software* that she saw.  Testimony overwhelmingly established that the decision whether to prescribe a brace lay solely with the *doctor using the platform*, and that the software in no way interfered with that doctor-patient relationship.

The government's case was reminiscent of the speculative civil claims made against gun manufacturers who harbor knowledge that some people will illegally use firearms.  True hub-and-spoke conspiracies differ from lawful-product misuse conspiracies in important ways; the latter cannot be established anecdotally but require knowledge of the specific conduct that the specific customer intends to engage in—not knowledge that some people may unnecessarily commit crimes with the product.  Even then, there is no rim to connect the wheel, just dealings with individual customers for each of which a separate conspiracy analysis is required rather than unsupported grand conspiracy concepts.

i.   ***Testimony from the Healthsplash cooperators failed to establish an illegal agreement***

To establish an illegal agreement *within* the company, the government called Toni DeLanoy and Greg Shreck, both former employees of DMERx/HealthSplash. Their testimony failed to establish that Mr. Blackman joined any illegal agreement or that any such agreement existed *within* the company.

Toni Delanoy, who testified in exchange for leniency pursuant to a cooperation agreement with the government, stated that it was her understanding that you do not need to have intent to be guilty of conspiracy—calling the validity of her own plea agreement into question and undermining the essential proof element of an agreement to commit a crime; she testified that she did not ever intend to commit a crime.  She testified that she warned Mr. Blackman of various problems with the HealthSplash portal, and she also testified that she believed the software was not built to subvert Medicare.  An employee's warning Mr. Blackman of her perceived hearsay concerns about telemedicine (which as discussed below was not prohibited by Medicare in the

4

relevant time period; Medicare put out a "face-to-face" list and *none* of the orthopedic braces in this case were on it) does not establish an illegal agreement between Blackman and Delanoy; rather, it *contradicts* government allegations of any illegal agreement.  Delanoy's testimony about her fears regarding telemedicine or warnings she gave Mr. Blackman do not supersede Medicare's own face-to-face list and nor do they offer substantial evidence of the essential meeting-of-the-minds element that a conspiracy requires. Delanoy's testimony was designed to persuade the jury that notwithstanding this face-to-face list, telemedicine was not allowed; it did not offer proof of any illegal agreement to subvert Medicare.  As to any conspiratorial agreement with Delanoy, the government's theory of the conspiracy asked the jury to find that Mr. Blackman conspired with someone who conceded under oath that she never intended to commit a crime.  This is significant because the illegality of conspiracy *is* the intent to violate the law.  The fact that Ms. DeLanoy testified to being an in-house skeptic of how the DMERx software functioned fails to satisfy the substantial evidence burden required to sustain a verdict; indeed, her own voice recording when police first showed up to her house revealed that she told authorities Mr. Blackman never did anything necessarily intentional.  And, as she said, nor did she intend to commit a crime.  There was no conspiratorial agreement between Blackman and DeLanoy.

The evidence showed that Gary Cox created DMERx and Mr. Blackman later purchased it with a vision to expand it into something bigger.  The government at trial focused heavily on the fact that the vision was never realized—but its own evidence showed that was due largely to the government's *own arrests and indictments*.  The fact that the vision was never realized does not supply after-the-fact proof of any intent to do anything illegal.

The only other HealthSplash corporate witness who testified as to Count 1 was <u>Gregory Shreck</u>.  Shreck was charged in the same indictment and who pleaded guilty in exchange for the dismissal of four charges and a reduced statutory maximum.  Shreck offered conclusory legal testimony, over defense objection, that he "conspired with" others at HealthSplash.  But the actual conduct which Mr. Schreck described on the stand undermined this improper legal assertion of a conspiratorial agreement.  The platform enabled DME Suppliers to connect with telemedicine companies.  *There is nothing illegal about that*: the government's own expert witness, Dr. Hoover, testified that medical necessity determination was supposed to be a collaborative effort between the DME supplier (who dispensed the brace and submitted the claim) and the healthcare provider (who wrote the prescription).  The fact that the software allowed these two parties to connect is

not evidence of conspiratorial agreement; it is evidence of an industry functioning as contemplated. And Shreck's testimony revealed evidence not of a company that was a shell for an illegal conspiracy, but rather one that was functioning as it should: when a supplier reported concerns about some patients not receiving telephone consults, Shreck forwarded the complaint to his compliance department. Again, the *software* had no role in the delivery of care, nor the patient-doctor relationship. Nor could the company police such matters without interfering with that privileged and confidential relationship. The government's arguments that, upon learning of fraudulent actors, the company did not take *sufficient* remedial measures (though the evidence plainly established remedial efforts were taken) converted its theory of willful conspiratorial agreement into a best-practices; should-have-policed-better argument that cannot sustain the verdict.

Schreck's testimony failed to offer substantial evidence of any conspiratorial agreement. When pressed about whether he ever intended to commit a crime he said that when he had knowledge of what was going on he continued to stay on board; when asked when he decided to commit a crime, he said "[w]hen I got knowledge of what was going on, more so around the kickbacks to the—or the money that was being paid from marketers to telemed physicians as well as DME companies paying the marketers, when I was aware of that and chose to do nothing." Tr.Day9:101. First, his own testimony indicated *no* awareness of fraud and related only to off-platform payments between third parties. Second, an awareness of unlawful conduct *without any willful agreement to participate*, and merely a decision to keep working for a company, is insufficient to establish proof of illegal agreement between Shreck and Blackman.

The Shreck testimony demonstrates a sales representative playing his role in the company and, when concerns arose, such concerns were forwarded to the compliance department. *Notably, the government failed to call a single witness who was a member of the DMERx/HealthSplash compliant department*. Without any testimonial support, it took the position at trial that the compliance department too was conspiring to do fraud—but it offered no proof of that, and the evidence contradicted those assertions by establishing that any concerns *brought to the attention of HealthSplash* were escalated to compliance to develop an action plan. The government also tried to pursue with Shreck a theory that outside counsel—who were retained to ensure legal compliance—did not have the full picture. But the government never established as much; nor does that establish an illegal *agreement* within the company. (Throughout the case, the government

flipped the burden of proof, seeking to establish reasonable doubt that HealthSplash was a legitimate company without ever offering substantial evidence that Blackman was involved in any wrongdoing, much less that everyone at the company conspired to commit a crime.)

Again, the lawyer whom the government chose to call, Denise Leard, emphasized that telemedicine was legal and that the DMERx software was not illegal. Testimony from Shreck characterized a company functioning exactly as it should: it retained outside counsel, ran a compliance department, and consulted with counsel prior to making changes. And when pressed on criminal intent, Schreck spoke only of kickbacks—emphasizing that he should have left the company but he stayed, which again does not provide substantial evidence that he made an illegal agreement with anyone, much less Brett Blackman, and failing to establish an illegal agreement as to any fraud conspiracy.

The government cannot point to any evidence that Mr. Blackman conspired with anyone inside HealthSplash to commit healthcare fraud or wire fraud. The email the government relied on throughout trial—one in which Mr. Blackman approves removing "telemedicine" from the orders generated after doctors input patient information fails to establish any material omission nor any intent to conspire as to any legitimate object of a conspiracy. When presented with that specific statement as an object of a conspiracy to make materially false statements, the jury acquitted Mr. Blackman. There was nothing wrong with removing "telemedicine" from the orders: Medicare did not require an in-person visit for the prescribed braces, nor was there any evidence that Mr. Blackman had *any* knowledge of what Medicare did or did not require. *Cf. Ingram v. United States*, 360 U.S. 672, 678-80 (1959) (in gambling tax conspiracy, no proof illegal lottery employees shared employers' criminal knowledge as to tax crime). Nor is evidence of an effort to avoid auditor scrutiny sufficient to establish fraudulent intent; this is wholly consistent with a lawful conduct: claims paid out should not be unfairly clawed back in audits where a doctor has made the requisite reasonable-and-necessary determination.

Internal company communications about attempting to avoid audits do not establish willful intent to commit healthcare fraud or wire fraud, or any crime for that matter. The indictment's allegations that the platform was "programmed" to generate "false and fraudulent doctors' orders" was wholly disproven by Delanoy's testimony that the platform was not built to subvert Medicare and Leard's testimony that she saw nothing illegal about the software. The evidence at trial also revealed that the content of the orders generated *depended entirely on doctors' inputs*. The

government introduced zero evidence that Mr. Blackman had any knowledge of how *any* doctor was using *software he purchased after it was up and running*, nor the truth or falsity of any information input by any doctor.

DeLanoy and Shreck's testimony that they chose to stay at the company and do nothing fell far short of producing substantial evidence of the affirmative meeting of the minds that conspiracy requires. *United States v. Brown*, 954 F.2d 1563, 1571 (11th Cir. 1992) (government may not rest upon proof that defendant acted in a way that would have furthered goals of conspiracy if there had been one). Without sufficient illegal intent as to an agreement entered into by DeLanoy and Shreck, there is similarly insufficient evidence of a meeting of criminal minds that conspiracy law requires. The government failed to introduce substantial evidence of any illegal agreement that Mr. Blackman joined with anyone inside his company. *See United States v. Parker*, 839 F.2d 1473, 1477-78 (11th Cir. 1988) (to support conspiracy conviction, evidence must establish a common agreement to violate the law; sales brokers presence at meeting discussing investment offerings later found to be fraudulent and brokers supposed motivation to commit fraud to help employer out of bad financial situation, so as to keep their jobs, insufficient to prove they entered into agreement with employer to commit fraud where no information provided at meeting informed brokers of fraudulent nature of investment; employer also not shown to have conspired, given insufficiency of evidence as to brokers, because "existence of a coconspirator is not only an element of the crime of conspiracy, but the very essence of the crime")

ii. ***The government's external cooperators characterized multiple conspiracies, none of which involved Mr. Blackman and none of which established proof of a single conspiracy charged in the indictment but rather reflected multiple separate conspiracies***

The government called various unconnected cooperators who were charged for conduct unrelated to Mr. Blackman but who later agreed to testify that they conspired with the platform, even though one cannot form an illegal agreement with software. Most witnesses testified they had never met or spoken to Brett so could not testify they made any illegal agreement with Blackman personally. The government had each cooperating witness recite their own crimes and name "DMERx" as a co-conspirator, but the testimony revealed no single unified conspiracy or any involving Blackman.

The government does not satisfy its substantial evidence burden by eliciting conclusory testimony from cooperating witnesses that they "conspired with" the software platform. The

content of these cooperating witnesses' testimony contradicted such assertions and the government's notion of a single unified conspiracy, creating a multiple conspiracy problem that not only was insufficient as to prove any offense on the part of Blackman, but which also resulted in material prejudice.

Chris Cirri stopped using the DMERx platform prior to Mr. Blackman's purchasing it. He testified, remarkably, that he conspired with: "[e]verybody I did business with . . . [A]ll the DME suppliers, all the telemedicine companies, and DMERx."' Cirri's testified that Mr. Blackman "came to visit me to try to get my business back" after he had left the platform (*prior* to Blackman's purchasing it), but that fails to establish any agreement between Cirri and Blackman. Cirri testified extensively about his dealings with Mr. Cox and asserted that he would propose changes to the platform to Mr. Cox, back when the platform. This all occurred prior to Mr. Blackman purchasing the platform. And, significantly, the evidence showed that when Cirri would request changes, he would represent to Mr. Cox that he had ran such proposals by *a Medicare attorney*. This fails to prove an illegal agreement: it demonstrates that Cox trusted Cirri based on his purported expertise of having a Medicare attorney review such changes. Even if the jury did credit Cirri's testimony that Mr. Blackman later sought to get his business back, that establishes no proof of any illegal agreement. *See United States v. Falcone*, 311 U.S. 205, 209 (1940) ("it could not be inferred . . . from the casual and unexplained meetings of some respondents with others who were convicted as conspirators that respondents knew of the conspiracy"). Cirri's testimony regarding fraud was premised on the false notion that Medicare prohibited telemedicine, which was repeatedly disproven at trial and which is not substantial evidence of a conspiratorial fraud agreement.

