**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-20271-CR-LEIBOWITZ**

**UNITED STATES OF AMERICA**

**v.**

**BRETT BLACKMAN,**

**Defendant.**
_________________________________________/

**GOVERNMENT'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR NEW TRIAL UNDER FED. R. CRIM. P. 33**

Defendant Brett Blackman ("Defendant") received a fair trial and was convicted for orchestrating a scheme to bill federal health care programs $1 billion for falsified telemedicine orders for orthotic braces and pain creams from his software DMERx. The United States of America, through undersigned counsel, hereby opposes Defendant's Motion for New Trial Pursuant to Fed. R. Crim. P. 33(a) ("Motion"). [D.E. 520]. Defendant was integral to each facet of this scam. Defendant: (1) designed deceptive mailers to feed vulnerable, elderly patients into high-pressure call centers to coax them into agreeing to receive the braces and creams; (2) agreed to the language in the falsified, audio-only telemedicine orders produced from DMERx; and (3) approved the sham contracts used to cover up the scheme. Defendant's Motion largely sidesteps each of these facts, amongst others, that establish his overwhelming guilt in leading one of the most egregious fraud schemes in Florida history. He instead presents a 70-plus page morass of internally inconsistent arguments that are divorced from the evidence admitted at trial. Accordingly, the Motion should be denied.

## BACKGROUND

A. The Indictment

On February 20, 2024, a federal grand jury returned a six-count Superseding Indictment against Defendant and his Co-Defendants Gary Cox and Gregory Schreck. [D.E. 76]. Count 1 charged a conspiracy to commit health care fraud and wire fraud. Counts 2 – 4 charged substantive health care fraud counts. [*Id*. at 14-15]. Count 5 charged a conspiracy to pay and receive health care kickbacks [*Id*. at 16-17]. Finally, Count 6 charged a conspiracy to defraud the U.S. and make false statements in connection with health care matters. In sum, the Superseding Indictment alleged that Defendant and his co-conspirators used the National Center of Pain ("NCP") – a massive, international telemarketing operation – to connect brace suppliers and pharmacies with his online software DMERx, a subsidiary of Defendant's company HealthSplash, that sold the falsified telemedicine orders.

B. Defendant Schreck Pleads Guity; Defendant and Defendant Cox Proceed to Trial

On February 20, 2025, Co-Defendant Schreck pleaded guilty to Count 1. [D.E. 170]. He is awaiting sentencing. On May 5, 2025, Defendant, along with Co-Defendant Cox, signed three factual stipulations to the admissibility of several Government exhibits, including GX 408. *See* Composite Exhibit 1. On May 7, 2025, Defendant and Co-Defendant Cox proceeded to trial. On May 15, 2025, the Court granted Defendant a mistrial because his counsel at the time raised a conflict of interest during trial that rendered him unable to continue representing Defendant. The trial against Co-Defendant Cox nonetheless continued. On June 3, 2025, Co-Defendant Cox was convicted on all counts. On December 23, 2025, he was sentenced to, *inter alia*, 180 months' imprisonment and ordered to pay $452,345,979 in restitution.

C. Court's Evidentiary Rulings

The Court made several pertinent evidentiary rulings at the April 1, 2026 pretrial conference that provide context. The Court ruled that party opponent and co-conspirator statements elicited through lay witnesses regarding DMERx plummeting after Defendant's largest clients were arrested could be admitted. [D.E. 413] Hr'g. Tr. Apr. 1 at 60:10-62:14.[1] Additionally, the Court ruled that Defendant's statements regarding his Federal Trade Commission ("FTC") settlement for a previous telemarketing scam were admissible. *Id*. at 99:4-108:14. Finally, the Court permitted Defendant to withdraw from his factual stipulations. *Id*. at 113:25-116-17.

D. Defendant is Retried and Convicted

On April 20, 2026, Defendant proceeded to trial. Approximately four days in, when asked, Defendant could not articulate a sufficient reason for withdrawing from his May 5, 2025 stipulations. *See* Tr. Apr. 23 (AM) at 13:5-14:22.[2] The Government nonetheless had to include two additional witnesses in its trial presentation to account for this. Over almost four weeks, the Government called 19 witnesses and admitted approximately 400 exhibits in its case-in-chief. These witnesses consisted of DMERx executives and DMERx clients, each of whom had pleaded guilty to health care offenses related to using Defendant's software. The Government's case also featured Defendant's accountant, expert witnesses who had reviewed and adjudicated Medicare claims for orthotic braces and pain creams, and even an undercover agent who was fed through Defendant's scheme from a call center all the way to a falsified claim billed to Medicare.

Defendant did not put on a case. During deliberations, the jury submitted two notes on how to interpret the instructions for Counts 2-4 charging substantive health care fraud and the false

---

[1] Excerpts from the April 1, 2026 pretrial conference are attached hereto as Composite Exhibit 2.

[2] Excerpts from the trial transcripts are attached hereto as Composite Exhibit 3.

statement object of the conspiracy in Count 6. [D.E. 464-65]. When the jury was called to address the notes, the foreman stated that there might have been a language barrier, asking to have certain instructions in English and Spanish. Tr. May 13 at 16:18-20:25. The Court then conducted a *voir dire* of each juror, one by one, and outside of each other's presence. None of them stated having difficulty understanding English. *Id.* at 21:17-34:21. On May 14, 2026, the jury convicted Defendant on each of the conspiracy counts in the Superseding Indictment. Specifically, he was convicted of both objects in Counts 1 and 5, but only the conspiracy to defraud object in Count 6. The jury acquitted him of Counts 2-4.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33 permits a district court to order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of justifying a new trial." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (*en banc*). While the court has discretion to grant or deny a new trial, the court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985)). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Martinez*, 763 F.2d at 1313. "Courts are to grant [new trials] sparingly and with caution, doing so only in those really 'exceptional cases.'" *Id.* (citations omitted).