Chintan Anjaria owned a call center. The government, upon realizing it could not proceed on a theory that telemedicine was prohibited, shifted gears and attempted to draw attention to offshore call centers. Though the government elicited over defense objection testimony that offshore call centers were prohibited, there was no prohibition on off-shore call centers (and the trial revealed that government experts repeatedly expanded and cast new interpretive gloss on the text of Medicare regulations, in a manner inconsistent with due process, notice and comment, and the rule of law). Nor can the conduct of offshore call centers who used the platform be attributed to Blackman. Anjaria's testimony disproved any conspiratorial agreement with Blackman. His testimony revealed that he was not using the platform as intended but rather selling orders off-platform; there was no evidence that Blackman had any knowledge of this. He testified that he

never told anybody at DMERx/HealthSplash that he had told his call center agents to lie to people, revealing perhaps his own company's criminal conspiracy but not any that involved Blackman.

Again, government used Mr. Anjaria primarily to bolster its improper and highly prejudicial argument that offshore call centers were prohibited. The government emphasized an "illegal telemarketing scheme" to the jury—even though DMERx/HealthSplash did not engage in telemarketing, and nor did National Center for Pain, the direct mailing company with which Blackman was associated, engage in telemarketing. Anjaria's testimony was buttressed by the legally invalid testimony from government expert Jodi Sullivan, who testified that Medicare does not allow overseas call centers (even though there is no such regulation stating as much, nor did the government charge that in the indictment, nor did it produce any such regulation or statute stating that such is prohibited). The government cannot create an entire body of unwritten regulatory law via the testimony of experts and cooperators in a criminal fraud case. And to the extent that the government sought to persuade the jury that the call centers were engaging in improper conduct, there was a total absence of evidence linking Blackman to such conduct.

The government also introduced via Anjaria, over defense objection, a Skype chat between him and another individual (who apparently had nothing to do with HealthSplash or DMERx) that contained a link to a DOJ press release about law enforcement takedowns in the DME industry. The link was to arrests for DME fraud in a case that had nothing to do with DMERx or HealthSplash. This shows the existence of multiple conspiracies as to each separate external cooperator and demonstrates the deficiency of proof as to Blackman. The government fails to prove a conspiracy by asserting that an entire industry is fraud, or by asserting, as it did in argument to the jury, that there was an "ecosystem" of fraud. An ecosystem is not a conspiracy. An industry is not a conspiracy. Anjaria's testimony demonstrates the deficiency and unduly prejudicial nature of the government's conspiracy theory at trial: it sought to establish that the industry was riddled with fraud, ergo there was a conspiracy, but failed to offer any proof of a single unified agreement to violate the law.

Willie McNeal, who owned a telemedicine company, echoed the conclusory and legally improper testimony of other cooperating witnesses, stating that he conspired with "the three parties, the marketing agencies, the DMEs, as well as the software company that we were working with." Tr:160. Describing an industry does not offer substantial evidence of an *industry-wide conspiracy* as the government alleged. Mr. McNeal's company submitted the claim charged in

Count 2, on which the jury *acquitted* Mr. Blackman. And, like Anjaria, Mr. McNeal's testimony revealed that his company too was using the platform improperly, unbeknownst to Mr. Blackman. The jury acquitted Blackman of the substantive counts related to claims submitted by McNeal's company.

Mindy Breitman had a DME billing company. Her testimony did not establish that she had *ever even used the DMERx* platform. She never met or spoke to Blackman. Nevertheless, she testified "I conspired with my husband, I conspired with other medical supply companies, marketers, doctors themselves, and software platforms." Her reference to multiple platforms reveals that the *software platforms* were merely tools rather than participants. The jury acquitted as to Counts 2 and 4, both related to orders Ms. Breitman had submitted to Medicare *after* an audit was requested. She never met Brett. She testified that she "recognized" these orders as having come from the DMERx platform even though she never testified as to any apparent use of the platform; she received the orders downstream from either users of the platform or people who had purchased them from users who sold them improperly. There is insufficient record evidence to show Blackman conspired with Breitman.

Sargon Audisho  The jury rejected any concept of Blackman's involvement in Audisho's conduct in finding him not guilty of aiding and abetting the substantive health care charged in Count 3. There is insufficient evidence that Audisho conspired with Blackman. Audisho testified to improper use of the platform *as a doctor*. There was no evidence that Blackman had any idea that Audisho was using the platform improperly, or that Audisho was not calling patients, or that Audisho was not signing orders.

Keaton Langston and Jordan Karlick. The only cooperating witness the government called to establish pharmaceutical product billing fraud—disparate, separate-conspiracy allegations which it failed entirely to prove at trial, and only half-heartedly sought to prove as a tagalong to the brace accusations—was Keaton Langston, who offered no testimony regarding fraud and spoke only to kickbacks. Jordan Karlick was also called to testify as to kickbacks, discussed *infra*, and his testimony did not establish a fraud conspiracy.

There is no evidence that Brett joined a fraud conspiracy with *any* of the witnesses who testified at trial. The vast majority of the external cooperators who were offered to prove evidence of a conspiratorial agreement did not even know him, or had only known or met him briefly. The proof at trial failed to connect Blackman to any agreement to commit fraud. Even being present in

11

"very suspicious circumstances" is not sufficient evidence that a defendant was part of a conspiracy, *United States v. Perez-Tosta*, 36 F.3d 1552, 1559 (11th Cir. 1994) and varied, unconnected, and generalized allegations of *industry-wide* fraud by different actors who happened to use the prescription-writing software does not *even* establish "very suspicious circumstances" in the manner contemplated by the case law; proof must be specific and cannot be general.

The government failed to introduce substantial evidence of a single person with whom Blackman entered into an agreement to violate the law by committing healthcare and wire fraud. The proof failed to establish the core *agreement* that is essential to a conspiracy.

To determine whether the jury could have found a single conspiracy, the Eleventh Circuit considers "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *United States v. Eduoard*, 485 F.3d 1324, 1347 (11th Cir. 2007). All three of these factors illustrate the existence of *at best* multiple conspiracies, existing *separate from* DMERx and none involving Blackman.

This was an undefinable, vast, legally impossible, and non-unanimous conspiracy. A conspiracy is not an "ecosystem of fraud" as the government argued to the jury. Nor does participation in an industry where fraud has occurred establish a conspiracy. This is not a case such as a drug conspiracy "in which the object of the conspiracy is clearly illegal and there are various different clandestine functions to perform"; the common goal of making money is not enough. *See Chandler*, 388 F.3d at 811 (goal of redeeming game stamps for money was not enough). The only "goal" uniting the platform's 7,400 users and 5,000 physicians was one the government could articulate only at the highest, and insufficient, level of generality: making money. Notably, the company earned a use fee *regardless* of whether Medicare ultimately paid out a claim or not: the software platform charged a use fee for every transaction. The evidence revealed that the purposes of individual cooperating witnesses were often *counter* to any rational purpose of Mr. Blackman: indeed, when cooperating witnesses used the platform improperly, as the evidence showed that they did, Mr. Blackman *lost* money. And the various alleged co-conspirators—the various users of the platform—were *market competitors* with one another; they were not co-conspirators. To the extent that DME supply companies partnered with telemedicine companies via the DMERx/HealthSplash app, that was not evidence of a common *illegal* role, but rather the industry functioning exactly as it was supposed to function, as Dr. Hoover testified.

12

The DMERx software was a per-order, fee-for-service software company.  The success of the individual alleged spokes did not depend on one another.  The generalized testimony that other market players were necessary failed to establish a unifying illegal agreement.  The government's theory was that the *platform* connected the bad actors—but the proof revealed the opposite: any bad acts were occurring off the platform or unbeknownst to the platform.  Each individual cooperator could operate with their own people, regardless of the others.  The proof at trial revealed insufficient overlap of participants; the government's only claimed overlap is a software company.  This is not wrongdoing, and the evidence fails to establish a single conspiracy with the company as a "hub."

Moreover, it has long been established that supplying goods or services, even *knowing* the buyer's illegal purpose (which the evidence showed Blackman did not), does not render someone a co-conspirator.  *See United States v. Dekle*, 165 F.3d 826, 829-31 (11th Cir. 1999) (evidence-showing buy-sell relationship did not support inference that buyer and seller had same joint criminal objective to distribute drugs where doctor was providing drugs in exchange for sexual favors); *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) ("[O]ne does not become a party to a conspiracy by aiding and abetting it, through sales or supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally"); *United States v. Falcon*, 311 U.S. 205, 210 (1940) ("one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge").  The government's proof falls even further short here. The government failed to introduce substantial evidence that Mr. Blackman willfully joined anyone who may have used the software illegally.

Contributing to the multiple conspiracy problems, the charged conspiracy never existed as a unit.  It spans three separate segments which the government failed to connect to establish a unified conspiracy: (1) a six-month lead-and-order sales relationship between Mojo Media and PME that was not evidence of fraud but only used to prove kickbacks (which it failed to do, *see infra*); (2) the period during which Gary Cox owned the company and proof related to Cox's conduct as ownership, with Blackman absent; and (3) the period that followed Blackman's purchase of the company.  These were separate arrangements, again reflecting at best allegations of multiple conspiracies but failing to establish any unified course of conduct.

13

Similarly, the allegations of pharmacy billing fraud reflected allegations of a separate conspiracy—one which the government failed to prove and failed to connect to Blackman. With respect to factual testimony, the government relied only on the testimony of Keaton Langston, who testified only to kickbacks; it failed to prove any fraud with respect to pharmaceuticals. The pharmacy allegations involved different individuals and different products with different regulatory reimbursement structures and an entirely different network of participants; there was no overlap, nor any connection to the brace allegations. And there was a fundamental failure of proof as to any fraud occurring in the pharmaceutical context.

Blackman did not join the overarching, legally defective, and non-existent conspiracy charged in the indictment, and nor did he join any of the disparate and isolated conspiracies perhaps committed by various people who used his platform. "'Widesweeping and damaging as is a charge of conspiracy, difficult as it is for one caught in the net of such a charge to extricate himself from it when the government has any evidence tending to connect him with it, such a charge, no less than charges of substantive offenses, requires proof. This proof may be circumstantial or direct, or both, but it must be proof. That is, the evidence must have a legitimate tendency to compel belief in and finding of defendant's guilt.'" *Ah Ming Cheng v. United States*, 300 F.2d 202, 203-04 (5th Cir. 1962) (quoting *Kassin v. United States*, 87 F.2d 183, 184 (5th Cir. 1937). *See also United States v. To*, 144 F.3d 737, 744-46, 748 (11th Cir. 1998) (despite evidence that defendant extensively associated with conspirators that committed restaurant robberies, knew some conspiratorial plans, and accepted some proceeds of one robbery, evidence did not show his agreement to join RICO enterprise, voluntary participation in conspiratorial agreement, or actual participation in commission of offenses); *United States v. Awan*, 966 F.2d 1415, 1434-35 (11th Cir. 1992) (speculation and stretched inferences from business transactions conducted in secretive manner and involving limited group insufficient to prove defendant's knowing participation in money laundering; no direct proof of an agreement, and circumstantial evidence of agreement insufficient to support such inference; substantial evidence required).

### B. The government's fraud theory was defective and there was insufficient evidence of an agreement to commit fraud

This case involved over-the-counter braces prescribed via a software platform that Blackman owned. The crux of the coverage determination for such braces was whether they were "reasonable and necessary." The government charged a theory of fraud premised on the notion

14

that prescribing braces via telemedicine was prohibited—and thus, any brace deemed to be medically necessary via a telephonic visit was *per se* fraud. The trial proof contradicted this, revealing that Medicare published a so-called "Face-to-Face List" for DME braces, and that all the braces at issue in this case were *not* on that list during the relevant time frame. *Cf. United States v. AseraCare, Inc.*, 938 F.3d 1278, 1294 (11th Cir. 2019) ("the Government's framing of the eligibility inquiry is not consistent with the text or design of the law").

The government instead asked the jury to look to expert auditors' interpretation of "local coverage determinations" which do not have the force of law and which did not explicitly prohibit telemedicine. This was insufficient to prove fraud and amounted to improper deference not to the agency but to private contractors' *personal interpretations* of local coverage determinations. And the lack of materiality as to any purported violation of local coverage determinations (which are issued by *private contractors who perform audits*) is apparent in the fact that a local coverage determination does not even exist for every brace in the case. *See United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) (reversing all convictions for making false statements in Medicare/Medicaid reimbursement cost reports and for conspiracy to defraud the government by making false statements in those reports; "In a case where the truth or falsity of statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law").

Not a single Medicare regulation prohibited prescribing the *braces at issue in this case* via telemedicine—there were *some* braces for which Medicare put out a list requiring a face-to-face examination, and during the indictment time frame, these braces were not on it. The government cannot retroactively amend the plain text of the governing regulations via testimony from experts and cooperating witnesses about what it now says Medicare really wanted.