## ARGUMENT

### I. DEFENDANT'S ARGUMENT AGAINST THE WEIGHT OF THE EVIDENCE IS MERITLESS

The evidence admitted at trial proved Defendant's guilt beyond a reasonable doubt. The Government's Medicare experts testified about the falsities in the telemedicine orders that

Defendant sold from DMERx. Dr. Hoover reviewed several prescriptions for orthotic braces, such as GXs 303, 305, and 306,[3] and explained how the accompanying notes did not justify the braces. *See, e.g.*, Tr. Apr. 23 (PM) at 57:5-59:19. Dr. Hoover also performed a live demonstration of the physical examinations purportedly performed in DMERx's orders showing that it was impossible to conduct them telephonically. *Id.* at 13:1-16:18. Dr. Sullivan similarly walked the jury through four prescriptions for compound creams, GXs 316-19, and opined that the quantities and combinations of medications were impractical and dangerous if used as prescribed. *See, e.g.*, Tr. Apr. 21 at 177:12-179:19. Both experts testified to the Medicare Program Integrity Manual's indicia of fraud associated with false claims submitted for reimbursement. *See* GX 641. The fact witnesses throughout trial consistently testified that they used Defendant's online software – *i.e.*, interstate wires – to carry out that precise conduct.

Although no formal agreement is required to establish a criminal conspiracy, Defendant and his co-conspirators memorialized their criminal partnership with sham contracts to conceal the agreement's true nature. There was a contract for each component of scheme: (1) Marketing Service Agreements for call centers; (2) Physician Data Coordination Agreements for telemedicine companies; and (3) Supplier Data Coordination Agreements for durable medical equipment ("DME") companies and pharmacies. *See* GX 1221 (July 24, 2017 Email from D. Barth to Defendant et al.). Defendant's co-conspirators paid him to use DMERx and each other for the fraudulent services that DMERx facilitated. This flow of funds all led to the end product – a falsified doctor's order billed to Medicare. *Id.*; Tr. May 4 (AM) 127:17-25 ("[G. Schreck] A. the marketers were paying for the telehealth groups, the telemed groups were then paying the doctors, DMEs were paying the marketers. I came to realize it was just a circle of dollars being paid back

3 Government exhibits admitted a trial that are not under seal are attached hereto as Composite Exhibit 4.

to each individual for their services."). These contracts described the non-operational software HealthSplash 2.0 which was intended to disguise that they were using DMERx, a completely different platform. Here is why. Defendant had his attorney Randy Schultz draft these sham contracts the day after his other attorney Denise Leard advised him that DMERx risked violating the Anti-Kickback Statute. *Compare* GX 633 (D. Leard Legal Opinion) *with* GX 1221. Defendant agreed to finalize the contracts describing HealthSplash 2.0 knowing that they were being used for DMERx. *Id.* ("Brett has . . . finalized and approved [the contracts]").

Defendant and his co-conspirators knew that these contracts were false. For example, one of the first things the contracts describe is an "online patient waiting room" where patients were to be uploaded into a portal and then chosen by any available DMERx-enrolled provider for a telemedicine consult. *See e.g.*, GX 228, 230, 233, 234, 236, 237 (DMERx contracts). This was a lie. Defendant's co-conspirators uniformly testified that there was no online patient room. *See* Tr. Apr. 28 (AM) at 51:13-25 ("Q. Did that patient waiting room exist in the telemedicine module in DMERx? A. [T. De Lanoy] No . . . that wording would be inaccurate."); *see also* Tr. May 4 (AM) at 147:16-148:3 ("Q. [W]hat was the online patient waiting room? . . . Did it exist? [G. Schreck] A. It did not."). Instead, the telemedicine doctors were already assigned to the patient because the marketers had already paid for the doctor's order. *See* Tr. Apr. 30 at 168:11-16 ("[W. McNeal] A. Again, there wasn't any patient waiting room which ties into the fact that the – the second part of that paragraph [in the contract], the referral service end of things. Q. What was inaccurate about the referral service language here? A. [DMERx] did, in fact, refer most of my clients to me."). This is exactly what Leard advised Defendant not to do. GX 633. These contracts, *inter alia*, show that Defendant and his co-conspirators participated in a single, massive conspiracy to buy and sell falsified doctors' orders billed to Medicare.

Defendant fed the lion's share of patients into the call centers that fueled the scheme. He sold the deceptive mailers from NCP to DMERx's clients that urged Medicare beneficiaries to contact the telemarketers. Defendant designed these mailers to create a false sense of urgency about limited-time Medicare coverage for braces. GX 606 (NCP's Mailer); *see* Tr. Apr. 27 at 59:25-60:3 ("Q. And to your knowledge, who created this [GX 606]? A. [J. Karlick] . . . Mr. Blackman."); *id*. at. 61:17-19 ("Q. . . [T]o your understanding, why would that language be there? A. To create urgency, to generate a phone call."); *id*. at 62:5-20 ("A. So as a DME owner, I would be paying for one lead . . . Q. . . . where would someone be directed to upon calling that number? A. Mr. Kimble's call center in the Philippines."). Herb Kimble, a recently captured Most-Wanted FBI Fugitive for participating in this conspiracy,[4] was Defendant's largest customer at DMERx. GX 1220a (Sheet: Orthosis Order by Supplier). Defendant solicited call centers for these mailers directly through HealthSplash, DMERx's parent company. GX 1202 (Email from Health Splash to M. Moranz); *see also* Tr. May 4 (PM) at 68:3-12 ("Q. What's going on here? A. [G. Schreck] This is a marketing piece that was generated from the software to our customer base asking them if they had any need for additional marketing, so additional patients. Q. And to your understanding, what company was going to handle that? A. National Center for Pain. Q. How . . . did that relate to generating referrals? A. That's exactly what it was."). Once the mailer duped a patient into calling the number, the telemarketers then pressured them into agreeing to accept braces and creams. These telemarketers were trained to not take "no" for an answer. *See* GX 610 (NCP's

---

[4] U.S. Department of Justice, Press Release: *International Fugitive Pleas Guilty to Healthcare Fraud Conspiracy and Failure to Appear*, (August 11, 2026) https://www.justice.gov/usao-sc/pr/international-fugitive-pleads-guilty-healthcare-fraud-conspiracy-and-failure-appear (last visited August 17, 2026) ("Kimble was charged for his role in a $1.2 million telemedicine and durable medical equipment scheme …." Earlier this summer, "the FBI announced . . . Kimble as one of FBI's eight most wanted fraudsters. On June 8—just four days later—Kimble was apprehended in the Philippines . . . .").