The absence of materiality as to the purported omission—that the doctors orders generated via the platform did not *automatically* disclose that the prescription for the brace resulted from a phone consultation (though the proof showed doctors could and did include this information in writing their own prescriptions)—is apparent in the fact that these prescriptions (the so-called "doctors orders") *were not even required to be submitted when a claim for coverage was made* by the DME supplier. This reveals deficiency as to the materiality of the alleged false representation.

The concurrences in *Kousisis v. United States*, 605 U.S. 114 (2025), made clear that the materiality inquiry is essential. *See id.* at 135 (Thomas, J., concurring), 146 (Gorsuch, J.,

15

concurring). *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) instructs that any misrepresentation must go to the "nature of the bargain." *Id*. at 1313 "[T]he traditional benefit-of-the-bargain injury rule is not some vestigial limb. It plays an important role in separating mere lies from criminal frauds and, in that way, reducing the risk of frivolous prosecutions." *Kousisis*, 605 U.S. at 151 (Gorsuch, J., concurring); *see also id*. at 146 ("the essence-of-the bargain standard is rigorous and context specific. Although the contracts in this case used language suggesting the DBE provisions were material, we have made clear that the materiality inquiry turns on substance rather than labels") (Thomas, J., concurring) (citing *Universal Health Services Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016); *Universal Health Services Inc.* at 194 (materiality cannot be found where noncompliance is minor or insubstantial). Medicare's bargain is coverage of reasonable and necessary devices for eligible beneficiaries. The case showed that these were not fake patients—they were real beneficiaries who *had called in to request a brace*. The government failed to even attempt to introduce substantial evidence that the beneficiaries did not need, want, benefit from, and use the braces in this case; indeed, it could not identify a single patient.

Moreover, a conditional injury cannot be deemed material as it does not affect the benefit of the bargain under *Kousisis* and *Takhalov*. The asserted injury was that **if** Medicare decide to audit the claims, **then** they would not have all the information that they might want (i.e., whether the claim was prescribed over a telemedicine visit) but that the government failed to show was required—particularly because according to the plain text of the face-to-face list, such information was not required for a claim to be paid. The government's shying-from-audits theory is legally defective in part because the alleged deception went to the *phrasing of non-essential and non-material information documentation in the event of the audit*.

There can be no materiality in non-essential information as to the specific claim determination; the allegation that the *claims* were fraudulent fails upon revelation during trial, and confession by government witnesses, that such "doctors orders" were *only* submitted to Medicare in the event of an audit. This fails to establish materiality as to the omission of telemedicine on the doctors' order, particularly where the doctors themselves were tasked with attesting as to the medical necessity. The government's theory was that medical necessity statements were *intentionally false* because the visits were conducted over telemedicine, but that substitutes the government auditors' own categorical and non-codified clinical judgment (which contradicts the governing regulation excluding such braces from the face-to-face list) for the doctors' independent

clinical judgment which is ultimately what matters and what is material. The government's theory of fraud—that the telephonic nature of the encounter was concealed and thus there was a material misstatement as to medical necessity—is legally invalid because silence is not a false statement where the silence is on a matter not covered by the rule and not required to be submitted with a claim.

As to Count 1, the government did not identify a conspiracy to make a false statement, much less a conspiracy to make a *material* false statement. The statement alleged was medical necessity, but Blackman had no knowledge much less willful intent as to whether the orders were *in fact* medically necessary (he is not a doctor); moreover "reasonable and necessary" (as the government's own expert Robert Hoover ultimately conceded was the governing standard) is a clinical judgment call in the context of therapeutic pain management braces where the proof failed to show that the *actual patients* did not want, need, use, and benefit from the braces.

Rather, the proof showed the opposite; as to every patient for whom a recorded call was produced, they called in affirmatively stating they were in pain and wanted a brace. Even if *some* doctors using the platform did not call patients *on some occasions*, the government failed to introduce substantial evidence that doctors were not calling patients or that if they were not, Blackman had any awareness.

The government introduced hundreds of doctors orders at trial (at least some of which were revealed to have been modified after download from the platform or unconnected to claims), but failed to introduce proof as to the specific doctors who signed those orders and the specific patients who received the braces.  This is why the government had to rely on its legally invalid telemedicine-is-fraud theory, which cannot sustain the verdict.  The government asked the jury to speculate that the patients did not need the braces but again failed to produce a single patient who said they did not need a brace.

The government called only its undercover agent, who had posed as a patient and who had affirmatively called in to a call center (insufficiently connected to Blackman) requesting a brace. The fact that an undercover agent duped an unrelated call center employee and subsequently never received a call from a doctor attributes *no* wrongdoing to Mr. Blackman personally, nor does it offer any evidence of conspiracy to commit fraud *by the software platform*.  There was no evidence that the software platform had *any* knowledge of Dr. DeCorso's supposed failure to call patients (much less conspiratorial intent).  Even failing to call patients cannot be deemed *per se* evidence

17

of lack of medical necessity in this context; a doctor could have reviewed call center recordings and reasonably concluded that an over-the-counter brace was "reasonable and necessary" for someone who described their pain (and, to be sure, the proof did not show that but for in some isolated instances doctors were not calling patients, much less that Blackman had *any* knowledge any doctors were not calling patients). The absence of testimony from a single patient is fatal to the government's case. Moreover, this has nothing to do with Blackman: the prescription decision and patient interaction was left to the doctors and would have been protected under doctor-patient confidentiality.

Of the doctors orders introduced at trial, the government failed to identify or offer proof of which was ultimately audited (meaning the claims were submitted to Medicare); of the merely *two* audits that the government introduced (over defense objection to the invalid audit theory and use of the existence of audits to prove wrongdoing), the jury found Mr. Blackman not guilty of substantive healthcare fraud.

Testifying witnesses who were not doctors and who did not make the medical necessity determination were asked to opine on whether a doctor's medical necessity determination was true or false. They stated false based on a purported rule prohibiting telemedicine that did not exist in writing anywhere and which was contradicted by the exclusion of these braces from the face-to-face list and/or without knowledge of the particular doctor-patient interaction as to which they opined falsity. The government tried to prove materiality and falsity based on the perceived payment preferences of auditors and the auditors' own interpretations of policy manuals and guidance that was not subject to notice-and-comment and which directly contradicted the government's own face-to-face list.

Medicare's payment decision is not wholly discretionary (and to the extent it is that undermines materiality allegations). Coverage is not based on the whims of auditors—it is governed by law via the reasonable-and-necessary standard. And the law did not prohibit telemedicine. *Loper Bright v. Raimondo*, 603 U.S. 369 (2024), instructs that courts—not agencies, and certainly not agency contractors or private auditors—determine what a statute requires. This means that the definition of "reasonable and necessary" *cannot* be deferred to the post-hoc interpretations of regulators who have contractual obligations to assist the government particularly where such deference is offered to establish criminal fraud. *Cf. United States Securities & Exchange Commission v. Amah*, 2026 WL 504794, at *4 (2d. Cir. 2026) (post-*Loper Bright*,

remanding on the theory that "[b]oth the SEC and the district court treated the SEC's prior interpretation of the Advisers Act as authoritative, and offered no substantive defense of that interpretation's correctness").

The reasonable and necessary standard—particularly in the context of therapeutic over-the-counter DME braces—is one that is of course subject to reasonable clinical disagreement as well as individual patient factors such as pain tolerance and preference. The medical necessity inquiry *in this context* cannot form the basis for a finding of falsity, much less material falsity. *Cf. United States v. AseraCare, Inc.*, 938 F.3d 1278, 1296–97 (11th Cir. 2019) (reasonable difference of clinical opinion does not establish falsity); *id*. (the claim cannot be "false"—and thus cannot trigger FCA liability—if the underlying clinical judgment does not reflect an objective falsehood . . . a properly formed and sincerely held clinical judgment is not untrue even if a different physician later contends that the judgment is wrong"); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) (holding that "a sincere statement of pure opinion is not an 'untrue statement of material fact' " under the Securities Act of 1933, "regardless whether an investor can ultimately prove the belief wrong").

Medical necessity in the DME context is a matter of *clinical opinion*, not a statement that is proven true or false by the assertions of government auditors. *Cf. id*. at 1293 ("The language of the statute and implementing regulations makes plain that the clinical judgment of the patient's attending physician (or the provider's medical director, as the case may be) lies at the center of the eligibility inquiry"); *id*. at 1295 ("the law is designed to give physicians meaningful latitude to make informed judgments without fear that those judgments will be second-guessed by laymen in a liability proceeding"); id. at 1300 ("certain good-faith medical diagnoses by a doctor cannot be false") (noting that a Sixth Circuit case cited with apparent approval this language from the district court decision in *AseraCare*).

The "false statement" alleged was the attestation of medical necessity on the doctors orders. The government failed to prove that telemedicine encounters made this attestation false. The legal invalidity of that theory warrants a judgment of acquittal. The government cannot defend the legal invalidity of the telemedicine-is-illegal theory by insisting it was within the scope of delegated authority, precisely because the LCDs it relied upon (which did not expressly prohibit telemedicine and which did not exist for all of the braces in this case) did not meet statutory requirements such that they can be deemed substantive payment standards, much less material. The government also

never introduced any evidence that an actual claim was ever denied *because* the visit was telephonic, contradicting the testimony about LCDs. Submitting a claim for reimbursement without disclosing non-essential information (which is not submitted with the claim and which is apparently not even required in the event of the audit as there was cited no rule requiring that a prescription disclose the type of visit conducted) is not a legally sufficient theory of fraud.

As the statute governing Medicare states: "No rule, requirement, or other statement of policy (other than a ***national*** coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1)." 42 U.S.C. 1395hh(a)(2). Medicare policy manuals, local coverage determinations, videos produced by testifying experts, and other regulatory instructional materials are not exempt under this statute. They do not have the force of law and cannot be used to establish the clinical falsity of a statement of medical necessity based on telemedicine that was *permitted by rule by its exclusion from the face-to-face list*. "*Expressio unius est exclusio alterius*." *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (as to both the face-to-face list and the exclusion of LCDs from 42 U.S.C. 1395hh(a)(2)). *See United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) (government "failed to sustain its burden to prove the claim false by virtue of the nonreimbursable nature of the interest"); *United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) ("The government cannot meet its burden in this case because, despite its contention to the contrary, no Medicare regulation, administrative ruling, or judicial decision exists that clearly requires interest expense to be reported in accordance with the original use of the loan"). In this case, the applicable regulation *exempt* these braces from those for which prescription via telemedicine was prohibited except in narrow circumstances.

### C. The government relied on a deficient kickback theory to prove fraud, and argued in closing that fraud is defined by Medicare

The government improperly argued in closing that "[T]his is simple stuff ladies and gentlemen. This isn't hard to understand. Medicare explains what fraud looks like. ***It is paying a kickback or bribe or referring patients***. It is misrepresentation of dates and descriptions of services." Tr.FirstClosing:88 (emphasis added). This argument mis-instructed the jury and conveyed to the jury that GX 641 (a page from a Medicare policy manual that was introduced over

defense objection and argued in closing as establishing a substantive standard) provided the definition of criminal fraud. This is particularly problematic because that page does not accurately convey criminal fraud. The government conveyed to the jury that it could find a criminal fraud conspiracy if it found kickbacks. This is untrue: While perhaps for purposes of the civil *False Claims Act*, claims that violate the Anti-Kickback statute are deemed false, that is not the case with respect to criminal fraud. The government's inviting the jury to convict based on purported legal instruction in a Medicare policy manual makes it impossible to tell on which ground the jury convicted, warranting a judgment of acquittal.

The government's closing argument, and its use of GX 641 to argue to the jury that kickbacks are criminal fraud, was directly at odds with the Eleventh Circuit's decision in *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007). As the Court there held: "While we acknowledge that paying kickbacks like those at issue in this case is a violation of 42 U.S.C. 1320a-7b(b)(2)(A), we cannot hold that this conduct alone is sufficient to establish healthcare fraud without someone making a knowing or false or fraudulent representation to Medicare." *Id*. at 1297-98. The government's argument that fraud is paying a kickback invited conviction on a legally invalid basis, and the prejudice is apparent from the fact that the jury acquitted Mr. Blackman of all substantive healthcare fraud counts. This creates the substantial likelihood that the jury thought it should convict of the Count 1 conspiracy if it found a conspiracy to commit kickbacks.