phone intake script); GX 636 at 8 (Paddlepoint BPO Services phone intake script) ("If patient says 'No' during final agreement . . . [rebuttal] 'As you said 'no,' we won't be able to proceed. However, I'll repeat the closing statement one more time—please let me know if you agree.'"). The telemarketers would even impersonate Medicare just to get to beneficiaries to agree. Special Agent Vitaly Zubry, while undercover as the fictious Medicare beneficiary Kevin Green, captured one of these calls. GX 503 ("[V. Zubry] . . . Can I ask who am I talking to? [Telemarketer]: My name is Katie. [Zubry]: Katie, and you're calling from where? Katie: Medicare shipping department. You call to this number . . . This is Medicare."[5] Unsurprisingly, the Medicare "shipping department" does not exist. Tr. Apr. 22 (PM) at 103:2-10 ("Q. Now, Agent Zubry, Katie is calling you, and now she's asking you about your insurance again after telling that you already called them. You heard that? A. Yes. Q. What, if any, sense did that make to you? A. No sense . . . there's no such thing as Medicare shipping department."). This fictitious Medicare beneficiary was cycled all the way through DMERx's portal, its telemedicine interface, and billed to Medicare without any contact with a doctor. *Id*. at 103:11-13 ("Q. And she also told you that it was approved. Had you done anything in between the prior call and then? A. No, no medical professional ever examined me."); GX 111; GX 417 (Row 41024).

Defendant and his co-conspirators designed the telemedicine encounters to eliminate patient and physician choice at each step. This enabled them to obtain the highest reimbursement from federal health care programs. The beneficiaries arrived in DMERx's portal already paired with the telemedicine providers and DME suppliers and pharmacies that selected the highest-cost product to prescribe. Tr. Apr. 28 (AM) at 56:7-18 ("[T. DeLanoy] . . . the codes that were in our software were the highest reimbursed codes . . . Q. And who made the decision to only put the

---

5 The Government has attached GX 505, the transcript of GX 503 in Composite Exhibit 4.

higher reimbursed codes into the software? A. It was a DME choice and . . . Brett would make the final decision."); Tr. Apr. 29 (PM) at 24:15-25-3 ("Q. [S. Audisho] And for the [Medicare beneficiaries] that you did call, would they have any idea of who you were? A. No. . . Q. So based on your understanding and your use of DMERx, would it be misleading to suggest that a patient could choose you? . . . A. Absolutely."); *Compare* GX 626 at 2 ("Problems with Current [DMERx] Workflow . . . Forced Supplier & Clinician Product Selection . . . .") *with* GX 117 ("Top 10 HCPCS Account for <u>99%</u> of Billed Amount"). In fact, 93% of DMERx patients had no prior relationship with the providers that ordered their braces. Tr. Apr. 30 at 106:20-107:5. Medicare has flagged both as indicators of fraud. GX 641 ("Fraud may take such forms as . . . Completing Certificates of Medical Necessity . . . for patients not personally and professional known by the provider [and] [p]articipating in schemes that involve collusion between a provider and a beneficiary, or between a supplier and a provider, and result in higher costs or charges to the Medicare program."). Additionally, DMERx was programmed to state that physical examinations occurred that could not be performed over the phone and that were conducted at an impossible rate. Tr. Apr. 23 (AM) at 13:1-16:18; Tr. Apr. 29 (PM) at 80:17-23 ("Q. Now, Mr. Audisho, you testified that these were approximately 100 or so orders that you signed in one day . . . how, if at all, is it possible for you to examine that many people in one day? A. That is logically impossible to do that.").

Defendant's culpable *mens rea* is plain. For example, he knew that there was no online patient waiting room but still approved the contracts. Tr. May 4 (AM) at 148:4-12 ("Q. Did you have any reason to believe that Mr. Blackman was unaware that the online patient room did not exist? A. No. Q. Why? A. He knew DMERx as well, if not better, than me, and knew . . . there was no question that this wasn't part of DMERx . . . Q. Now, was this contract used for DMERx customers? A. It was."). Defendant gave the final stamp of approval for DMERx to conceal that

he and his co-conspirators used telemedicine providers to approve orders to avoid scrutiny from Medicare. GX 1052 ([Oct. 19, 2016 Email from G. Cox to Defendant] "Got a call from Chris Cirri . . . He said Medicare busts their chops over Telemed encounter[s] . . . That apparently will raise a red flag for CMS in an audit . . . Chris is asking if the Telemed encounter . . . can be omitted from the final documents."). Defendant responded that, "An evaluation is an evaluation. So I would say yes. Change to say [an] evaluation." *Id*. Chris Cirri corroborated this at trial, testifying that "when we first started doing this, quickly, Medicare was auditing and denying orders . . . when they knew they were telemarketing – telemedicine orders, ***so we masked it***." Tr. Apr. 21 at 219:24-220:2 (emphasis added). This key omission supercharged the scheme. *See* GX 634 (Email Composite of Weekly Orders DMERx sold). Indeed, as one of the billers for DMERx's fraudulent DME clients testified, "[DMERx] . . . checked all the boxes so that when you would bill to Medicare, it would, you know, it would make us feel invisible, really. Q. What do you mean by invisible? A. That nobody could really tell what we were doing, that these patients were not actually seeing the doctors." Tr. May 7 at 13:19-14:2.