GX 641 contains other descriptions of criminal conduct that are likewise insufficient to prove fraud; the government's referring the jury to that exhibit to guide its decision on the Count 1 healthcare and wire fraud conspiracy renders the conviction invalid. Medicare does not define fraud. The government's mis-instruction to the jury that it could find fraud based on what Medicare policy manuals describe fraud to be warrants a judgment of acquittal. The government's reference to "misrepresentations of dates and descriptions of service" also invited conviction on the basis of non-material and uncharged misrepresentations.

The other reason the government's kickbacks argument was insufficient and cannot sustain the verdict as to Count 1 is because there was *no false statement or omission charged* relating to any kickback. The government improperly relied on kickbacks during the Rule 29 hearing, asserting that Dr. Hoover "demonstrated the falsity of the prescriptions by showing how Medicare would only pay for medically necessary prescriptions ***and that it would not pay for prescriptions that were procured through kickbacks and bribes***." Tr.Rule29:106 (emphasis added). Medicare

refusing to pay does not demonstrate falsity, and this argument veered from the core allegations of medical necessity that were the false statements charged in the indictment.

The False Claims Act's more expansive definition of fraud does not guide the 18 USC 1343 analysis—and nor does a Medicare policy manual. Throughout the trial, both in eliciting testimony from witnesses and in arguing to the jury, the government relied on these definitions and conveyed to the jury that they were sufficient to convict. This warrants a judgment of acquittal on Count 1.

**D. <u>A judgment of acquittal must be entered on Count 1 because the government argued theories of fraud that do not implicate a traditional property interest.</u>**

The government at trial advanced theories of fraud that do not implicate a traditional property interest and are thus legally invalid. The healthcare and wire fraud statutes "reach[ ] only those schemes that target traditional money or property interests." *Kousisis v. United States*, 605 U.S. 114, 118 (2025). *See also Ciminelli*, 598 U.S. 306 (2023) (rejecting right-to-control theory).

A primary invalid theory advanced by the government was that this was a scheme to avoid audits. Medicare contractors' access to unfettered nonmaterial information in discretionary claims review is not a traditional property interest. It is a purely regulatory interest that advances a right-to-control theory precluded by *Ciminelli*. Whether a claim is eligible such that it can be submitted for reimbursement as opposed to whether Medicare in its exercise of discretion will decide to pay it after an audit are two different inquiries and the government sought to collapse that distinction here. *See Ciminelli,* 598 U.S. at 316 ("The right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest."); *Kelly v. United States*, 590 U.S. 391, 403 (2020) ("Federal prosecutors may not use property fraud statutes to set[ ] standards of disclosure and good government for local and state officials . . . Much of governance involves (as it did here) regulatory choice.") (internal quotation marks and citation omitted); *United States v. Mueller*, 74 F.3d 1152, 1157-60 (11th Cir. 1996) (obstructing discovery and filing misleading pleadings in civil suit brought by financial institution to recover dividends due did not support bank fraud conviction).

The government's kickbacks-are-fraud theory likewise did not implicate a traditional property interest. As discussed above, Medicare's interest in prohibiting the payment of kickbacks is purely regulatory; it does not implicate the benefit of the bargain nor affect a traditional property interest; the benefit-of-the-bargain is a formal inquiry and it is insufficient for the government to

assert it "would not have paid if only it had known."  Another theory of fraud advanced by the government was that this was a scheme to deprive patients of choice in the type of brace they were prescribed or in the doctor they received (particularly where such patients had called in requesting a brace, not a particular doctor).  Patient choice is not a traditional property interest, nor did whether patients had a choice in the doctor or brace they were prescribed bear on any essential element. The government argued several theories of fraud that were legally invalid because they did not target traditional property interests.  A judgment of acquittal therefore must be entered on Count 1.

### E.  The jury instructions made the *Takhalov* economic-loss rule law of the case, and the government failed to prove intent to cause economic harm.

The jury was given the so-called *Takhalov* instruction—that "proving intent to deceive alone without the intent to cause loss or injury is not sufficient to prove intent to defraud." Tr.Day14:73.  The government (which asked for the *Takhalov* instruction in its proposed instructions) therefore needed to prove Blackman had an intent to cause economic harm and it failed to prove any intent to cause economic loss here.  The jury instructions are binding under law-of-the-case doctrine.  *See United States v. Martin*, 803 F.3d 581, 590 (11th Cir. 2015) (citing *United States v. Spletzer*, 535 F.2d 950, 954 (5th Cir. 1976); *United States v. Yates*, 733 F.3d 1059, 1063 (11th Cir. 2013), *rev'd and remanded*, 574 U.S. 528 (2015); *United States v. Murillo*, 443 Fed. App'x 472, 474 (11th Cir. 2011).  Thus, Blackman's convictions cannot be sustained on a theory at odds with *Takhalov*'s intent-to-cause-loss element.  *See United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) ("a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick," and "this is so even if the transaction would not have occurred but for the trick").

The government failed to prove that Brett intended to cause any economic *loss* to Medicare or any other program.  The government never introduced any evidence that Blackman wanted, much less assisted in the submission of, any claims for services that were not medically necessary. Nor did the government introduce evidence that Blackman wanted to cause economic loss or injury to Medicare.

### F.  A judgment of acquittal must be entered because the government failed to prove that Blackman had any criminal intent.

The government failed to introduce substantial evidence that Blackman had any criminal fraudulent intent, warranting a judgment of acquittal on Count 1.  Blackman had *no role whatsoever* in the ultimate clinical determination of medical necessity, nor did he receive any financial compensation as the result of the payment of claims; the software charged a $5 transaction fee *prior* to the submission of reimbursement and the payment of such fee did not depend on the success of reimbursement.

To the extent that witnesses testified regarding notice or awareness of risk that regulators may disapprove of telemedicine, notice of awareness of risk of regulatory disapproval is insufficient to prove criminal intent.  Even knowledge of wrongdoing is insufficient to prove willful criminal intent.  The evidence showed that when allegations of fraud were raised, the matter was referred to compliance and outside counsel.  The government did not introduce substantial evidence that Blackman overrode the advice of compliance; even if he had, that would not have shown criminal intent; it is typical for a CEO to delegate and then to ultimately make the final decision.  The inferences the government asked the jury to make throughout trial as to Blackman's criminal intent were fueled by prejudice, were based on legally invalid theories of fraud, and were speculative rather than reasonable.

There is no evidence that Blackman had any awareness of the doctor-patient interactions in the hundreds of orders the government introduced.  The government advanced an improper and insufficient theory as to data analysis; that Blackman should have known based on the volume of orders that some orders were fraudulent.  The government proved no knowledge on the part of Blackman as to the Medicare regulations (which permitted telemedicine) or as to how long a telemedicine consult was supposed to take.  There was no evidence that he tracked signing speed analytics; tracking revenue figures alone is not evidence of criminal intent. Even to the extent that he did, that would have advanced a should-have-known recklessness theory insufficient to establish willful intent.  The government focused on three doctors—Audisho, DeCorso, and Cuttino—who were using the platform improperly. Of these three, the government called only Audisho and the jury rejected Blackman's involvement in any wrongdoing by Audisho.  There is no evidence Blackman had any knowledge of DeCorso's misconduct to the extent such existed (which was targeted by the undercover, whose findings did not reflect the platform as a whole and

24

nor did they establish substantial evidence to prove fraud as to even DeCorso); Cuttino's orders, meanwhile, stated that a "telephonic examination was conducted," undermining the government's theory of fraud. The "stacks-of-orders" or volume-of-orders-in-a-given day theory is insufficient to prove willful intent. *See United States v. Falcone*, 311 U.S. 205, 205 n.1 (1940) ("To establish guilty knowledge the Government relies upon evidence showing that the volume of their sales was materially larger during the periods of activity of the illicit stills"; court found evidence "too vague and inconclusive to support a finding that respondents knew of a conspiracy from the size of the purchases"). The government's theory in this respect required the inference that as the platform's *owner*, Blackman not only knew but *willfully intended to join in* fraud that occurred outside of the platform—based solely on data analytics that they never proved he studied—is the type of speculation that cannot sustain a verdict. The same is true as to the government's multiple-brace theory; it amounts to a speculative should-have-known theory that even if factually supported would establish only recklessness.

The government's evidence failed to establish any less illegal agreement with these doctors. The evidence did not establish any illegal agreement with respect to what outside users were doing with the orders off platform. Nor is Blackman's involvement in multiple businesses within the healthcare sector proof of any criminal intent.

> **G. The government constructively amended and materially varied from the indictment by arguing to the jury that Mr. Blackman was a "telemarketer" and introduced a legally deficient theory of a "telemarketing fraud" scheme, warranting a judgment of acquittal**

The government in arguments to the jury characterized the charges as a "telemarketing fraud" scheme and improperly characterized Blackman as a "telemarketer." Blackman was not engaged in telemarketing; this had the effect of suggesting that he was violating the prior FTC order which was admitted only for a limited purpose.

None of the proof related to telemarketing fraud; the government's focus on this theory betrays the deficiency of the core charges as to telemedicine equating to fraud and sought to distract the jury with allegations of "shady call centers" in which Blackman was not involved. He was not engaged in telemarketing for the period of the indictment; the government's characterization of him as a telemarketer who preyed on the elderly and disabled misrepresented the evidence in the case, caused substantial prejudice, and is both factually and legally insufficient to sustain the verdict.

As to the National Center for Pain facet of the case, the evidence revealed that National Center for Pain sent direct mailers.  This was not telemarketing and did not violate the FTC settlement though the government suggested otherwise to the jury.  The telemarketing theory was legally invalid and factually incorrect.  Resulting prejudice is apparent because the jury rejected the government's core medical necessity theory as evidenced by its acquittal of Counts 2, 3, and 4, as well as of the material false statements object in Count 6.  There is thus a substantial likelihood the jury convicted on the basis of purported lies to patients by what the government described as "shady call centers", *see* Tr.Day14:89 (government's first closing); this was legally invalid, reflected a departure from the indictment's charges, and was factually unproven.   Upon realizing the deficiency of the telemedicine allegations, the government improperly turned to prove fraud-by-call-centers; the evidence did not support that theory particularly as to Blackman's conduct and it was legally invalid

### H. The government's vulnerable patients theory argued to the jury warrants a judgment of acquittal.

The government argued to the jury that Blackman preyed on 350,000 vulnerable patients—though it never called a single patient to testify that they did not want, need, or benefit from a brace.  This was improper argument that referenced facts not in evidence.  The patient call recordings indicated that patients had called into call centers (which were not operated by Blackman) saying they wanted and needed a brace. The government argued in closing that Blackman lied to patients; not only was this argument unsupported by the factual evidence, any purported misrepresentations to patients (which were not sufficiently proven) are legally invalid to form the basis for a healthcare fraud conviction or an 18 USC 371 conviction.

The government also advanced an invalid theory of fraud related to purportedly "misleading mailers" sent to beneficiaries (which the evidence showed made materially correct claims as to potential brace eligibility). The theory that beneficiaries were "tricked" (though not a single beneficiary testified) was not established by the factual proof at trial and likewise does not implicate a traditional property interest and served only to distract and prejudice the jury.  Via this argument the government sought to attribute industry-wide conduct to Blackman; it did not prove Blackman lied to a single patient.

Given that the jury rejected the government's telemedicine theory of fraud in Counts 2-4 and the acquittal of the material false statement object in Count 6, there is substantial prejudice

26

warranting a judgment of acquittal because it raises the likelihood of conviction on an invalid basis that was unsupported by the evidence.

### I. The government failed to prove pharmacy fraud allegations

As with the telemedicine theory, the pharmacy fraud theory was legally defective; the government called a former auditor to testify that a "genuine medical relationship was required, though conceded that her definition of genuine medical relationship was not required but inferred. As with the telemedicine, the government sought to impose new requirements and assert fraud on the basis of purported noncompliance with requirements that do not have the force of law and which the expert witness conceded she inferred.

Moreover, the proof was deficient on the pharmacy fraud. The government only half-heartedly attempted to prove pharmacy fraud; its only pharmacy witness, Keaton Langston, testified as to kickbacks but not fraud, and the government's records introduced with respect to the pharmacy charges failed to introduce substantial evidence of guilt. None of the patients whose medical records with pharmacy orders the government introduced appeared in the government exhibit containing the universe of Medicare claims for pharmacy products made that matched up to patients in DMERx's system. *Compare* GX 316–319 to GX 448. There is insufficient evidence to sustain the verdict on the legally deficient pharmacy fraud allegations, separately warranting a judgment of acquittal.