Defendant also brought in and retained some of the worst actors in the scheme. The telemedicine provider Advantage Choice Care ("ACC") is a prime example. Co-Defendant Cox knew that ACC was falsifying doctors' orders early on. *See* GX 1111 ([July 13, 2017 Email from Co-Defendant Cox to R. Wilson] "I was informed today that you are logging in to [p]hysician accounts and doing patient assessments on their behalf. If that is true, that is fraudulent prescribing . . . ."). A few months after, Co-Defendant Cox referred ACC to the NCP for call center leads. GX 1130 ([Sept. 8, 2017 Email from Defendant Cox to J. Rulison and R. Wilson] "One of our Telemed clients [ACC] is going to be setting up a Marketing entity and is interested in . . . obtaining leads."). Defendant signed one of the sham HealthSplash 2.0 contracts with ACC a week after that

introduction. GX 228 (September 14, 2017, ACC contract executed by Defendant and R. Wilson). ACC's fraudulent conduct continued and was raised to Defendant almost immediately. *See* GX 1138 at 2 ([Oct. 24, 2017 Email from Co-Defendant Cox to Defendant] "Subject: FW ACC issues Spreadsheet . . . 'The front-end call from your phone reps are beyond illegal . . . Your phone rep is telling patients, 'I am calling from Medicare,'. . . 'Medicare approved you for free braces,' 'Medicare contacted us and told us to call you,' . . . All of those statements are the absolute worst things that a marketer can say . . . ."). Defendant kept ACC as a client. A few months later, Defendant's compliance team raised some of the same and additional issues with ACC. *See* GX 1158; GX 1170. The compliance team and Defendant's attorney Randy Schultz recommended for Defendant to terminate the relationship. *Id.* He did not. Randy Schultz alternatively prepared a corrective plan for ACC's issues: it had no effect. Tr. May 4 (PM) at 80:17-19 ("Q. [G. Schreck] What was the outcome of the corrective action plan? A. Nothing. Advantage Choice continued to do business within DMERx."). No new trial is warranted based on the weight of the evidence.

## II. THERE WAS NO LANGUAGE BARRIER AMONG THE JURORS

The jurors all stated that they had no issues understanding the evidence in English. A person is qualified to serve on a jury if unless, *inter alia*, they are "unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form or [are] unable to speak the English language . . . ." 28 U.S.C.A. § 1865(b). The statutory linguistic competency standard does not require a juror to have "the same command of English as a native speaker" if they otherwise understand the language. *See United States v. Gonzalez-Soberal*, 109 F.3d 64, 69 (1st Cir. 1997) (finding no abuse of discretion in retaining a juror and confirming conviction in noting that a "trial judge is in a much better position to assess the language competency of a particular juror."). Here, each of the jurors filled out the juror

questionnaires in English and were empaneled without objection. After the two questions from the jury and the foreperson raising the issue before the Court, the Court conducted an individual *voir dire* of each juror, one by one and outside of the presence of each other. Tr. May 13 at 21:17-34:21. Each confirmed that they had no issue understanding English. Indeed, the juror who Defendant flagged in the Motion goes on to state as much on the record:

> THE COURT: Sir, you heard just a few minutes ago that one of the jurors said that some of the questions are being asked because there's a potential language barrier or language problem. I'm just asking as to you, is there anything about this trial because the trial was being conducted in English, the evidence came in, in English, the law was given in English, and the deliberations are to be done in English, is there anything about that, that causes a problem for you in understanding?
>
> JUROR: Okay. Yes, I understand. . . .
>
> THE COURT: -- are you able to fully understand and participate?
>
> JUROR: Yes, yes.

*Id*. at 30:12-31:8. The cases Defendant cites are not applicable here because the jurors in those cases affirmed in open court that they could not understand English. *See United States v. Pineda*, 743 F.3d 213 (7th Cir. 2014) (affirming convictions after court dismissed a juror following the jury sending a note that the juror could not understand English and juror stating the same in open court); *United States v. Campbell*, 544 F.3d 577 (5th Cir. 2008) (dismissing the juror after jury raised that they could not communicate with him and he stated he could not understand English). But even if that one juror did not understand English, the jury could have continued to deliberate with the remaining 11 jurors. *See United States v. Abbell*, 271 F.3d 1286 (11th Cir. 2001) (affirming conviction returned by 11 jurors after a juror was excused for refusing to apply the law to the facts). Moreover, the jury acquitted on the counts and conspiracy object underlying the juror notes that prompted the *voir dire*. This simply is no basis for a new trial.

## III. THE COURT'S DELIBERATE INDIFFERENCE INSTRUCTION WAS PROPERLY GIVEN

Defendant ignores that the offenses that required willfulness (health care fraud and paying and receiving kickbacks) also required knowledge. A district court errs in giving a jury instruction only if there is "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *United States v. Xavier*, 735 F. App'x 656, 659 (11th Cir. 2018) (affirming mail fraud and making false statements convictions and finding no error in giving deliberate ignorance instruction over defendant's objection). Here, the Court supported giving the instruction by pointing to witnesses that testified to Defendant feigning ignorance as to how DMERx's customers operated and the fact that Denise Leard told him that there was a high probability that DMERx operated illegally yet he continued forward with it. *See* Tr. May 12 (AM) at 8:2-21. The Court correctly stated the law in giving the pattern instruction for deliberate ignorance. This instruction provided the jury an alternative way that the burden could be met as to the knowledge element in the offenses. Indeed, the jury was separately instructed as to what was required for willfulness. [D.E. 463 at 13] (the Court's Jury Instructions). According to Defendant's logic, the Court could not have given the good faith instruction that he requested because it only pertains to the willfulness element where the offenses also require knowledge. This is not the law. Moreover, *United States v. Rivera*, 944 F.2d 1563 (11th Cir. 1991) actually supports the Government's position, not Defendant's. In *Rivera*, the Eleventh Circuit affirmed the defendant's convictions despite finding that giving a deliberate ignorance instruction was unwarranted. *Id*. at 1572. The court found that it was harmless error because the jury was also instructed that it could convict based on actual knowledge. *Id*. The instruction was warranted in this case, but even if it was not, the Court separately instructed the jury on actual knowledge, [D.E. 463 at 13], which was

supported by the record. *See supra* at I. Giving the deliberate ignorance instruction was proper and does not warrant a new trial.