### J. The government failed to prove the CHAMPVA and TRICARE allegations

The government failed to introduce substantial evidence of guilt as to any scheme to defraud CHAMPVA or TRICARE; it relied only on expert and law enforcement testimony and failed to produce evidence related to any particular fraudulent claims or misstatements made to CHAMPVA. The government apparently never sought to prove TRICARE. Its CHAMPVA-related evidence rested on the same legally deficient theories as to the Medicare fraud which cannot sustain the verdict. The government's testimony as to the CHAMPVA evidence also failed to establish a link to HealthSplash.

### K. The wire fraud object must be vacated because the jury was not instructed as to wire fraud but rather twice instructed as to healthcare fraud.

As to the wire fraud object of Count 1, Defense proposed the pattern wire fraud instruction, *see* DE:455:29; and the Court indicated at the charge conference that it was inclined to give the pattern instruction. The government requested modifications which had the effect of duplicating

the instruction on healthcare fraud. *See* DE:455:29-30 (underlined text reflecting language proposed by the government; italicized reflecting language proposed by the defense). Notwithstanding the Court's stated intent to give the pattern as defense had requested, the wire fraud object was charged to the jury as a healthcare fraud object. This warrants a judgment of acquittal or new trial on the wire fraud object, or at the very least a limitation of sentencing to the healthcare fraud object.

Additionally, proof must be specific and wire proof was at best generic. The government argued at the Rule 29 hearing that claims are submitted through interstate wires, but there was no evidence that Mr. Blackman joined an agreement to submit *anything* via interstate wires; indeed, claims were submitted off-platform and government failed to introduce sufficient evidence that Blackman had any role in or knowledge of process via which claims were submitted (i.e. whether they were mailed or submitted via wires).

## II. A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON COUNTS 5 AND 6 BECAUSE THE GOVERNMENT SUBMITTED TO THE JURY LEGALLY INVALID OVERT ACTS.

Where a verdict is supportable on one ground but not another, and it is impossible to tell which ground the jury relied on, the verdict must be set aside. *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978). More specifically, where the government must prove an overt act, one or more of the overt acts submitted to the jury are legally insufficient, and it is impossible to identify the ground of conviction, the conviction must be reversed. *Cramer v. United States*, 325 U.S. 1, 36 (1945) ((holding that because two of three overt acts submitted to jury were insufficient as a matter of law, conviction must be reversed); *Griffin v. United States*, 502 U.S. 46, 55–56 (1991) (distinguishing legally inadequate grounds, which require reversal, from merely factually unsupported grounds, which do not).

A conviction under 18 U.S.C. § 371 as charged in Courts 5 and 6 requires proof that a conspirator committed at least one overt act in furtherance of the charged conspiracy, and that act must fall within the limitations period. 18 U.S.C. § 371; *United States v. Dynalectric Co.*, 859 F.2d 1559, 1564 n.6 (11th Cir. 1988) ("[T]he indictment must charge and the evidence at trial must show that an overt act in furtherance of the conspiracy was made in the limitation period."); *see also United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976).

Here, the government submitted numerous overt acts that were legally insufficient to support either conspiracy, and it is impossible to know which ones the jury relied on. For Count 5, seven of the fourteen submitted overt acts fell outside the five-year limitations period. DE:76 at 18–20. For Count 6, two of the seven submitted overt acts fall outside that period. These overt acts were legally insufficient to support either conspiracy as a matter of law. *Dynalectric Co.*, 859 F.2d at 1564 n.6.

Overt Acts 1 and 2 of Count 5 are also legally insufficient because they described conduct directed toward a lawful result achieved by lawful means. As explained above, the PME Homehealth–Mojo Media payment arrangement was lawful. An overt act that merely furthers a lawful arrangement cannot support a conspiracy conviction. *United States v. Driscoll*, 449 F.2d 894, 897–98 (1st Cir. 1971) (vacating conspiracy conviction because it was faced with possibility that jury was not persuaded by overt acts that could legally support conviction but relied instead on "an act directed towards obtaining a lawful result by a lawful means.").

Yet for both counts, these numerous legally invalid overt acts were submitted to the jury, and the jury was thus allowed to find, as per the jury instructions, that one of these legally invalid overt acts was the overt act the government had proved beyond a reasonable doubt such that the conviction was supported. And for both counts, the jury returned a general verdict with respect to the overt acts making it impossible to know whether it relied on a legally valid overt act or one of the numerous legally invalid ones. Because it is "just as possible" the jury relied on an invalid overt act as a valid one, the convictions on Counts 5 and 6 must be vacated. *See Cramer v. Fahner*, 683 F.2d 1376, 1379 (7th Cir. 1982) (reversing where the court could not tell whether the verdict rested on valid or invalid overt acts); *United States v. Head*, 641 F.2d 174, 179 (4th Cir. 1981) (reversing general-verdict conviction resting in part on acts outside the limitations period); *United States v. Carman*, 577 F.2d 556, 566–68 (9th Cir. 1978); *Feela v. Israel*, 727 F.2d 151, 154–56 (7th Cir. 1984); *United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir. 1984) (reversing where a "legally insufficient predicate act . . . may have been necessary to the verdict"); *United States v. Marcello*, 876 F.2d 1147, 1153 (5th Cir. 1989) (reversing conviction where no indication whether jury rested RICO conviction on legally insufficient predicate acts submitted).

### III.     A JUDGMENT OF ACQUITTAL MUST BE ENTERED ON COUNT 5

In order to sustain a conviction under 18 U.S.C. § 371, the government must prove (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and

voluntary participation in the agreement; and (3) the commission of an act in furtherance of the agreement. *United States v. Cure*, 804 F.2d 625, 628–630 (11th Cir.1986). The government must prove an agreement between at least two conspirators to pursue jointly an illegal objective. *United States v. Krasovich*, 819 F.2d 253 (9th Cir.1987); *United States v. Mulherin*, 710 F.2d 731, 737 (11th Cir.1983). The government must also prove beyond a reasonable doubt that each defendant had a "deliberate, knowing, specific intent to join the conspiracy." *United States v. Cole*, 755 F.2d 748, 755 (11th Cir.1985).

The government was never able to articulate a consistent and coherent theory of which payments it claimed were illegal kickbacks and which "referrals" were in return for payment. Instead, its theory shifted as the trial evidence established, payment by payment, that nothing charged in the indictment was in fact a kickback. In the end, the government failed to prove that any payment alleged in the indictment was made to induce a patient referral to a Medicare service, or made in return for such a referral. It likewise failed to prove that any referral alleged in the indictment was a referral of the kind the Anti-Kickback Statute prohibits, that Mr. Blackman knowingly and willfully joined an agreement to violate the statute, that he did so before any timely overt act, or that he had the requisite intent. Each of these independent failures requires acquittal on Count 5.

**A. The government failed to prove that any payment alleged in the indictment was an illegal kickback.**

In the indictment, the government identified three categories of payments in the kickback conspiracy charged in Count 5: (1) the payment from PME Homehealth to Jordan Karlick's Mojo Media, which the government described as a payment for doctors' orders; (2) payments from US Orthopedics to STK Marketing; and (3) payments from STK Marketing and Chronos to HealthSplash. DE 76 at 19–20. The government identified no other payments in the indictment as illegal kickbacks. Each of these three theories fails.

**1. The PME Homehealth to Mojo Media payment.**

The payment from PME Homehealth to Jordan Karlick's Mojo Media of $125/$150 per brace order was not an illegal kickback as a matter of law. This arrangement is materially indistinguishable from the arrangement the Seventh Circuit held lawful in *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025). There, a DME supply company paid a marketer to advertise its orthotic braces. The marketing firm "published advertisements for orthopedic braces."

30

*Id.* at 496. Interested patients responded through an electronic form providing their names, addresses, and their physicians' contact information, which "was forwarded to call centers where a [] sales agent would contact the patient to discuss ordering a brace and generating a prescription form." *Id.* After collecting additional information and obtaining the patient's consent, sales agents faxed prefilled but unsigned prescription forms bearing the DME supplier's name and logo and listing the devices ordered to the patient's physician. *Id.* The physician decided whether to sign and return the prescription form to the marketer or DME provider. Eighty percent of the forms were never returned. *Id.* at 501. The DME supplier billed Medicare and paid the marketers and shippers a percentage of what Medicare reimbursed. *Id.* at 496.

The Seventh Circuit held that these payments to the shipper and marketers—payments expressly tied to the amount of Medicare reimbursement—were not illegal kickbacks. It stated that although the Anti-Kickback Statute can reach non-physicians, in these "less common cases," the touchstone is whether "a payee leverages fluid, informal power and influence over healthcare decisions." *Id.* at 500 (internal quotations omitted). The Court found that because "there simply is no evidence that the entities [the DME supplier paid] leveraged any sort of informal power and influence over healthcare decisions," the payments were lawful. *Id.* at 501, 504 ("aggressive advertising efforts are not equivalent to unlawful referrals of patients").

The Seventh Circuit is not alone. In its holding, the Seventh Circuit relied on the Fifth Circuit's similar holding in *United States v. Miles,* 360 F.3d 472 (5th Cir. 2004). In *Miles*, the Fifth Circuit overturned convictions under the Anti-Kickback Statute where a Medicare-registered home healthcare provider paid a public relations firm. The Fifth Circuit explained that there are "certain situations where payments to non-doctors would fall within the scope of the statute," but the court distinguished between a payment to induce referrals from a payee who is in a position to make or influence healthcare decisions, which violates the statute, and a payment for advertising services, which does not. *Miles*, 360 F.3d at 480–81. Similarly, in *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024), the Fifth Circuit held that the government must show more than just evidence that a defendant was compensated for referrals as a percentage of revenue generated. *Id.* at 831. There was no evidence that the *Marchetti* defendant impermissibly influenced "those who make healthcare decisions on behalf of patients." *Id.* at 827. The Fifth Circuit made clear that the actions in *Marchetti* and *Miles* did not prevent physicians from independently choosing whether to authorize care.

31

Here, the evidence at trial showed that the arrangement between PME Homehealth and Mojo Media was, in every material respect, identical to that in *Sorensen*. Just like in *Sorensen*, the DME supplier (PME Homehealth) hired a marketer (Mojo Media) to generate advertising for orthopedic braces. Interested patients called a designated call center, where a sales agent discussed ordering a brace and generating a prescription form. After collecting information and obtaining the patient's consent, the sales agent faxed a prefilled but unsigned prescription form to the patient's physician. GX 1001. The physician alone decided whether to sign it and return to Mojo Media, who then forwarded it to PME Homehealth. PME filled it, shipped the brace, and billed Medicare. PME Homehealth then paid Mojo Media based on the number of orders returned signed. Government witness Jordan Karlick testified that 10–20% of the orders sent out were returned. Tr. Apr. 27, 2026 at 87. Importantly, just like in *Sorenson*, there was no evidence that Mojo Media leveraged any sort of informal power and influence over the healthcare decisions of the clinicians who decided whether or not to sign the brace orders. Consequently, as a matter of law, this payment cannot support a conviction for Count 5.

### 2. The US Orthopedics to STK Marketing payments.

The next group of payments alleged by the government fares no better. The government alleged as kickbacks two payments from US Orthopedics to STK Marketing, "a purported telemedicine company owner." DE 76, Count 5, ¶¶ 8–9. But the government offered no evidence that these payments were made to induce a Medicare referral. The only proof at trial was a US Orthopedics bank statement showing an outgoing payment to "Stk Marketing Inc" and testimony from the government's summary expert, Michael Petron, that the payment occurred. *See* GX 144, 145, 902, 921. The government introduced no evidence of who STK Marketing was, what business (if any) it did with US Orthopedics, or why the payments were made. Nor did the government prove that it was owned by a telemedicine owner. Petron's testimony was limited to identifying the transaction on a bank record; he had no personal knowledge of its purpose. Absent any evidence of purpose, a finding that this payment was made to induce a referral to a Medicare service would rest on pure speculation.