**IV. GOVERNMENT'S CLOSING ARGUMENTS WERE PROPER**

The Government properly characterized the evidence before the jury in its open and rebuttal closings. It is well-established that during closing argument the Government can state conclusions drawn from the evidence. *See United States v. Sosa*, 777 F.3d 1279, 1294-1300 (11th Cir. 2015) (affirming defendant's convictions for, *inter alia*, conspiracy to commit health care fraud and conspiracy to pay health care kickbacks and rejecting defendant's argument that the government made several inflammatory statements during closing because they were based on conclusions drawn from the evidence). Defendant takes issue with a half-dozen arguments the Government made in closing, none of which were improper:

A. <u>Defendant Overlooks that GX 408 Is a Listed Source In Admitted GX 107</u>

Defendant's argument that the Government argued an exhibit that was not in evidence is incorrect. As a preliminary matter, this argument underscores the problem with him withdrawing from his stipulations without cause. He already agreed that GX 408 was admissible prior to backing out of the stipulation without good cause and now claims error by it being a source for a properly admitted summary exhibit. Defense attempted to use his last-minute reversal of the stipulation to assert to the jury that "the patient in Count 2, is not in the claims data." Tr. May 12 (PM) at 35:7-8. However, the billing data for the claims submitted for the patient in Count 2 is in GX 408 at Rows 7528-30. And more, Defendant did not object to summary exhibit GX 107 as containing an erroneous summary of GX 408, including reference to the Count 2 patient. The Government merely corrected defense counsel's incorrect assertion by pointing to the summarized claims data admitted at GX 107, which cited the actual claims data in GX 408. The cases Defendant cites are

not applicable because GX 408 was summarized in GX 107, which was admitted into evidence. Fed. Rule of Evid. 1006 ("The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."). The claims for the Count 2 patient were in the data underlying the summary. Regardless, Defendant's argument is of no consequence because the jury acquitted him on Count 2.[6]

Defendant's argument that the Government accused his counsel of fraud is also flawed "because the [Government] made it sufficiently clear that [it] was urging the jury to conclude that [Defendant's] defense was untrue based on a consideration of the relevant evidence." *Sosa*, 777 F.3d at 1297. The argument was tethered to what was before the jury, not a personal attack.

B. Defendant's Claim of Improper Bolstering or Vouching is a Non-Starter

Improper bolstering and vouching pertain to argument regarding a witness's credibility, not reading summaries and documents that are in evidence. Defendant's argument does not fit the authority through which he frames it. Nonetheless, "[a] prosecutor's comments amount to improper vouching if the jury could reasonably believe that the prosecutor was expressing a personal belief in the witness's credibility." *Sosa*, 777 F.3d at 1295. The cases Defendant cites maintain the same. *See, e.g.*, *United States v. Eyster*, 948 F.2d 1196, 1207 (11th Cir. 1991) (reversing convictions because "the prosecutor cannot vouch for the credibility of a witness even if she devoutly believes the facts she improperly places before the jury."). Defendant does not and cannot point to a witness for which the Government bolstered or vouched. Instead, he points to characterizations of a summary exhibit and documentary evidence. The data in GX 115 show that

---

[6] Defendant's argument that none of the orders he cites were in the DMERx system is incorrect. For example, the orders at GX 316 and GX 317 are in GX 426 rows 16458 and 21523.

right after Defendant's largest clients were arrested in April 2019, DMERx essentially went out of business by May 2019. Defendant omits that the text messages in GX 601[7] directly coincide with the Medicare billing flatlining for DMERx's customers:

| | | | |
|---|---|---|---|
| chintan.anjaria1986 | chintan.anjaria1986,dswhitby | That back brace bust was HUGE | 2019/04/09 19:08:21 |
| dswhitby | chintan.anjaria1986,dswhitby | Yes, i am unable to get in touch with any of my folks | 2019/04/09 19:08:39 |
| dswhitby | chintan.anjaria1986,dswhitby | Even the telemed companies aint responding | 2019/04/09 19:08:50 |
| chintan.anjaria1986 | chintan.anjaria1986,dswhitby | Then they're for involved. what's the names and I can tell you | 2019/04/09 19:09:00 |
| dswhitby | chintan.anjaria1986,dswhitby | Sunrise Medical, Murdock Consulting | 2019/04/09 19:09:31 |
| dswhitby | chintan.anjaria1986,dswhitby | Their names arent there | 2019/04/09 19:09:39 |
| chintan.anjaria1986 | chintan.anjaria1986,dswhitby | Do you know the principal's names? I didn't send the link from the DOJ website that has names. I guy i have known for 10 years got arrested.. billed $200 million to medicare | 2019/04/09 19:10:27 |
| chintan.anjaria1986 | chintan.anjaria1986,dswhitby | on a side note.. IF ANY government ever contact you.. don't respond.. ping me | 2019/04/09 19:12:20 |
| dswhitby | chintan.anjaria1986,dswhitby | Okay | 2019/04/09 19:13:06 |
| chintan.anjaria1986 | chintan.anjaria1986,dswhitby | Were you sending anything to any of these telemeds: Video Doctor USA, AffordADoc, Web Doctors Plus, Integrated Support Plus and First Care MD | 2019/04/09 19:13:40 |
| dswhitby | chintan.anjaria1986,dswhitby | No, i had stopped video doctor plus last year july | 2019/04/09 19:14:18 |
| chintan.anjaria1986 | chintan.anjaria1986,dswhitby | you know the owners or principals of sunrise or murdock? | 2019/04/09 19:15:06 |
| dswhitby | chintan.anjaria1986,dswhitby | I think both | 2019/04/09 19:15:32 |

The month following the "bust" shows that DMERx's clients' submissions to Medicare stopped abruptly. GX 115. Witnesses such as Willie McNeal (telemedicine operator) and Chintan Anjaria (call center operator) testified to being arrested or not being able to operate fully because of the arrests. This testimony is interwoven with why they stopped using DMERx and eventually pleaded guilty to the health care offenses that they committed with Defendant. It was simply corroborated by real-time communications made the same day that the events took place. These communications warranted the common sense, rhetorical question posed to the jury: does a legitimate business not respond <u>at all</u> when the authorities contact them when its affiliates are being arrested? The jury's verdict speaks for itself in this regard.

[7] GX 601 in relevant part is cited herein and not included in Composite Exhibit 4.

This chain of events further highlights that a single conspiracy existed beyond a reasonable doubt.[8] Indeed, Anjaria mentioned a number of other DMERx clients in GX 601. *See, e.g.*, GX 233 (Integrated Support Plus); *see also* GX 230 (Sunrise Medical). In addition to GX 601, Anjaria also testified to emails where Co-Defendant Cox connects him to DMERx's telemedicine clients, including Sunrise. GX 1142 (Nov. 6, 2017 Email from Cox to Anjaria re Sunrise); Tr. May 6 (AM) at 59:12-15 ("Q. And so after this email, did you eventually start working with Sunrise? A. If I remember, yes, I think later, they started accepting Medicare patients.").