### 3. The HealthSplash use-fee payments.

The government's remaining theory that the use fees paid to HealthSplash were the kickbacks sufficient to establish the conspiracy to engage in kickbacks also fails. Specifically, the government noted two payments of approximately $20,460 and $3,230 from STK Marketing to

HealthSplash and payments of the $85,900 and $93,915 from Chronos to HealthSplash. DE 76 The government's theory as to use fees is insufficient for several reasons. First, the government failed to prove any of the specified payments were made to induce or in return for a Medicare patient referral. As a baseline, the government failed to prove the two payments of $20,460 and $3,230 went to HealthSplash. The only evidence offered were STK Marketing's account records (GX 921) and two demonstratives (GX 146, 147) showing STK Marketing sending those sums to an unidentified account with a memo line reading "HealthSplash." However, a review of HealthSplash's own accounts (GX 141: Bank of America x2420, Arvest Bank x0734, Central Bank of the Midwest x3937) shows no matching deposits on the relevant dates. *See* GX 790–797, 807–808, 931, 784–789, 798–806. And the government's own exhibits do not list an account number for the alleged HealthSplash recipient account, only for the outgoing STK Marketing account. *See* GX 146 and 147.

Further, the government introduced no evidence of the purpose of these transactions or who directed them; it only introduced evidence that they occurred. Nor did the government prove that STK Marketing was a telemedicine company, or was owned by one, or that a telemedicine company owner directed the payment, as the indictment alleges.

The same gap infects the $85,900 and $93,915 payments from Chronos to HealthSplash alleged in paragraphs 12 and 14 of Count 5. DE 76 at 20. No witness testified who directed these payments or what they were for. Consequently, the government did not introduce sufficient evidence that any of these payments were kickbacks. It is telling that the government rested this theory on payments for which it called no witness with personal knowledge, when it had a multitude of witnesses at its disposal and a multitude of witnesses who would have had knowledge of their companies' own payments to HealthSplash or other HealthSplash users.

*Second*, the government did not establish that the $5 use fee HealthSplash charged constituted an illegal kickback. In attempting to make the $5 use fee unlawful, the government relied solely on Denise Leard's memorandum in which the government claimed she told Mr. Blackman the fee violated the Anti-Kickback Statute (GX 633). In closing, the government cited exclusively Ms. Leard's memorandum as its evidence that the $5 fee was a kickback. The government first stated that Ms. Leard warned Mr. Blackman in writing that the "proposed arrangement in its current form poses a risk of violating the anti-kickback statute." Closing Tr. May 12, 2026 (AM) at 86. It went on to claim that in the contracts HealthSplash used, Mr.

Blackman "kept that same $5 download fee that Denise Leard told him not to use." *Id*. at 87. The government then argued: "Which leads us to Count 5, conspiracy to pay and receive healthcare kickbacks. He knew it was illegal, circling back to Denise Leard's advice. She told him it was a risk of violating the antikickback statute. He kept that in the orders because that is how he made his money, selling doctor's order to fraudulent suppliers, $5 a pop." *Id*. at 111. The government argued no other theory or evidence as to how a $5 use fee constituted an illegal kickback.

But this argument fails for two reasons. First, the memorandum did not say what the government claimed. On the contrary, the memo stated that "payments by DME Suppliers to DMERX *do not* implicate the AKS because Health Splash does not refer (or 'arrange for the referral of') Patients to the supplier." GX 633 at 3 (emphasis added). It flagged only a *potential* violation arising from a use fee paid by a *clinician* to HealthSplash, under a structure in which HealthSplash would refer patients directly to that specific clinician and would not do so if the clinician did not use the HealthSplash software. *Id.* But the evidence at trial established that HealthSplash never operated that way: it never referred patients to clinicians and clinicians never paid HealthSplash. The entities that paid the use fee were the telemedicine companies, DME suppliers, and marketing companies, not clinicians. Ms. Leard's memorandum, addressed to a structure that was never adopted, does not permit a reasonable jury to find beyond a reasonable doubt that the fee arrangement actually used was an illegal kickback.

Second, and more fundamentally, the Court admitted GX 633 for a limited purpose and expressly barred the government from using it to show what the law prohibits or whether the arrangement was unlawful. As the Court instructed the jury when the exhibit came in: "th[e] document is not admitted . . . for the witness' legal conclusions in the document. Whether the witness is right or wrong about that, that is not what you can consider this document for at all. . . . [I]t is admitted only for the purpose of the defendant's state of mind." Tr. Apr. 22, 2026 (AM) at 144. Yet in closing, the government did precisely what the Court forbade: it used Ms. Leard's legal conclusion (as misstated by the government) as substantive proof that the use fee arrangement actually used by HealthSplash violated the statute. That is not a permissible use of the memo, and testimony or documents admitted for a limited, non-substantive purpose cannot be recast in closing as proof of the very fact they were barred from proving.

Third, the $5 fee does not constitute a kickback as a matter of law. The undisputed evidence was that HealthSplash charged the fee *per download* of patient information for the telemedicine

company, and per download of documentation for the DME supply company, *regardless of whether a brace was prescribed*. A flat, per-use software fee that does not vary with whether a brace was prescribed, and that is charged whether or not the underlying transaction results in a Medicare claim, is not remuneration paid "to induce" or "in return for" a referral within the meaning of the Anti-Kickback Statute. It is a subscription charge for use of a platform, not compensation contingent a Medicare referral.

The government failed to show that any payment or planned payment alleged in Count 5 as the object of the conspiracy constituted an illegal kickback. The conviction cannot stand.

Because none of the three payment categories actually charged in the indictment constitutes a kickback, the government shifted to arguing more generally that payments from DME suppliers to marketing companies, and from marketing companies to telemedicine companies were generally illegal kickbacks. But to allow such to support a conviction to Count 5 would be an impermissible and prejudicial variance from what was charged in the indictment. *See United States v. Varoz*, 740 F.2d 772, 775 (10th Cir. 1984) ("A defendant may not be convicted on a theory not charged in the indictment"). Evidence of these uncharged payments accordingly cannot support the conviction on Count 5.

But even if such payments could potentially support a conviction, the government did not establish that these payments were to induce a Medicare referral. To violate the statute, a payment must be made *to induce* a referral to a Medicare service, or solicited or received specifically *in return* for making one. 42 U.S.C. § 1320a-7b(b)(1)–(2). Payments made or received without that specific purpose—even if made between healthcare providers, marketers, and medical supply companies—are not illegal kickbacks. A payment made for services rendered, even services that happen to include referring a patient, is not illegal merely because a referral occurs; paying fair market value for work actually performed is not "remuneration" at all. *See* 42 U.S.C. § 1320a-7a(i)(6) (defining "remuneration" as including a transfer of value "for free or for other than fair market value"). The government introduced no evidence about what the DME supply company paid the marketer or that it was anything other than fair market value for the services rendered. In fact, the government introduced no evidence at all of actual payments from a DME supply company to a marketing company that were connected to the use of the DMERx platform. Similarly, the evidence showed that marketers paid telemedicine companies $80–100 and the

telemedicine company paid the clinician $20–40 per consultation. There was no evidence that was anything other than a fair market value for a consultation, and common sense dictates that it is. More importantly, the evidence at trial was that marketers paid telemedicine companies, and telemedicine companies paid clinicians, *on a per-consultation basis*, not per signed order and not per brace. *See, e.g.*, Tr. Apr. 28, 2026 (PM) at 12–13 (marketers paid telemedicine companies "80 to $90 per consultation, not per order," and telemedicine companies paid "the doctor 30 to $40 per consultation"); Tr. May 5, 2026 (AM) at 156–57 ("the telemed paid the doctor per consult"); Tr. May 6, 2026 (AM) at 5–6 (same). The clinicians were paid the same amount whether or not they ultimately signed a brace order. A flat, per-consultation fee that does not turn on the outcome of the consultation is the paradigm of a lawful payment for services, not an inducement to refer. And under *Sorensen* and *Marchetti*, where the government introduced no evidence that the marketer or DME supplier exerted influence over the clinician's independent medical judgment, such payments cannot constitute illegal kickbacks as a matter of law.

In sum, all the government proved was that there were payments. But there was not a single payment alleged in the indictment that the government proved was to induce or was in return for a Medicare referral. The conviction on Count 5 cannot stand.

## B. The government failed to prove the existence of a patient referral for a Medicare-covered service induced by, or made in return for, illegal remuneration.

The government never identified with any specificity a referral that was the object of an inducement or a *quid pro quo* payment. The only "referrals" the indictment identifies are business introductions made by Gary Cox or Gregory Schreck connecting companies who were customers or potential customers of DMERx. DE 76 at 19 (overt acts 3 and 6). These are the "illegal referrals" the government relied on at trial as the referrals violating the Anti-Kickback Statute repeatedly asking witnesses about the "referrals" HealthSplash made. For example, the government elicited from Willie McNeal:

Q: How did you find the marketing companies that you used on DMERx?

A: One of the key ways when getting into the industry was through — the HealthSplash DMERx were given referrals of different marketing agencies that they worked with.

. . .

Q: What was inaccurate about the referral service language here [in the contract stating that HealthSplash did not make medical referrals]?

A: That they did, in fact, refer most of my client to me.

Q: And how—just explain that.

A: So there's a—I will receive an email with an introduction, is what it was entitled, to marketers individually, and then were was others where they would send them in a batch, introduce them.

Tr. Apr. 30, 2026 at 156.

The government solicited similar testimony from Gregory Schreck, introducing multiple emails in which he made business introductions or recommendations. *See e.g.*, GX 1156. Similar testimony was elicited from Chris Cirri and Chintan Anjaria. *See* Tr. Apr. 22, 2026 at 88; Tr. May 6, 2026 at 11 (government stating, And what I'm also going to show through other parts of Ms. Anjaria's [sic] testimony is that some of these other clients of DMERx are being referred to Mr. Anjaria.").

However, the government's theory that DMERx connecting businesses were forbidden "referrals" under the Anti-Kickback statute is legally invalid. A business-to-business introduction is not a referral of a patient to a Medicare-covered service. Further, the government introduced no evidence that HealthSplash was paid for these referrals meaning it did not prove that the "referral" was induced by remuneration or made in exchange for remuneration. This theory cannot support a conviction on Count 5.

The government conceded as much during the trial. By closing, after its own evidence failed to show these were referrals of *people* for Medicare services induced by or in return for remuneration, the government essentially abandoned the theory, arguing instead that "[w]e have not argued that referrals, themselves, are improper" but that "concealing the referral relationship through the contracts is improper." Closing Tr. May 11, 2026 (PM) at 45. But that theory is similarly invalid. Concealing a cost-free introduction between two businesses is not paying or receiving a kickback, and a business referral is not a "patient" referral within the meaning of the statute, which requires referring "an individual" for a covered item or service. 42 U.S.C. § 1320a-7b(b)(1)(A), (2)(A). Evidence that Mr. Blackman concealed business-to-business introductions therefore cannot support a finding that he conspired to make the kind of referral the statute prohibits.

**C. The government failed to prove the existence of the conspiracy charged and that Blackman joined in such conspiracy.**

To convict Mr. Blackman of Count 5, the government had to prove not merely that some payment was made to induce a referral, or that some referral was made in return for payment, but that Mr. Blackman knowingly and willfully agreed with at least one other person to engage in that unlawful conduct, knowing it was unlawful. 18 U.S.C. § 371. It failed to do so.

First, the government introduced no evidence of an agreement that included Mr. Blackman to engage in illegal kickbacks. It failed to prove that Mr. Blackman and at least one other person made a "deliberate, knowing, specific" decision to form a conspiracy. Cole, 755 F.2d at 755. It is not enough that Mr. Blackman built and operated a platform that other companies used to conduct their own business, even if some of those companies were engaged in unlawful conduct using documents from the platform. "[E]ven where the act in question appears to further the objective of a conspiracy, not every such act provides a sufficient basis to demonstrate the actor's concurrence in the agreement." United States v. Toler, 144 F.3d 1423, 1433 (11th Cir. 1998). Nor is it sufficient that Mr. Blackman may have known that companies using his platform were themselves paying or receiving kickbacks and did nothing to stop it; knowledge of another's crime, without more, is not agreement to join it. Id. (even if a defendant "knew of [a] conspiracy," the government must still show he "affirmatively agreed to participate in [it]"); see also Direct Sales Co. v. United States, 319 U.S. 703, 709 (1943) ("[O]ne does not become a party to a conspiracy by aiding and abetting it, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally.").