C. <u>The Arguments Regarding the FTC Settlement Came From Witness Testimony</u>

Witnesses testified as to Defendant's statements regarding the FTC settlement. The Court ruled that this was admissible. [D.E. 413] Hr'g Tr. Apr. 1 at 99:4-108:14. DMERx personnel, including Defendant's co-conspirators, testified that Defendant concealed his involvement with the NCP and control over bank accounts in this scheme because of his issues with the FTC. He even lied about the outcome of the FTC action. Tr. Apr. 28 (AM) at 43:12-44:17 ("[T. DeLanoy] So Mr. Blackman . . . was telling me a story about how he had won a case with the FTC related to his former partners . . . Q. Did you ever learn if that was true? A. I did . . . I learned that he had a lifetime ban from marketing. Q. Did that concern you? A. Very much so . . . Because we had a marketing component to the business that we were involved in."); Tr. Apr. 30 at 85:4-86:15 ("Q. And you testified that Mr. Blackman was on some of those Accounts . . . and he wasn't on some

---

8 Defendant's argument that Herb Kimble was not established as co-conspirator is dubious at best. In GX 601, Chintan Anjaria and his client to whom he sold DMERx orders immediately point to Kimble and his call center in the Philippines as being at the center of the arrests. Also, Jordan Karlick, Defendant's co-conspirator who pleaded guilty to conspiracy to commit health care fraud, testified to brokering the relationship between Herb Kimble and Defendant. Tr. Apr. 27 at 50:16-20 ("Q. And what relationship did Mr. Blackman have with Mr. Kimble? A. I acted as a liaison between the two of them. Q. A liaison for what? A. National Center for Pain, PME and DMERx.") The documentary evidence corroborated this relationship. *See, e.g.*, GXs 1236 (May 25, 2016 Email from G. Cox to H. Kimble, Defendant, et al. regarding programming the billing codes that Kimble wanted applied to orthotics examinations).

of them . . . did Brett Blackman tell you about why he couldn't open that bank account? . . . A. [K. Rogers] . . . [B]ecause of his history with the FTC, he could not get one."); GX 899 (NCP signature card omitting Defendant); Tr. May 4 (AM) at 131:12-133:9 ("A. [G. Schreck] Brett had said to me that he could not have ownership of [NCP] because of something in his past . . . Q. did you . . . learn what that was in his past? . . . A. I learned that Brett, as well as some other individuals, had an injunction against -- from the FTC for some marketing they had done . . . .").

Defendant cites neither the Court's ruling nor all of the witness' testimony that the Government characterized in closing arguments. Moreover, after fighting to preclude the FTC settlement itself from being admitted (despite it being on the public docket in the District of Kansas), Defendant now argues for a new trial based on the specific language in the settlement. He cannot have it both ways. Defendant did not attempt to enter the settlement into evidence or cross-examine witnesses with it. Instead, the evidence regarding the FTC settlement was limited to the witness' testimony regarding what Defendant told them and what they learned to understand that these statements meant. The Government's closing arguments accurately summarized this testimony and properly argued its probative value to the jury.

D. Leard's Memorandum Bears Directly on Defendant's Knowledge and Intent

Leard's memo was properly admitted into evidence and highlights that Defendant had the requisite *mens rea* for the offenses for which he was convicted. The memo explicitly advises Defendant that DMERx poses a high likelihood of violating the Anti-Kickback Statute. Defendant's actions upon becoming aware of this risk are what the Government argued in closing. Specifically, by the next day, his other attorney had finalized contracts that describe a completely different software, Health Splash 2.0, and Defendant used these contracts to cover up the real agreement with his co-conspirators, which was to use DMERx in the way Leard advised against.

*Compare* GX 633 (D. Leard Legal Opinion) *with* GX 1221. Defendant's culpable mental state is clear. On the eve of Leard's advice, he finalized the contracts used for DMERx that omitted any mention of DMERx and instead referred to a software that was never fully launched. Having received Leard's advice, this omission highlights that he intended to engage in conduct that the law forbids.

E. The Evidence Mirrored the Alleged Manner and Means of the Conspiracies

Defendant misconstrues what constitutes as a variance from a charging instrument. "A variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." *United States v. Flynt*, 15 F.3d 1002, 1006 (11th Cir. 1994) (affirming Hobbs Act and money laundering convictions and rejecting defendant's variance argument). Additionally, a variance requires reversal only when the defendant's rights are substantially prejudiced by it. *See id*. The Manner and Means of the Conspiracy in Counts 1, 5, and 6, in relevant part, allege the following:

> 5. BRETT BLACKMAN and his co-conspirators at National Center for Pain and at various telemarketing companies targeted hundreds of thousands of beneficiaries on behalf of DME suppliers and pharmacies. The beneficiaries were targeted to provide their personally identifiable information and accept braces, pain creams, and other items through misleading mailers, television advertisements, and calls from offshore call centers. Co-conspirators at DME suppliers and pharmacies instructed the telemarketing companies to solicit beneficiaries for the braces, pain creams, and other items that received the highest reimbursement from Federal Health Care Plans.
>
> . . .
>
> 12. BRETT BLACKMAN and GARY COX, through PME Home Health, and co-conspirators at DME suppliers, pharmacies, and telemarketing companies, including DME suppliers located in the Southern District of Florida, paid illegal kickbacks and bribes to co-conspirators at purported telemedicine companies in exchange for signed doctors' orders.
>
> . . .

> 14. BRETT BLACKMAN, GARY COX, GREGORY SCHRECK, and others concealed and disguised the scheme, including by entering into sham contracts and agreements that falsely concealed the purpose, nature, and scope of arrangements between and among PMDRx, HealthSplash, DME suppliers, pharmacies, telemarketing companies, and purported telemedicine companies.