At most, the government proved that users of the HealthSplash platform separately conspired among themselves. But the evidence showed that the allegedly unlawful kickbacks to which these witnesses testified—selling downloaded brace orders to other DME suppliers—happened off the platform, not through it. Chintan Anjaria and Willie McNeal testified that they downloaded brace orders through legitimate DME-supplier accounts and then sold them outside the platform. Anjaria testified he had to obtain or falsely claim a DME supplier relationship simply to access the patient evaluations he later sold off-platform. That the platform was misused by some of its customers, working around its structure rather than through it, undercuts rather than supports an inference that Mr. Blackman built HealthSplash to join their conspiracy. And on cross-examination, Anjaria, McNeal, and Cirri each confirmed they never communicated with Mr. Blackman about their own payment arrangements, never sought his approval for them, and in most cases never met him. The

government failed to prove that the conspiracy as charged existed, and that Mr. Blackman willfully and knowingly joined in a plan to engage in illegal kickbacks.

Second, the government failed to prove the conspiracy because it failed to prove that any timely overt act was done in furtherance of the charged conspiracy. The government indicted Mr. Blackman on June 27, 2023. DE 1. The limitations period for Count 5 thus extends to June 28, 2018. That means the government had to have proven beyond a reasonable doubt one of Overt Acts 8–14 in order to convict Mr. Blackman of Count 5. For the reasons stated above, the government failed to prove the payments in Overt Acts 8, 9, 11–14 (payments) were in furtherance of the conspiracy. That leaves only Overt Act 10: that Gregory Schreck signed a Supplier Data Coordination Agreement on behalf of HealthSplash with a DME supplier on October 25, 2018. DE 76 at 19. Yet the government never identified such an agreement throughout the entire trial. Nor did the government elicit testimony about such an agreement, any information about the DME supplier in the contract, who owned the DME, any evidence showing the owners of that DME were members of the conspiracy, and how that agreement furthered the purpose of the conspiracy. The government's closing argument was also devoid of any discussion about such an agreement and how it furthered the conspiracy. An overt act the government does not even attempt to connect to the conspiracy at trial cannot sustain a conviction.

Even if the government had proven that a conspiracy existed and Mr. Blackman joined it (which the government did not, as discussed further below), the government failed to prove when Mr. Blackman joined it. A conspiracy to engage in unlawful kickbacks cannot exist before at least two co-conspirators know the arrangement is unlawful, and a defendant cannot be convicted of joining that conspiracy for conduct that predates his own knowledge. Thus, the government must show that this occurred before at least one of the alleged overt acts in the indictment. *See Grunewald v. United States,* 353 U.S. 391, 396–97 (1957) ("For where substantiation of a conspiracy charge requires proof of an overt act, it must be shown both that the conspiracy still subsisted within the [time bar] prior to the return of the indictment, and that at least one overt act in furtherance of the conspiratorial agreement was performed within that period.").

Multiple cooperating witnesses testified that they did not initially believe what they were doing was illegal, but that they came to understand this at some later point and continued anyway. No witness or document established when Mr. Blackman himself came to know that any payment arrangement was unlawful, let alone that this occurred before any timely overt act. Because the

government introduced no evidence establishing *when* Mr. Blackman came to know any arrangement was illegal, and, critically, no evidence that this occurred before any of the overt acts within the limitations period (Overt Acts 8 through 14), it did not meet its burden on this element.

**D.  The government failed to prove Blackman had the requisite criminal intent.**

Even accepting, arguendo, that some payment charged in the indictment was made to induce or in return for a Medicare referral, the Anti-Kickback Statute requires proof that the defendant acted "knowingly and willfully"—that is, that he knew the payment was unlawful, not merely that he knew of the payment. 42 U.S.C. § 1320a-7b(b). The government's proof of intent failed.

First, the government failed to proof that Mr. Blackman knew any specific payment arrangement was unlawful. No witness so testified, and no document so stated. The government's entire theory of knowledge rested on Ms. Leard's memorandum, government exhibit 633. But as explained above, that memorandum cannot carry this weight. It expressly stated that payments from a DME supplier to HealthSplash were not illegal kickbacks, and it flags only a potential problem with a direct clinician-to-HealthSplash payment under a referral structure HealthSplash never actually used. The memo does not address a payment from a DME supplier to a marketer, from a marketer to a telemedicine company, or from a telemedicine company to a clinician. It cannot establish that Mr. Blackman "knew" arrangements it never discusses were illegal.

The vagueness of the statute makes this gap especially significant. The evidence at trial, including Ms. Leard's own testimony, established that the Anti-Kickback Statute is unusually complicated and unclear, so much so that it has led to the creation of a niche field of legal expertise, in which lawyers like Denise Leard are paid tens of thousands of dollars to advise clients on whether a certain arrangement could *potentially* violate the statute.  And even then, a lawyer can often speak with certainty. Instead, the lawyer can, as did Ms. Leard in this case, suggest the client seek an advisory opinion from the HHS Office of the Inspector General. Where a statute requires specialized legal analysis for a trained compliance attorney to venture even a qualified opinion— and where the *lawyer's* position is "get an opinion from the government"—the statute is unconstitutionally vague.  To the extent it can be prosecuted, the government's burden to prove that a layperson defendant knew a given arrangement was unlawful is correspondingly high. Mere awareness that the Anti-Kickback Statute exists is not evidence that a defendant knew a particular payment structure violated it, and even Ms. Leard, a specialist in the field, did not purport to know with certainty.

40

The government's evidence at trial did nothing to sharpen the reach of the statute as applied to this case. A review of the government's closing argument reveals its own lack of clarity as to what payments in this case constituted a kickback. And this lack of clarity guides the sufficiency analysis. Even knowledge of the existence of the statute is insufficient to show knowledge of what it prohibits for the normal person who is not a legal specialist in that area. And even a legal specialist, such as Ms. Leard, does not know in every instance whether something will violate the antikickback statute, but still requires further guidance from the OIG. The government has not and could not show knowledge and intent here, just as it could not show that the statute clearly enough to pass constitutional muster prohibits the payment arrangements in this case.

But the government is required to prove more than just that Mr. Blackman knew a payment-referral arrangement was unlawful; it must also prove that Mr. Blackman, knowing it to be unlawful, deliberately joined in the conspiracy. Even if Mr. Blackman knew that some platform users were engaged in paying or receiving kickbacks and did nothing to stop it, that is not evidence that he willfully joined their conspiracy. *Toler*, 144 F.3d at 1433; *Direct Sales Co.*, 319 U.S. at 709. Building and operating a platform that bad actors misuse—off the platform's own structure, as the evidence showed here—is not the same as agreeing to join their scheme.

### E. The government failed to prove a single conspiracy

Even setting aside the deficiencies described above, the indictment charges a single conspiracy joined by Mr. Blackman, Gary Cox, Gregory Schreck and Toni De Lanoy to pay and receive kickbacks. DE 76 at 16–17. The trial evidence, however, showed at most a series of separate, unconnected relationships radiating outward from the HealthSplash/DMERx platform, with no evidence that the individual participants were aware of, coordinated with, or depended upon one another.

Where a central figure or platform deals independently with a series of counterparties who have no knowledge of, or connection to, one another, the result is not one conspiracy but "as many conspiracies as there are spokes." *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004) (citing *Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946)). This is the classic "hub-and-spoke," or "rimless wheel," problem; indeed, here the government did not even prove DMERx was a hub, it proved only a common denominator. But in order to show a single conspiracy, the government must show that that the spokes were aware of each other and shared a common goal,

41

that the participants knew and agreed to some scheme larger than their own spoke. Id. at 808. Without this, there is no single overarching conspiracy, only a collection of separate ones. Id.

The government's own witnesses demonstrated the multiple unrelated conspiracies which did not involve Blackman. Anjaria, McNeal, Breitman, and Cirri each testified on cross-examination that they never communicated with Mr. Blackman about their own payment arrangements, never sought his approval for them, and in most cases never met him. The DME suppliers, marketers, and telemedicine companies that used the platform negotiated and priced their own arrangements independently, with no evidence that any one of them knew what any other participant was being paid or had agreed to.

At most, then, the evidence proved a set of independent bilateral relationships: PME Homehealth and Mojo Media; US Orthopedics and STK Marketing; various telemedicine companies and various clinicians, each transacting through a common platform, but with nothing connecting any one relationship to any other or showing that any participant knew of or agreed with the others. Because the indictment charged one conspiracy and the proof, if anything, showed several independent ones, none of which involved Blackman, the variance is fatal.  The attribution of separate disparate conduct to Blackman affected his substantial rights. Evidence of numerous unrelated participants' independent dealings was introduced against him and merged into a single narrative of guilt. See *Kotteakos*, 328 U.S. at 774–75; *Chandler*, 388 F.3d at 807–12 (reversing where the conspiracy's organizer recruited participants who were unaware of each other and of the overall scheme). This same defect infects Count 6, which is charged as part of the same overarching agreement among the same three individuals.

For all the above reasons and all previously argued, the government failed to prove with sufficient evidence each and every element of Count 5. The conviction must be vacated.

**F.  The government argued a legally and factually insufficient "bribes" theory**

The government repeatedly told the jury in opening that this case was about bribes.  *See* Tr. Apr. 26, 2026 at 58 (stating Mr. Blackman "defrauded Medicare using a massive telemarketing scam fueled by lies, *bribes*, and 1.3 million false prescriptions," (emphasis added); *id.* at 61 (telemedicine doctors were "bribed,"); *id.* at 62 (Mr. Blackman "used DMERx to pay and receive illegal kickbacks and bribes,"); *id.* at 63 (Mr. Blackman "agreed with telemarketing companies to sell the false prescriptions . . . in exchange for illegal kickbacks and bribes,"); *id.* at 65 ("doctors were bribed to sign,"); *id.* at 67 (patients were "always prescribed an expensive brace through a

fraudulent prescription that was bribed and paid for,"); *id.* at 68 ("Telemedicine companies, telemarketers, and brace companies, they all paid or received bribes,"); *id.* at 71 ("For the defendant's fraud factory and the doctors that he and his co-conspirators bribed, it was always one thing,"); *id.* at 72 (the scheme was "based on the ecosystem of bribes between the brace companies, the foreign telemarketers, and telemedicine companies,"); *id.* at 74 (a government witness "bribed telemedicine doctors by paying their companies to obtain signatures on the prescriptions so that Medicare would pay for them,"); *id.* at 74 ("You will also hear from a telemedicine company owner who acted these bribes from foreign call centers,"); *id.* at 75 ("Mr. Blackman would choose where the beneficiaries went where their telemedicine bribes doctors . . . .").

Kickbacks and bribes are legally and factually distinct forms of remuneration. That the statute lists both indicates they encompass different conduct. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'"); *see also* Jury Instructions in *United States v. Esformes*, 16-CR-20549-RNS, DE 1216 at 16 ("As used in these instructions, the term "kickback" means the return of a portion of the original payment. As used in these instructions, the term "bribe" means the corrupt transfer of anything of value from one person or entity to another person or entity to accomplish some unlawful result or to accomplish some lawful result by some unlawful means.").

The government's improper argument on the factually unsupported bribery allegations (which it never sought to prove at trial) invited conviction on an improper basis. The jury was instructed as to kickbacks or bribes without receiving a definition of a bribe. This, particularly in light of the government's emphasis on bribes in argument, enabled the jury to convict on an unsupported theory, violating Blackman's right to a fair trial. *See United States v. Fontenot*, 483 F.2d 315, 322 (5th Cir. 1973) (stating it is error to submit to jury overt act as to which there is no proof). Because it is impossible to tell whether the jury convicted Mr. Blackman on the theory of kickbacks or the theory of bribes that was improperly submitted to the jury, the conviction must be vacated. *Yates*, 354 U.S. at 312.

### IV.   COUNT SIX MUST BE VACATED

#### A. The government failed to prove the defraud-clause object—that Blackman specifically intended to impede a lawful government function

To sustain a conviction on the defraud-clause object of a § 371 conspiracy, the government must prove not merely that a government function was in fact impeded, or that the defendant

engaged in conduct that happened to have that effect, but that impeding the agency's lawful function was itself an object of the agreement. In other words, the government had to prove that Mr. Blackman specifically intended, through deceitful or dishonest means, to impair or defeat a federal agency administering federal health care plans. *United States v. Adkinson*, 158 F.3d 1147, 1153–57 (11th Cir. 1998) (reversing § 371 defraud-clause conviction for insufficient proof that defendants intended to impede a federal agency, as distinct from proof that their conduct merely had that incidental effect). Concealment, standing alone, or the government's characterization of conduct as "dishonest," is not enough without proof that impeding the agency's function was an object of the agreement itself. *Id*.