[D.E. 76 at 11, 13, and 14]. Defendant cites the Government's closing argument, not evidence admitted at trial as grounds for the variance. However, a prosecutor's statements are not evidence. Nonetheless, the Government simply urged the jurors to apply common sense and experience with healthcare to what they saw at trial. Without being exhaustive, the Government can summarily debunk any variance arguments with a small sampling of exhibits. The mailers, call scripts, a call center recording, and Defendant's knowledge that DMERx pre-selected high reimbursement codes were admitted. *Compare* GXs 606, 610, 626, 636, and 503 *with* [D.E. 76 at 11 ¶ 5]. Evidence of Defendant's knowledge of and payment and receipt of illegal of kickbacks was also admitted. *Compare* GXs 633, 201, 251, 1110, and 1242 *with* [D.E. 76 at 13 ¶12]. Several of the sham contracts also came in. *Compare* GXs 228, 230, 233, 234, 236, 237 *with* [D.E. 76 at 13 and 14 ¶12]. Each of these types of evidence mirrors the allegations in the manner and means of Counts 1, 5, and 6. Accordingly, there was no variance.

F. <u>The Government Fairly Described the Defense Through the Evidence</u>

As noted *supra* at IV.A, the Government characterized the defense through what had been admitted into evidence. *Sosa*, 777 F.3d at 1297. Here, "the main defense strategy was to attack and undermine the credibility of the Government's case. It was clearly permissible for the prosecutors to counter this strategy." *See United States v. Bernal-Benitez*, 594 F.3d 1303, 1314 (11th Cir. 2010) (affirming convictions and finding no improper closing argument). The cases Defendant cites again offer no support for his position. *See Berger v. United States*, 295 U.S. 78 (1935) (overturning conviction where prosecutor insinuated that defense counsel conspired with the

defendant in arguing "they can sit up in their offices and devise ways to pass counterfeit money; 'but don't let the Government touch me'" and the prosecutor arguing that he himself knew that a witness was lying); *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (reversing convictions where the prosecution "repeatedly characteriz[ed] defense counsel as a 'witness' and [defense counsel's] opening statement as 'unsworn testimony,' [and] . . . urg[ed] the jury to ignore defense counsel's entirely legitimate role as an advocate . . . ."). Defendant cannot credibly argue that the Government attempted to cast his counsel as co-defendants by pointing to one stray reference to "defendants" in plural form when the immediately following remark from the Government addresses his counsel by name, not as a defendant. Tr. May 12 (PM) at 54:8-15.

## V. THE COUNT 5 INSTRUCTION WAS WHAT DEFENDANT PROPOSED AS THE COURT ADOPTED HIS LANGUAGE ON IT

The Court instructed the jury as to what constituted illegal remuneration under the Anti-Kickback Statute, including kickbacks and bribes. The instruction mirrored the Anti-Kickback Statute which prohibits the offering, paying, soliciting, or receiving rumination, including kickbacks and bribes, to induce or in exchange for the referral or ordering of products reimbursed by Medicare or any federal health care program. *See* 42 U.S.C. § 1320a-7b.

Defendant helped fashion the instruction for Count 5 by providing much of the language with which the Court instructed the jury. Defendant cannot claim error in the Court giving the instruction that he largely proposed for Count 5. A party who challenges a jury instruction on appeal after having proposed the instruction language commits "a textbook case of invited error." *See United States v. Alexander*, 170 F.4th 1303, 1315 (11th Cir. 2026) (declining to review defendant's challenge to a jury instruction where "the court's final version . . . incorporated [the defendant's] submission almost exactly[.]"). The instruction Defendant cites, *see* Mot. at 16-17, tracks what he proposed, which does not make the distinction that he now raises in distinguishing

a kickback from a bribe. *See* [D.E. 455 at 45-48]; *see* Tr. May 12 (AM) at 23:5-24:2 ("The Court: . . . Count 5 . . . This is language largely taken from the defense's proposal. It's adopted . . . ."). Moreover, counsel additionally contributed at length to the precise language in the instruction at the charge conference. Tr. May 12 (AM) at 24:3-55:19. As a result, Defendant cannot propose an instruction, receive the substance of it, further contribute to fine tuning the language at the charge conference, and then claim that it was given in error because he was convicted.

## VI. THE GOVERNMENT MET AND EXCEEDED ITS DISCOVERY OBLIGATIONS

Defendant has not and cannot point to any *Brady*, *Jencks*, or *Giglio* errors and again omits important facts. Nearly three months after trial, he now claims to have perfected his previous motion [D.E. 418] alleging late disclosure of a mere 225 pages of non-Rule 16 material. The Government produced these documents two weeks before trial. The Court has long since denied that motion. [D.E. 435]. Nonetheless, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "To prevail on a *Giglio* claim, a petitioner must establish that '(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material- i.e., that there is 'any reasonable likelihood' that the false testimony 'could . . . have affected the judgment.'" *Ford v. Hall*, 546 F.3d 1326, 1331-32 (11th Cir. 2008) (finding no *Giglio* violation over defendant's claim that the Government promised to provide a cooperating witness help to obtain parole in exchange for testifying) (citation omitted). *Jencks v. United States*, 353 U.S. 657 (1957), which is codified in 18 U.S.C. § 3500, and Federal Rule of Criminal of

Procedure Rule 26.2, generally requires a party who called a witness to produce any of the witness' statements in its possession after the witness completes direct examination.

*Brady* does not apply to evidence that is produced (the 225 pages produced) and *Jencks* and *Giglio* do not apply to witnesses that are not called (*e.g.*, Michelle Cuttino, Pamela Edwin, Jean Wilson, and Joseph DeCorso, none of whom testified in Defendant's trial). Therefore, Defendant's has no colorable *Brady* claim because no evidence was suppressed. Moreover, the overwhelming majority of what Defendant cites are interview reports written by federal agents, not witnesses that testified, and therefore is not *Jencks* material. Defendant otherwise cites to the trial testimony of Michael Petron in *United States v. Rivera*, S.D. Fla. No. 22-cr-20552, a case that was happening simultaneously as Defendants, that this prosecution team did not have. There was no *Giglio* violation because the Government did not illicit any perjured testimony. Defendant had the statements he cites before any of the other witnesses he listed took the stand. It is incredible to claim that he could not review 225 pages of material produced two weeks before trial in a trial that spanned four weeks that did not sit on Fridays. Defendant's cite to Chintan Anjaria's testimony, which occurred in the third week of trial, emphasizes this point. The authority Defendant cites say as much: those cases involve hundreds of thousands of unsorted documents. Not the 225-page indexed and text searchable production that the Government gave defendant. This argument fails.