The government's proof here consists, at most, of evidence that some platform users at some point concealed the telehealth nature of certain patient encounters from a DME supplier or others. But as explained above, the government's own charged overt acts cut against, rather than support an inference that concealing the telemedicine nature of an encounter was even an object of the charged agreement: one overt act shows a DME supplier objecting to and rejecting rubber-stamped orders, and another shows a platform user complaining that new template requirements could not be satisfied without an in-person visit, meaning the very telephonic-only examinations the government says never happened were, on this evidence, actually occurring and actually being scrutinized. Nothing in this record shows that Blackman specifically intended, through this or any other conduct, to impede the lawful functions of CMS or its contractors, as opposed to simply operating a software platform that some customers misused for their own purposes.

This deficiency was exacerbated by the Court's improper instruction to the jury on Count 6, which failed to tell the jury that in order to convict Blackman on Count 6 under the defraud-clause object, it had to find he intended to impede an agency's function. Instead, the jury was instructed that all it had to find was that Mr. Blackman intended to join a conspiracy.

### B.  The government failed to prove the existence of the charged conspiracy

The government also had to prove beyond a reasonable doubt that Mr. Blackman knowingly and willfully joined a conspiracy to defraud the United States by impeding the lawful functions of federal agencies administering Federal Health Care Plans. DE 76 at 21. For the reasons set out above, the government failed to prove that a conspiracy existed and that Mr. Blackman knowingly and willfully joined in the plan, knowing its object was unlawful.  Moreover, for reasons stated above with respect to Count 1, the conspiracy charged in Count 6 (and as argued by

the government in its first closing, though this deviated from the indictment) rested on a deficient fraud conspiracy—that attempting to avoid being audited, or attempting to avoid regulatory scrutiny, is a crime. An individual does not defraud the United States by failing to provide non-essential, non-required, and non-material information (regarding doctors' visits permitted by Medicare's own regulations) in response to an audit; even without the materiality and false statement problems that doom Count 1, the government's theory was defective as to Count 6. The other invalid fraud theories argued and detailed above (including telemarketing fraud, lack of patient choice, and purported "vulnerable patients" where no such patient testified) also warrant a judgment of acquittal on Count 6; given the confusion in both how the government argued the Count and the way it was instructed, and the government's failure in argument to distinguish between Count 1 and Count 6 (where it sought to do so, it only characterized Count 6 as a false statements conspiracy of which Blackman was acquitted), the verdict cannot be sustained.

### C. The government failed to prove a co-conspirator committed one of the alleged overt acts within the limitations period.

Further, as with the Count 5 conspiracy, the government had to prove that a coconspirator committed at least one overt act within the limitations period. However, the government did not introduce sufficient evidence to establish that at least one of the five overt acts that were within the limitations period (Overt Acts 3–7) was 1) committed, 2) committed by a coconspirator, and 3) done in furtherance of the conspiracy.

Overt Act 3 alleges that Schreck forwarded an email to Toni De Lanoy and Julie Lafon reporting that patients of Integrated Support Plus said they had not spoken to a medical provider. DE 76 at 22. The government did not prove, or even argue, how this email, or forwarding this email, was in furtherance of the conspiracy. To the contrary, this email cuts against the conspiracy's purpose as presented by the government: it shows a DME supplier objecting to rubber-stamped orders, not participating in the conspiracy. This contradicts the government's theory that the telemedicine companies, DME suppliers, and DMERx conspired to send false claims to Medicare without speaking to patients and when patients did not need the braces.

The same applies for Overt Act 6, in which the government alleged that Steve Murdock emailed Schreck and De Lanoy complaining that certain template questions could not be answered unless the patient was physically in the office. DE 76 at 23. This, too, is inconsistent with and not in furtherance of the conspiracy the government charged: it shows a platform user objecting that

45

new requirements could not be satisfied through a telephonic evaluation, meaning that medical providers actually were conducting telephonic examinations, contrary to the government's theory that no such examinations occurred.

The government also had to prove that each timely overt act was committed by an actual coconspirator: someone who knew the conspiracy's specific unlawful purpose and knowingly and willfully joined it. It did not do so for Overt Acts 3, 4, 5, 6, or 7.

For Overt Act 3, the government failed to prove that Gregory Schreck was a coconspirator at the time he forwarded the email. Schreck testified that initially he did not think what he was doing was unlawful, but that later he "got knowledge" of what was going on at DMERx and "stayed on." Initially, "staying on" at DMERx is not sufficient to show Mr. Schreck willfully joined in a conspiracy to do something he knew was unlawful, specifically to impede federal agencies in the administration of health care benefits. But secondly, he did not testify that he gained this knowledge and "stayed on" before forwarding the email on July 5, 2018 identified in Overt Act 3. Consequently, this Overt Act cannot support a conviction to Count 6.

Overt Act 4 alleged that Active Assist DME Inc. submitted a Medicare Redetermination Request Form with exam notes and medical-necessity documentation. DE 76 at 22. However, the government introduced no evidence of who owned or controlled Active Assist, or that whoever did so knew of and knowingly joined the specific conspiracy charged, as opposed to believing the conduct was lawful, or operating an entirely separate scheme. The government's own evidence showed that Active Assist was never a customer of HealthSplash or the DMERx software. See GX 1220a.

Overt Act 5 alleged that a telemarketing-company owner, William Novack, emailed De Lanoy the name of a new DME supplier and a telemedicine company. DE 76 at 22–23, GX 1222. The government introduced no evidence establishing who William Novack was, that he knew of the charged conspiracy's unlawful purpose, or that he knowingly and willfully joined it and joined it prior to the October 5, 2018 email. Similarly for Overt Act 6, as discussed above, the government did not establish that Steve Murdock knew the plan's unlawful purpose or knowingly and willfully joined it prior to the overt act alleged.

Finally, Overt Act 7 alleges that practitioner Joseph DeCorso signed a knee-brace order for patient Barbara Stout, attesting that certain physical examination tests were positive, when he had not performed them, resulting in a $1,200 Medicare claim. DE 76 at 23; GX 308. The government

46

called neither DeCorso nor Stout, nor any witness with personal knowledge of that examination, and introduced no evidence that the tests were not performed. It likewise introduced no evidence that DeCorso knew of, and knowingly and willfully joined, the specific conspiracy charged in the indictment, as opposed to, at most, some separate and uncharged wrongdoing of his own.

Finally, the government failed to prove that Overt Act 7 was committed as charged. The government introduced no evidence that the medical practitioner did not perform a pivot shift test or one-legged stand test on the patient. It introduced no testimony from either the medical practitioner or patient, or anyone else with knowledge of the evaluation.

In sum, the government failed to a prove that at least one of the overt acts in Count 6 that occurred within the limitations period was committed as charged, committed by a coconspirator, done in furtherance of the conspiracy alleged, and joined in by Blackman with criminal intent. Consequently, the conviction on Count 6 cannot stand.

### D. The jury instructions constructively amended Count 6 as to the intent-to-impede element

An amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment. *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004) (quoting *United States v. Keller*, 916 F.2d 628, 634 (11th Cir.1990).

The Court did so here through its instruction to the jury. The indictment charged specific conduct: that Mr. Blackman conspired to "defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of departments and agencies of the United States in their administration and oversight of the Federal Health Care Plans." DE:76 at 21. But the instruction to the jury gave no such limitations, and in fact, did not even direct the jury that it had to find that the object of the conspiracy was to impede the functions of a government agency. First, the indictment limited the charged crime to conspiring to defraud only agencies tasked with administering and overseeing the Federal Health Care Plans. But the instructions directed the jury that Mr. Blackman was charged with conspiring to defraud "the United States or any of its agencies." Second, the indictment alleged that the object of the conspiracy was to "defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of departments and agencies of the United States in their administration and oversight of the Federal Health Care

Plans." DE 76 at 21. But the Court instructed the jury that "the elements of the crime that is this object of the conspiracy charged in Count 6 are:

> First: Two or more people in some way agreed to try to accomplish a shared and unlawful plan;
>
> Second: the Defendant knew the unlawful purpose of the plan and willfully joined in it;
>
> Third: during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the indictment; and
>
> Fourth: the overt act was knowingly committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy."

DE 463 at 32–33. The object of the conspiracy was not another conspiracy, as the instruction said, but to defraud the United States by impeding the function of an agency. Nowhere did the Court instruct the jury that in order to find Mr. Blackman guilty of Count 6 it had to find that he intended to impede the function of a federal agency. See Adkinson, 158 F.3d at 1153–57 (§ 371 defraud-clause charge requires  proof that defendants intended to impede a federal agency).  Instead, it told the jury it could convict Mr. Blackman of Count 6 if it found he intended to accomplish any unlawful plan. That broadened the basis of conviction far beyond what is charged in the indictment and what the statute prohibits. By instructing the jury as such, this Court constructively amended the indictment, allowing the jury to convict Mr. Blackman for conduct that was not prohibited by 18 U.S.C. § 371 and that was not charged in the indictment. Constructive amendment of the indictment is per se reversible error. Narog, 372 F.3d at 1247. The conviction on Count 6 must be vacated.

## V.      THE GOVERNMENT FAILED TO PROVE VENUE

The government failed to prove venue.  In arguing venue at the Rule 29 hearing, the government referred the Court to the substantive healthcare fraud counts as establishing venue with respect to the Count 1 conspiracy.  Blackman was acquitted of those counts.  The jury acquitted Mr. Blackman of all substantive healthcare fraud counts relating to claims originating in the Southern District of Florida.  Throughout the trial, the government failed to establish venue as to the general and overarching conspiracies charged in Counts 1, 5, and 6.  The burden concerning venue is not as high as that of other essential elements.  But nor is it toothless.  "It is by now well-settled that venue is an essential element of the government's proof at trial."  *United States v.*

*Snipes*, 611 F.3d 855, 865 (11th Cir. 2010). "Questions of venue . . . are not to be taken lightly or treated as mere technicalities." Id. at 866 (quoting *United States v. White*, 611 F.2d 531, 534 (5th Cir. 1980)) (alterations in original). In other words, the venue requirement imposes a real standard that must be supported by real evidence—evidence that was lacking in this case. See *United States v. Smith*, 22 F.4th 1236, 1243 (11th. Cir.), aff'd 599 U.S. 236 (2023) (reversing and remanding for new trial based on failure of proof of "essential conduct" of the offense in the venue of prosecution).

The government never proved that any essential conduct as to the Count 1 conspiracy occurred in the Southern District of Florida. The government attempted to prove venue based on the allegations in the substantive counts (which were alleged to be a part of the conspiracy)—but Blackman was acquitted of the substantive counts. The government's core allegations was that the design of the HealthSplash software platform constituted the charged conspiracy. The design and operation of the software platform occurred outside the Southern District of Florida. The government failed to establish venue, particularly given the acquittal on Counts 2, 3, and 4.

Venue is constitutionally and statutorily proper only in the district where the offense has been committed. *United States v. Bradley*, 644 F.3d 1213, 1253 (11th Cir. 2011). In an action involving a conspiracy, the offense has been committed in any district where any overt act was performed in furtherance of the conspiracy. *Id*. Here, the government did not prove with sufficient evidence that an overt act it proved took place within the Southern District of Florida. As discussed above, the government must prove at least one overt act within the limitations period. For the reasons discussed above, the government failed to prove at least one of the overt acts alleged occurred within the limitations period, was committed by a coconspirator in furtherance of the charged conspiracy. This same analysis thus renders infirm the government's attempts at venue: if the government did not sufficiently prove an overt act, then it necessarily did not prove an overt act within the Southern District of Florida. But more specifically, the government did not establish that any overt act within the limitations period took place within the Southern District of Florida.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Blackman requests a judgment of acquittal on Counts 1, 5, and 6 of the indictment.

BY: /s/ Jenny Wilson
　　Jenny Wilson
　　Florida Bar No. 1031758
　　40 NW 3rd St, PH 1
　　Miami, Florida 33138
　　Tel: (305) 536-1191
　　E-mail: jenny@klughwilson.com


　　/s/Julie Holt
　　Julie Holt
　　Florida Bar No.: 95997
　　Julie Holt Law PLLC
　　40 NW 3rd Street PH 1
　　Miami, Florida 33128
　　Tel: (786) 505-4240
　　julie@julieholtlaw.com