## VII. THERE IS NO MULTIPLICITY BECAUSE HEALTH CARE FRAUD AND A *KLEIN* CONSPIRACY ARE DIFFERENT CRIMES

Defendant argues for a new trial on Count 6 because he alleges that it suffers from multiplicity with Counts 2-4. "An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Sirang*, 70 F.3d 588, 595 (11th Cir. 1995) (rejecting defendant's multiplicity argument and affirming conviction bank fraud and wire fraud convictions). An alleged non-jurisdictional defect in an indictment must be raised before trial. Fed. R. Crim. P. 12(b)(3).

Defendant did not raise this argument in his pretrial motion to dismiss and thus waived it. To the extent he claims he did, the motion was denied. Nonetheless, Counts 2-4 charged Defendant with substantive health care fraud for three separate claims for reimbursement billed to Medicare from orders stemming from DMERx clients. Count 6 charged him for a single 18 U.S.C. § 371 conspiracy with two objects: (1) to defraud the U.S. (a *Klein* conspiracy) and (2) making false statements in connection with health care matters. These offenses each have different elements and the Superseding Indictment and the Court's jury instructions tracked the respective statutes. Thus, there is no issue with multiplicity. Defendant was acquitted on Counts 2-4 and was not convicted on Count 6 for making false statements. No further discussion is warranted as to those offenses.

Defendant's remaining argument stems from a misreading of the *Klein* object in Count 6. It is a federal crime "[i]f two or more persons conspire either to commit any offense against the United States, or to ***defraud the United States, or any agency thereof in any manner or for any purpose***, and ***one or more of such persons do any act*** to effect the object of the conspiracy." 18 U.S.C. § 371 (emphasis added). The second clause (or "defraud prong") of the federal conspiracy statute creates criminal liability for anyone who conspires "to defraud the United States." *Id*. The "defraud" prong of 18 U.S.C. § 371 is widely called a "*Klein* conspiracy" based on Second Circuit precedent. *See United States v. Klein*, 247 F.2d 908, 921 (2d Cir. 1957) (affirming conviction for conspiracy to defraud in connection with tax evasion for whiskey sales where evidence showed concealment of income, including false statements on tax returns and in interrogatory responses). A defendant can be charged with the defraud prong of the conspiracy statute without any charge of violating a separate substantive statute. *United States v. Harmas*, 974 F.2d 1262, 1266 (11th Cir. 1992) (noting that Section 371 "is written in the disjunctive and should be interpreted as establishing two alternative means of committing a violation."). Although the conspiracy alleged

here did cause a monetary loss, a *Klein* conspiracy does not have to cause a loss if the defendant impedes a Government function. *See United States v. Puerto*, 730 F.2d 627, 630 (11th Cir. 1984) (holding that "[c]onspiracies in violation of section 371 need not cause any monetary loss to the government, so long as they interfere with or obstruct its lawful functions" in finding that submitting false or misleading affidavits to a government agency impeded its lawful functions). Here, Defendant impeded the Centers for Medicare & Medicaid Services, an agency of the U.S., from carrying out its functions by programming DMERx to generate falsified doctors' orders designed to defeat its audits by concealing the use of telemedicine. Defendant's decision to sell these orders for that purpose amongst others establishes his culpability. *See* GX 1052; Tr Apr. 21 at 219:24-220:2; Tr. May 7 (PM) at 13:19-14:2. Defendant's argument unnecessarily convolutes this straightforward evidence. No new trial is warranted on the *Klein* conspiracy in Count 6.

## VIII. THE GOVERNMENT'S OFFERED CO-CONSPIRATOR STATEMENTS WERE ADMISSIBLE

Defendant's argument that there was no conspiracy after cross examining several witnesses that identified him as a co-conspirator in their own conspiracy convictions is baseless. Without citing the record, Defendant asserts that "the evidence did not reveal *any* conspiracy between Blackman and the declarants." Mot. at 26. Defendant conveniently ignores that over a half dozen witnesses, including Defendant's fellow executives at DMERx, testified that they pleaded guilty to committing and conspiring to commit health care offenses with Defendant and by using DMERx. *See, e.g.*, Tr. Apr. 30 at 158:6-11 ("Q. Now, Mr. McNeal, did you plead guilty to a crime in connection with your business relationship with DMERx? A. I did, yes, sir. Q. And what did you plead guilty to? A. Two counts. One for conspiracy and the other for receiving remuneration kickback."); Tr. May 4 (AM) at 106:6-10 ("Q. And did you plead guilty to a crime related to HealthSplash and DMERx? A. [G. Schreck] I did. Q. What crime did you plead guilty to? A.

Conspiracy to commit healthcare fraud."); *id*., at 112:1-8 (Q. . . Were you indicted before you pleaded guilty? A. I was. Q. Were you indicted alone or with other people? A. Other individuals. Q. Who were you indicted with? A. Gary Cox and Brett Blackman. Q. Do you see any of them in the courtroom today? A. I see Brett Blackman."). Even more, as noted *supra* at I., Defendant memorialized his criminal partnership through the sham contracts that lied about what he and co-conspirators were doing. The Government admitted communications stemming from that criminal partnership amongst Defendant and his co-conspirators. Defendant cannot cite a single statement that was admitted that he claims was not a co-conspirator statement. The Government established three criminal conspiracies beyond a reasonable doubt to the jury and certainly met the lesser preponderance standard required for admission of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E). Defendant's argument on this issue, and his Motion itself, is meritless.

## CONCLUSION

For these reasons, the Court should deny Defendant's motion for a new trial in its entirety.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

By: *\/s/ Reginald Cuyler Jr.*
DARREN C. HALVERSON
Florida Special Bar No. A5503082
REGINALD CUYLER JR.
Florida Bar No. 0114062
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice

1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 880-2233
Tel: (202) 748-3024
Email: Darren.Halverson@usdoj.gov
Email: Reginald.Cuyler.Jr@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 17, 2026 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record.

*/s/ Reginald Cuyler Jr.*
Reginald Cuyler Jr.
Trial Attorney