**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 23-CR-20271-DSL**

UNITED STATES OF AMERICA

v.

BRETT BLACKMAN,

Defendant.

_______________________________________ /

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL UNDER RULE 29**

The United States, through undersigned counsel, respectfully submits this response in opposition to Defendant Brett Blackman's (hereinafter "Defendant" or "Blackman") Motion for a Judgment of Acquittal under Federal Rule of Criminal Procedure 29(c). D.E. 521. After a lengthy trial from April – May 2026, featuring 19 witnesses and hundreds of exhibits, the jury convicted Blackman of conspiracy to commit health care fraud and wire fraud (Count 1), conspiracy to pay and receive health care kickbacks (Count 5), and conspiracy to defraud the United States (Count 6). The jury acquitted Blackman of the substantive health care fraud executions charged in Counts 2 – 4. Blackman now asks this Court to substitute his own view of the evidence for the jury's, to re-characterize testimony the jury was entitled to credit, and to treat every ambiguity the defense can identify—without reference to the specific trial record—as fatal to a verdict that rests on substantial, mutually reinforcing evidence. Rule 29(c) does not permit that. Viewing the evidence in the light most favorable to the verdict, as the Court must, the record amply supports each conviction, and the motion should be denied in its entirety.

The Superseding Indictment alleged, and the Government proved at trial, that from February 2015 through October 2020, Blackman and his co-conspirators connected offshore and domestic telemarketing centers, purported telemedicine companies, orthotic brace suppliers, and

pharmacies through their online platform ("the DMERx platform") for the purpose of generating false and fraudulent doctors' orders for hundreds of thousands of medically unnecessary items that were unlawfully billed to Federal health care benefit programs for beneficiaries. One of the telemarketing centers was called National Center for Pain ("NCP"), which solicited beneficiaries on behalf of Blackman and others. NCP and other telemarketing centers solicited Federal health care benefit program beneficiaries to accept orthotic braces and pain creams and then paid fraudulent telemedicine companies to have telemedicine doctors sign the orders and prescriptions. The telemedicine doctors had no prior relationship with the patients, were not treating the beneficiaries, and did not examine or evaluate the patients beyond the brief, audio-only telemedicine encounter. At times, the doctors did not even speak with the beneficiaries. The telemarketers then sold the brace orders to brace suppliers and sold the pain cream prescriptions to pharmacies each for a kickback and bribe. Blackman's intended loss to Federal health care benefit programs exceeds $1 billion.

## I. STANDARD OF REVIEW

Defendant recites the correct authorities but then largely ignores them. On a motion for judgment of acquittal under Rule 29(c), the Court must view all evidence "in the light most favorable to the government," draw "all reasonable inferences" in the Government's favor and accept the jury's resolution of "any conflicts in the evidence." *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999). "It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id*. (citations and quotation marks omitted). "The court must accept all of the jury's 'reasonable inferences and credibility determinations.'" *Id*. "Although the evidence need not

exclude every reasonable hypothesis of innocence in order to sustain a guilty verdict, as we have noted, [the court] cannot sanction a conspiracy conviction predicated on 'conjecture.'" *United States v. Toler*, 144 F.3d 1423, 1433 (11th Cir. 1998).

To sustain a conviction for conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349 (Count 1), the Government had to establish beyond a reasonable doubt that: (1) a conspiracy existed to commit health care fraud under 18 U.S.C. § 1347; (2) Defendant knew of the conspiracy; and (3) Defendant knowingly and voluntarily joined it. *See United States v. Moran*, 778 F.3d 942, 960 (11th Cir.). "[I]n a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007). A person makes a false claim if the treatments that were billed were "not medically necessary, or were not delivered to the patients." *See id*. at 1304.

To sustain a conviction for conspiracy to commit mail or wire fraud the government must prove: (1) the existence of an agreement or common purpose to execute a scheme to defraud, and (2) use of the mail or wire systems to further the scheme. *See United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).

"The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Mateos,* 623 F.3d 1350, 1362 (11th Cir. 2010) (quoting *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006)). "A conspiracy conviction will be upheld 'when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to [her].'" *Moran*, 778 F.3d at 960–61 (quoting *United States v. Vernon*, 723 F.3d 1234, 1273–74 (11th Cir. 2013); *Mateos*, 623 F.3d at 1362). "[T]he government need not prove that the defendant knew all of the details or

participated in every aspect of the conspiracy." *Id.* at 960 (quoting *Vernon*, 723 F.3d at 1273). Rather, the Government must only prove, beyond a reasonable doubt, that the defendant knew of "the essential nature of the conspiracy." *Id*. (quoting *Vernon*, 723 F.3d at 1273). The Government can establish that a defendant voluntarily joined the conspiracy "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." *Id*. at 961 (quoting *Vernon*, 723 F.3d at 1274).

"To sustain a conviction for conspiracy to defraud the United States, the Government must prove the existence of an agreement to achieve an unlawful objective, the defendant's knowing and voluntary participation in the conspiracy, and the commission of an overt act in furtherance of it." *United States v. Suba*, 132 F.3d 662, 672 (11th Cir. 1998) (citation omitted). "[I]f the proof shows the defendant knew the essential objective of the conspiracy, it does not matter that he did not know all its details or played a minor role in the overall scheme." *Id.* (citation omitted). In addition, "participation in a criminal conspiracy need not be proved by direct evidence; a common purpose or plan may be inferred from a development and collocation of circumstances." *Id*. (citation and quotation marks omitted). "Variance between allegations and proof is reversible only when the defendant is actually prejudiced." *Id*. (citing *United States v. Coy*, 19 F.3d 629, 634 (11th Cir. 1994)).

## II. SUBSTANTIAL EVIDENCE SUPPORTS BLACKMAN'S COUNT 1 WIRE & HEALTH CARE FRAUD CONSPIRACY CONVICTION

Defendant repeatedly invites the Court to do what Rule 29(c) forbids: reweigh cooperator credibility, credit the answers cooperators gave on cross-examination over what they said on direct, and resolve inferences about Blackman's knowledge and intent in his favor. Each of those is a jury function. Where cooperating witnesses testified on direct that they conspired with the platform and its operators, that Blackman was warned of legal risk and pressed forward anyway, and that he

concealed the true nature of patient encounters throughout the ordering process, the fact that defense counsel extracted hedges and disclaimers on cross does not render the evidence insufficient — it means the jury had a credibility question to resolve, and it resolved it against Blackman. Ignoring the mountains of evidence presented at trial, Blackman suggests—without citation to evidence—that "[a]cquiring a business whose customers may include people who are committing fraud does not establish proof of any illegality on the part of the business owner, whom the evidence at trial revealed took a hands-off role in the day-to-day operations of the company." D.E. 521 at 3. While this may have been the defense theory at trial, it had no evidentiary support and the jury was entitled to discount it in light of the voluminous cooperator testimony, corroborated by documentary evidence, showing that Blackman was involved in every detail of the fraud conspiracy. *See*, *e.g.*, Tr. Apr. 28 (AM) at 137 (De Lanoy testifying that Blackman made decision to remove references to telephone calls from orders). Blackman also managed the relationships with some the platform's most fraudulent customers — *e.g*., Advantage Choice Care. GX 228 (September 14, 2017, Advantage Choice Care Contract); GX 1138 ([Oct. 24, 2017, Email from Co-Defendant Cox to Defendant] "Subject: FW: ACC Issues Spreadsheet . . . 'The front-end call from your phone reps are beyond illegal'"). The Court should deny Blackman's attempt to rewrite the trial record without bothering to cite to it, and deny his unsupported motion for acquittal.

Defendant also continuously reframes the theory of fraud that was presented to the jury, in an attempt to cast it as a nonsensical fraud. For instance, Defendant writes without reference to any argument or testimony, "[t]he government charged a theory of fraud premised on the notion that prescribing braces via telemedicine was prohibited—and thus, any brace deemed to be medically necessary via a telephonic visit was *per se* fraud." D.E. 521, at 14-15. The Government's

theory of fraud is detailed in the Superseding Indictment, D.E. 76, which detailed approximately 11 manners and means to accomplish the conspiracy charged in Count 1. And the Government made clear to the jury that, "[t]his case is not about whether Medicare allowed telemedicine. It did. Blackman removed the language that would have told Medicare that the doctors were not seeing these patients in person, and he and his coconspirators added false diagnostic testing, knee testing, that he knew could not be done over a telephone call." Tr. Apr. 21 at 61 (Halverson opening statement). In essence, Blackman and his co-conspirators lied about the very nature of the medical necessity determinations upon which Medicare made its payment decision — *i.e.*, generating falsified doctors' orders including examinations that did not happen. This is the heart of Defendant's fraud scheme and is ignored wholesale by Defendant in his latest attempt to rewrite his illegal conduct. A mountain of evidence supported the Government's theory—which Defendant has resolutely ignored throughout his motion—and thus the Court should deny this motion.

### ***A. The Evidence Established a Single, Interdependent Illegal Agreement***

Defendant's *Kotteakos* argument depends on the false characterization that DMERx/HealthSplash was nothing more than a passive tool used by strangers who never dealt with one another. *See Kotteakos v. United States*, 328 U.S. 750, 769 (1946) (holding multiplicity where no connections between defendants who fraudulently obtained loans through a central person). The trial evidence permitted the jury to find otherwise. Under *United States v. Richardson*, a single conspiracy exists where the evidence shows (1) a common goal, (2) an interdependent scheme, and (3) overlapping participants. 532 F.3d 1279, 1284 (11th Cir. 2008) (affirming convictions in finding that a single conspiracy was established). All three factors were satisfied here.

First, the common goal was not the generic pursuit of money that this Circuit has held insufficient; it was a specific goal of defrauding Medicare through the creation of false and fraudulent orders and prescriptions. For instance, Jordan Karlick pleaded guilty to health care fraud and testified that he "billed Medicare for fictitious claims, around $19 million worth," Tr. Apr. 27 at 54:14-19. He also noted that the DMERx orders were "an ad-lib that you would just sign and then I would fill the order." *Id*. at 54:20-55:1. Sargon Audisho, a licensed physician whose license was later revoked, testified that the DMERx template was the same whether he called or not, and he often did not call beneficiaries before signing an order. Tr. Apr. 29 (PM) at 28:1-4. Defendant profited by a per-download fee charged on every prescription pushed through the platform. De Lanoy testified that "DMERx, HealthSplash was paid per download of the documentation for the orders," Tr. Apr. 28 (AM) at 90:17-19, and Gregory Schreck testified that "we would receive $5 per download on the telemed, and $5 per download on the DME. So we would receive $10 of revenue for each order," Tr. May 4 (AM) at 130:7-10. De Lanoy tied Blackman to this goal, saying that he "decided that pricing model," Tr. Apr. 27 at 226:20-25.

This structure gave brace suppliers, telemedicine companies, marketers, and the platform itself a common financial stake in maximizing the volume of orders without regard to medical need. Schreck confirmed this when he testified that "if we get more volume within the organization, we would get more download fees from both the telemed organization and the supplier, to a tee of $10 per additional customer." Tr. May 5 at 87:22-88:2. De Lanoy also noted that DMERx used tiered, volume-based pricing "to help drive larger volume," Tr. Apr. 27 at 256:19-257:8, and when she raised her concern that the volume of orders doctors were signing showed a lack of care for patients with Blackman, "it didn't go anywhere" because "we were trying to increase our revenue." Tr. Apr. 28 (AM) at 81:17-23. She also noted that the orders moved

through the same pipeline, week after week, and testified as to the revenue emails that: "This was all about tracking volume of orders and ultimately revenue." Tr. Apr. 28 (AM) at 84:22-23. De Lanoy noted that, "in order to get the revenue up, we needed more orders to be processed through the platform," *id.* at 91:22-25. This volume was driven using the same doctors. McNeal, who owned one of the largest telemedicine companies on DMERx, testified that some Integrated Support Plus doctors "would sign over 100 in a 24-hour period," with a goal completion rate of 100 percent, same day. Tr. Apr. 30 (AM) at 197:9-25. And as Paul Toman testified during his deposition, Blackman had access to this volume of data. GX 555 & GX 556, Paul Toman Deposition at 165 ("Q. So if Brett Blackman wanted to know the volume of any given doctor's prescriptions, he could have known that by asking you. Right? A. For asking for a breakdown. Yes"). The scheme relied on the same templated DMERx order, for instance Schreck testified, recognizing a DMERx order: "They all have the same flow, the same template to them." Tr. May 4 (PM) at 5:15. Defendant's argument that he received the fees regardless of if Medicare reimbursed the claim is beside the point. Defendant intentionally sold as many falsified orders as possible knowing that his co-conspirators submitted them for reimbursement, intending to defraud Medicare with each claim. *See*, *e.g.*, D.E. 463 at 27 ("The heart of the conspiracy is the making of the unlawful plan itself followed by the commission of any overt act. The Government does not have to prove that the conspirators succeeded in carrying out the plan.").

Second, the scheme was interdependent, not a series of isolated bilateral deals. Schreck testified that "marketers were paying for the telehealth groups, the telemed groups were then paying the doctors, DMEs were paying the marketers. I came to realize it was just a circle of dollars being paid back to each individual for their services," Tr. May 4 (AM) at 127:14-21. He also noted that a lead generated by a marketer was worthless without a telemedicine company to route it to a

prescriber. Tr. May 4 (AM) at 129:24-130:10. Shreck noted that: "The marketers paid the telemed organizations, and then the telemed organizations took that same money, kept a portion of it, and gave a portion to the physicians to complete the order." Tr. May 5 at 87:18-21. Karlick agreed that the system was worthless without a prescriber willing to sign many templated orders. He testified that his brace company, "Parris Medical did not have a relationship with telemed, so we had no one to sign doctor orders," Tr. Apr. 27 at 96:1-5. Audisho, who was paid a fee per consult described "a direct correlation" between consults completed and higher pay, Tr. Apr. 29 (PM) at 28:6-16. And the doctors' signatures were worthless without a DME supplier to bill Medicare. Karlick noted that without a doctors' signature, he "would not be able to bill Medicare," Tr. Apr. 27 at 96:6-8; but with signed DMERx orders in hand they "would be able to bill Medicare," *id*. at 70:24-71:1. Each link necessary for the next, all transacted through the same DMERx software Blackman owned and operated, and all to make Blackman and his co-conspirators millions.

Third, the participants overlapped extensively. Anjaria, McNeal, Cirri, Breitman, and the other cooperating witnesses were not strangers operating in isolated silos: they used the same platform, the same category of doctors flagged repeatedly in the evidence (Audisho, DeCorso, Cuttino), and the same templates that the Government's proof — including Government's Exhibit GX 1035, a HealthSplash "do's and don'ts" document — showed were used by DMERx users in patterned, recurring ways to circumvent Medicare (of which Blackman was well aware).

More still, the evidence at trial showed that far from being isolated in silos of criminal activity, a large part of Blackman's and HealthSplash's role was to connect the various players to make the fraudulent conspiracy operate through the three corners of the fraud triangle depicted in GX 156. *Cf. Coy*, 19 F.3d at 634 ("the two crews did not assist each other . . . "). For instance, telemedicine company owner McNeal confirmed HealthSplash was referring marketers to him.

GX 1104 is "what [McNeal] considered as an introductory email to a marketer," sent by Gary Cox to Chris Cirri and McNeal, announcing a newly signed prescriber group and directing marketers needing telemed services to contact McNeal. Tr. Apr. 30 (AM) at 188:9-16, 188:24-189:3. McNeal testified about another introduction from Gary Cox, attaching "a list of the marketers that he was introducing me to or making available to me from within their software." Tr. Apr. 30 (AM) at 190:23-191:2. McNeal did business with roughly 16 of them, including his largest customer, Empire/Chronos. Tr. Apr. 30 (AM) at 191:5-11. Schreck tied these referral connections directly to the fraud scheme on cross-examination, "connecting people that — within DMERx that were all, were both committing fraud, yes." Tr. May 4 (PM) at 109:22-23. In fact, De Lanoy testified that Blackman hired Schreck specifically to make the connections between participants in the fraud to drive up the volume of orders. *See* Tr. Apr. 28 (AM) at 82:8-20.

Defendant's reliance on cooperators' inability to recite the elements of *United States v. Chandler*, 388 F.3d 796, 807 (11th Cir. 2004) from the stand, or their concession that they never met Blackman personally, misses the point. *See* D.E. 521, at 41. *Chandler* is different from this case. The Eleventh Circuit found that there was no single conspiracy because there was no evidence of overlap in membership. *Id*. at 812 ("Nor was there any evidence of an overlap of membership between the spokes. There was none. The only member common to each separate spoke was Jacobson."). As noted above, the opposite was the case here. Moreover, a conspirator need not know or ever meet every other conspirator; he need only know the essential nature and scope of the scheme and intentionally join it. *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998) (noting that "it is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy; all that the government must prove . . . is an agreement or common purpose to violate the law."). Co-conspirators naturally have individual

roles that may not be fully known to others in the conspiracy. *See id*. The jury could credit testimony that DMERx referred marketers to DME suppliers and to one another as part of the routine operation of the platform—not, as the defense now claims, as an incidental byproduct of legitimate software use.

In fact, both Toni De Lanoy and Gregory Schreck provided significant evidence of a unified conspiracy to defraud Medicare through false brace and pain cream prescriptions, naming several other testifying co-conspirators during their testimony. De Lanoy pleaded guilty to conspiracy to commit health care fraud in connection with her work at DMERx. Tr. Apr. 27 at 212:18-25, 219:14-23. She testified that she conspired with Brett Blackman. Tr. Apr. 27 at 213:5-12. She characterized the payments between marketers and telemedicine companies as "a kickback." Tr. Apr. 28 (AM) at 61:16-18; *see also* Tr. Apr. 27 at 225:14, 225:20; Tr. Apr. 28 (AM) at 41:10. Gregory Schreck also pleaded guilty to conspiracy to commit health care fraud and explained; "I helped build and promote DMERx software and helped facilitate fraud being billed to Medicare." Tr. May 4 (AM) at 106:6-13. Schreck explained how the orders concealed the telemedicine encounter; "it was important that nothing in that document denoted that this was not a face-to-face, but was a via phone consultation." And he characterized that omission; "That is fraud." Tr. May 4 (AM) at 107:25-108:8. Schreck described the payment structure: physicians were paid by telemed groups funded by marketers, "which is a kickback," such that the physician "would then not have the consultation or to determine medical necessity." Tr. May 4 (AM) at 110:7-25.

More still, despite Blackman's attempt to distinguish between different periods of the Count 1 conspiracy—claiming without reference to the record that Blackman was not involved during certain times—*see* D.E. 521 at 13; significant evidence showed that Blackman was involved

throughout the period alleged in the Superseding Indictment and in each of the companies he used during the course of the charged conspiracy. This evidence was most apparent when Kristina Rogers, a witness the Court ruled was hostile to the Government's case, testified that Blackman was the "orchestrator" of a number of the companies in the fraud conspiracy, including National Center for Pain (which sent deceptive mailers to Medicare beneficiaries), PME Home Health (which billed Medicare for DMERx orders), and Amici Holdings (which was the holding company for a number of the entities). *See*, *e.g.*, Tr. Apr. 29 (PM) at 94:7-25, 100:18-19 (Rogers testifying that Blackman was "orchestrator" of National Center for Pain and Amici). And perhaps most tellingly, the evidence showed that Blackman was in charge at DMERx long before he formally purchased it from Cox, as shown by GX 1052, an email dated almost a year before Blackman formally purchased DMERx, in which he directed Cox to remove references to telemedicine because "Medicare busts their chops over Telemed encounters." Notwithstanding Blackman's wishful assertions about his conduct, the evidence submitted to the jury is consistent with the guilty verdict that he was involved in a single, unified conspiracy to defraud Medicare.

### *B. Blackman's Own Conduct Supplied the Requisite Knowledge and Intent for Count 1*

The defense claims, again without citation to the record, that the jury lacked evidence of Blackman's intent. But his motion largely ignores the Government's strongest proof: Blackman's own documented conduct. The memorandum HealthSplash's attorney Denise Leard prepared at Blackman's request flagged that the proposed fee structure posed a risk of violating the Anti-Kickback Statute. GX 633. Whatever technical distinctions the defense now draws between the structure described in that memo and the structure HealthSplash ultimately used, the jury was entitled to find that the memo put Blackman on notice that his revenue model sat in legally fraught territory, and that he proceeded regardless. That is precisely the kind of direct evidence of knowledge and willfulness that *Falcone* and *Direct Sales* found lacking where a seller merely

suspects a buyer's illegal purpose. *See United States v. Falcone*, 311 U.S. 205, 210 (1940) ("[I]t could not be inferred . . . from the casual and unexplained meetings of some respondents with others who were convicted as conspirators that respondents knew of the conspiracy"); *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) ("[O]ne does not become a party to a conspiracy by aiding and abetting it, through sales or supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally"). Here, the risk was not a customer's independent illegality; it was an illegality in Blackman's business model, identified to him by his lawyer.

Toni De Lanoy's testimony reinforces the point. On cross-examination, she testified without qualification that "warnings were given" and "they weren't heeded." Tr. Apr. 28 (PM) at 32:23. That testimony, elicited by the defense itself, is affirmative evidence that Blackman received and disregarded internal warnings about the platform's operation. De Lanoy likewise testified that while she did not believe DMERx was originally built to subvert Medicare, she believed it "changed over time"— testimony the jury could reasonably understand as describing an evolution toward accommodating the very conduct at issue, under Blackman's control. *Id*. at 43-44.

Most significantly, GX 1052 documents Blackman's personal agreement to remove references to telephones and telemedicine from the orders the platform generated. The Government's proof, including the email that Medicare "busts their chops over telemed encounters" and Toni De Lanoy's testimony that removing that language "was deceitful," Tr. Apr. 29 (AM) at 60-61, permitted the jury to find that Blackman participated directly — not through the unsupervised acts of distant customers — in altering the platform's output to obscure the true nature of the underlying encounters from exactly the auditors responsible for catching fraud. That

is not, as the defense insists, an innocent effort to avoid an erroneous audit clawback; it is direct evidence of an intent to defraud, from which the jury could infer Blackman's knowing participation in the charged scheme. This misrepresentation was more than a mere intent to deceive as in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *as revised* (Oct. 3, 2016), o*pinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016), *and abrogated by Kousisis v. United States*, 605 U.S. 114 (2025). It was material. Federal health care programs received no benefit of the bargain for paying providers for items because the examinations for medical necessity for those items were fabricated and procured through kickbacks. The Government's closing argument tied that exhibit to other proof — including GX 312, 313, and 314, reflecting order volumes the jury could find were inconsistent with doctors actually performing the examinations attested to — corroborating that the concealment was not a bookkeeping choice but a cover for encounters that were not occurring as represented.

Instead of confronting this record showing Blackman's intent, he has asked the Court to weigh the credibility of cooperators like Toni De Lanoy. *See* D.E. 521 at 4 ("Toni Delanoy, who testified in exchange for leniency pursuant to a cooperation agreement with the government, stated that it was her understanding that you do not need to have intent to be guilty of conspiracy"). Blackman also cherry-picks statements of cooperating witnesses, without including clarifying statements. For instance, Blackman states that De Lanoy denied having the intent to commit a crime, but Defendant conveniently ignores that De Lanoy clarified what she meant about intent on cross-examination. When Blackman's attorney asked, "you said you didn't ever intend to commit a crime, right?" she answered, "[i]t was not my intent, but I stayed. And I was involved." Tr. Apr. 28 (PM) at 47:20-22. Whether or not Ms. De Lanoy understood the legal term of art "intent," she clearly understood that she committed a crime with Blackman.

### *C. The Jury's Partial Acquittals Do Not Undermine the Conspiracy Verdict*

Defendant repeatedly argues that the jury's acquittal on the substantive health care fraud counts (Counts 2–4) proves the conspiracy verdict cannot stand. It is black-letter law that it does not. Juries are not required to reach consistent verdicts across counts, and a conspiracy conviction may stand even where the jury acquits on substantive counts arising from the same conduct.[1] The most likely explanation, and one fully consistent with the verdict, is that the jury found the Government had not proven beyond a reasonable doubt that Blackman participated specifically in the particular false or fraudulent claims identified in Counts 2 through 4, while still finding, based on the broader pattern of proof discussed above, that Blackman knowingly agreed to participate in the charged schemes involved in the conspiracy counts. *See*, *e.g*., *United States v. Cole*, 755 F.2d 748, 762 (11th Cir. 1985) ("[T]he jury acquitted some defendants on various counts and found them guilty on others. These facts demonstrate that the jury was able to sort out the evidence relevant to each defendant and render a verdict based solely upon that defendant's acts, statements, and conduct."). Acquittals on individual transactions do not erase agreement evidence that spans the life of the conspiracy. *United States v. Alonso*, 740 F.2d 862, 870–71 (11th Cir. 1984) (citation omitted) (affirming RICO convictions and holding that "[a]n acquittal on a substantive offense does not preclude a verdict of guilty on a count charging a conspiracy to commit such a substantive offense").

---

1 *See United States v. Powell*, 469 U.S. 57, 64–65 (1984) ("where truly inconsistent verdicts have been reached, '[the] most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'") (citation omitted).

### *D. The Government Alleged and Proved a Telemarketing Conspiracy with Defendant at its Center*

Defendant alleges that the Government "constructively amended and materially varied the indictment" by proving at trial that he was involved in telemarketing. *See* D.E. 521 at 11-12. But the proof at trial matched the Superseding Indictment, which alleged a telemarketing scheme in no fewer than 14 places. *See* Superseding Indictment, D.E. 76 at 11-14, 20. The Superseding Indictment alleged, among other things, that "BRETT BLACKMAN and his coconspirators at National Center for Pain and at various telemarketing companies targeted hundreds of thousands of beneficiaries on behalf of DME suppliers and pharmacies. The beneficiaries were targeted to provide their personally identifiable information and accept braces, pain creams, and other items through misleading mailers, television advertisements, and calls from offshore call centers." *Id*. at 11-12. The trial record bore out these allegations repeatedly.

Evidence at trial proved that Blackman marketed braces and pain creams and provided the call-center phone number that appeared on mailers sent to millions of Medicare beneficiaries. For instance, cooperating witness Jordan Karlick identified Herb Kimble as owner of "a call center in the Philippines as well a business partner in [Karlick's] first DME." Tr. Apr. 27 at 49:22-50:4. When asked about Blackman's relationship with Kimble, Karlick testified that he "acted as a liaison between the two of them"—between Kimble's call center and Blackman's "National Center for Pain, PME and DMERx." Tr. Apr. 27 at 50:16-51:7. Karlick described the relationship he brokered between Kimble and Blackman as one involving Kimble's call centers, and Blackman generating calls through National Center for Pain and doctors' orders through DMERx. Tr. Apr. 27 at 51:19-24.[2]

---

[2] Defendant also argues, without citing to authority, that the fact that the Government proved the Superseding Indictment's manner and means allegation that he used "misleading mailers" to

Chris Cirri, another call center owner, testified that Blackman came to his call center. When Cirri reduced his volume of doctors' orders purchased through DMERx, Blackman flew to Cirri's office in Howell, New Jersey on September 6, 2017, with Schreck, because "[t]hey wanted to get my business back." Tr. Apr. 22 (AM) at 77:25-78:23, 79:3-11.

Willie McNeal, the owner of the largest telemedicine company on DMERx, testified that Blackman worked with Herb Kimble, who was a telemarketer to Medicare beneficiaries. McNeal testified about how Kimble lured Medicare beneficiaries into receiving braces. Tr. Apr. 30 (AM) at 153. McNeal testified that Blackman and DMERx were at the center of the telemarketing scheme. *See* Tr. Apr. 30 (AM) at 156:6-8 ("One of the key ways when getting into the industry was through -- the HealthSplash DMERx were given referrals of different marketing agencies that they worked with").

Defendant's unsupported assertion that the Government constructively amended the Superseding Indictment by arguing that the conspiracy involved "shady call centers" is inconsistent with the record and simply insufficient to override the jury's verdicts. *See United States v. Wilson*, 149 F.3d 1298, 1302 (11th Cir. 1998) (holding only government remarks affecting defendant's substantial rights will cause court to override jury's verdict).

***E. The Government Proved the Charged Fraud Conspiracy as Related to Pharmacy Claims***

Defendant curiously argues that the Government failed to prove the allegations related to pharmacy claims.[3] This argument fails because the Government did prove those allegations and, in any event, need not prove every allegation in the Superseding Indictment to sustain a conviction.

---

trick beneficiaries demonstrates a need for acquittal. This nonsensical argument should be rejected as unsupported.

[3] Defendant's argument that none of the orders he cites were in the DMERx system is incorrect. For example, the orders at GX 316 and GX 317 are in GX 426 rows 16458 and 21523.

Each insider testified about the pharmacy goal of the fraud. Schreck stated that DMERx was used not only for braces but also for power mobility devices, wheelchairs, and "pain creams and a product called UV Wand." Tr. May 4 (AM) at 127:25-128:8. Schreck also testified that the pharmacy module "was not for a chronic condition or maintenance medication. It was for the topical pain cream." Tr. May 4 (PM) at 135:12-18. Schreck testified that marketers were "looking for telehealths for topicals." Tr. May 4 (PM) at 30:5. De Lanoy testified that the pharmaceutical module involved compounding pharmacies combining medications, and that "topical creams were really common in the industry." Tr. Apr. 28 (AM) at 57:20-58:23. De Lanoy confirmed that the pharmacy ran on the same weekly revenue reporting as orthotics, PMD, and UV wand, and that a pharmacy order could be "just an add-on for an orthotic brace." Tr. Apr. 28 (AM) at 86:8-87:6. De Lanoy testified that "the prescription was deemed an order," and that monthly revenue came from "our clients paying us the download fee, the transactional fee." Tr. Apr. 28 (AM) at 85:10, 85:17-18. De Lanoy testified that Schreck was brought on by Blackman because "volume wasn't going up the way the expectations were set," and he brought on board "Marketers, telemeds, DME, and pharmacy, as well." Tr. Apr. 28 (AM) at 82:8-20. Taken with Langston's testimony that he purchased from Blackman pain cream prescriptions in exchange for kickbacks and bribes, Tr. Apr. 30 (AM) at 313:24 – 314:16, this is more than sufficient evidence for the jury to find that Blackman engaged in a fraud conspiracy involving pain creams.

## III. THE GOVERNMENT'S FRAUD THEORY TARGETED A TRADITIONAL PROPERTY INTEREST AND WAS AMPLY SUPPORTED

### *A. The Scheme Targeted Medicare's Money, Not Merely Its Audit Discretion*

Defendant's reliance on *Ciminelli v. United States*, 598 U.S. 306 (2023), and *Kousisis v. United States*, 605 U.S. 114 (2025), rests on mischaracterizing the Government's theory as an "audit-avoidance" or "right-to-control" theory. It was not. The Government's theory, and its proof,

was that Medicare paid over $450 million in actual money through reimbursements for claims supported by orders falsely attesting that a qualifying medical encounter had occurred, when Black's platform's own operator, had personally approved stripping the orders of the very information that would have revealed the encounter's true nature. That is a scheme to obtain money by trick, the paradigm case that *Ciminelli* and *Kousisis* leave untouched. *Ciminelli* forecloses only theories premised on deprivation of intangible "right to control" information used for discretionary decision-making, 598 U.S. at 316. It does not immunize schemes, like this one, aimed at extracting actual reimbursement dollars through false statements and omissions of material facts as to whether the item was properly billable in the first place.

*Kousisis* does not help the defense either. *Kousisis* reaffirms that fraud requires a scheme to obtain "money or property," 605 U.S. at 118, and the Government's theory satisfies that requirement directly: Medicare paid money for braces obtained through orders whose supporting attestations the jury could find were fabricated. The "benefit of the bargain" the defense invokes from *Kousisis's* concurrences is not implicated where the Government proved a scheme aimed at inducing payment through false attestations that go to eligibility for payment in the first place — not, as in *Kousisis*, a collateral contractual term.

The fact that Medicare might audit only some of the claims does not negate the lies to Medicare that Blackman created. Before presenting a claim for payment to Medicare, the documentation, *i.e.*, the order, must attest to the truthfulness and medical necessity of the claim. Tr. Apr. 23 at 118 (Hoover's testimony). The false statement is the attestation of medical necessity used to induce payment from Medicare, and the evidence at trial demonstrated that Blackman operated the system to generate hundreds of thousands of false statements to induce payment by Medicare to himself and his co-conspirators.

### *B. The Charged Falsity Was Fabricated Medical Necessity Examinations, Not the Mere Use of Telemedicine*

The defense spends pages attacking a theory the Government did not present: that telemedicine, as such, was illegal. That was not the Government's theory, and Dr. Hoover's concession that the braces at issue were not on Medicare's face-to-face list does not undermine the conviction, because the falsity charged was not the mode of the visit — it was whether an adequate medical encounter took place at all. Dr. Hoover testified that the determination of medical necessity is "a collaborative effort between the doctor and the medical equipment supplier," and that the entity billing Medicare is "responsible for making sure that a claim is reasonable and necessary." The Government's proof, including its undercover operation, McNeal's testimony that doctors were not speaking with patients, and the volume evidence discussed above (GX 312, 313, and 314), permitted the jury to find that in a material number of instances no meaningful clinical encounter of any kind occurred — not that a permissible telephonic encounter was mislabeled. A properly conducted telemedicine visit resulting in a good-faith clinical judgment is, as the defense correctly notes, not fraud. A signature attesting to physical examination findings that were never performed, on a form stripped of the information an auditor would need to catch that fact, is fraud regardless of the face-to-face list.

This distinction also answers the defense's reliance on *AseraCare*, *Omnicare*, and the general principle that a sincere clinical judgment cannot be criminalized merely because another physician later disagrees. The Government did not ask the jury to punish a reasonable clinical judgment; it asked the jury to find that the attestations were not judgments at all — that they were signed without the underlying examinations the forms represented had occurred. That is a question of historical fact, not of competing medical opinion, and the jury was entitled to resolve it against

Blackman based on the pattern and volume evidence, Audisho's, McNeal's, and others' testimonies, and the undercover evidence.

Defendant also conveniently omits from his papers that in addition to false attestations as to medical necessity, the Government also alleged and proved that the fraud conspiracy involved payment of kickbacks and bribes for doctors' orders and prescriptions for braces and pain creams, along with the use of sham contracts and invoices to conceal the kickback relationships, among other manners and means alleged in the fraud conspiracy in Count 1.

***C. Materiality Was Established***

The removal of telemedicine references from the orders, standing alone, permits an inference of materiality. Blackman's own approval of that concealment, memorialized in GX 1052, is itself evidence that the omitted information mattered to the audit and payment decision — precisely the kind of direct evidence of materiality *Takhalov* contemplates. *See id.*, 827 F.3d at 1316–17 ("A 'material fact' is an important fact that a reasonable person would use to decide whether to do or not do something. A fact is material if it has the capacity or natural tendency to influence a person's decision. It does not matter whether the decision-maker actually relied on the statement or knew or should have known that the statement was false"). The defendant's argument that the "doctors' orders" were not submitted with every claim does not defeat materiality; it is undisputed that they were the documentation Medicare's contractors relied upon whenever a claim was in fact reviewed, and the evidence showed Blackman knew that and acted to frustrate that review specifically. He also continues arguing that there were no fake patients despite Agent Zubry's testimony, recordings, DMERx's own data, and Medicare data all showing that Agent Zubry's undercover, fake identities cycled through each phase of Blackman's scheme and were billed to Medicare. *See*, *e.g.*, GX 110 (Vernon Wheeler Summary); GX 525 (Vernon Wheeler

Recording); GX 111 (Kevin Green Summary); GX 503 (Kevin Green Recording). Defendant also ignores that Agent Zubry's recordings reflect the lies that the telemarketers told to induce beneficiaries to agree. *Id*. (misrepresenting being a representative of the non-existent "Medicare Shipping Department"). Defendant's qualm with the Government not calling a patient overlooks that the call center recordings of each patient in Counts 2-4 were introduced into evidence and is also agnostic to the fact that two of three are deceased.

Defendant does not even attempt to argue that the concealment of kickbacks and bribes from Medicare was immaterial to the payment decision, and for this reason alone, his argument as to materiality fails because concealment of kickbacks and bribes through sham contracts was a central part of the charged fraud and the evidence at trial.

## IV. THE GOVERNMENT'S CLOSING ARGUMENT AND USE OF GX 641 DO NOT WARRANT ACQUITTAL

The defense's argument that isolated statements in the Government's closing — referencing kickbacks, bribes, or GX 641 — misinstructed the jury on the law conflates attorney argument with the Court's instructions. The jury was instructed that the Court's charge, not counsel's argument, supplies the law, and juries are presumed to follow that instruction. Tr. Apr. 21 at 57:23-24 ("At the end of the defense case, there will then be closing arguments, and I will instruct you on the law."); *see United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992). Read in context and as a whole, the Government's closing did not tell the jury that a kickback alone equals health care fraud; it argued, permissibly, that the kickback evidence was probative of Blackman's fraudulent intent and knowledge — a proper use of Anti-Kickback Statute evidence even under *United States v. Medina*, 485 F.3d 1291, 1297–98 (11th Cir. 2007), which forecloses treating a kickback as *per se* health care fraud but does not preclude the jury from considering kickback evidence alongside independent proof of a false or fraudulent representation to Medicare,

which the Government supplied here. In any event, any potential confusion was cured by the Court's instructions on the actual elements of Counts 1, 5, and 6, and isolated statements in closing argument are evaluated in the context of the arguments and instructions as a whole, not in isolation. *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

The same analysis defeats the "bribes" argument, and the actual charge given confirms there was no error to begin with. The Court instructed the jury, consistent with the statutory text of 42 U.S.C. § 1320a-7b(b), that Count 5 required proof that a person offered, paid, solicited, or received "remuneration, including a kickback or bribe," to induce or in return for a referral. Tr. May 12 (PM) at 79:10-14. The statute itself, and the pattern instruction that tracks it, treats "kickback" and "bribe" as illustrative examples of the single prohibited category — improper remuneration tied to a referral — not as separately defined offenses requiring separate definitions. The jury did not need a freestanding definition of "bribe" because the operative question under the instructions actually given was whether Blackman knowingly and willfully participated in the payment or receipt of remuneration to induce or reward a referral, and the Government's use of both terms in its opening and closing tracked that statutory language concept rather than inviting conviction on an uncharged theory. To the extent defendant nonetheless faults the wording of the charge itself, that is a challenge to the jury instructions, not to the sufficiency of the evidence, and is not properly raised on a Rule 29(c) motion.

## V. THE WIRE FRAUD OBJECT WAS PROPERLY SUBMITTED

Defendant's argument that "the wire fraud object was charged to the jury as a healthcare fraud object" is contradicted by the charge the Court actually gave. The transcript of the May 12, 2026, charge conference and jury instructions shows that the Court instructed the jury on wire fraud as a freestanding object of the Count 1 conspiracy, with its own distinct elements, before

separately instructing on the health care fraud object shared by the substantive counts and the conspiracy's second object. The Court told the jury: "One of the objects charged in Count 1 is the federal crime of wire fraud. It is a federal crime to use interstate, wire, radio, or television communications to carry out a scheme to defraud Medicare or other federal health care plans," Tr. May 12 (PM) at 71:14-17 and instructed that the Government was required to prove, among other things, that "[t]he defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud." *Id.* at 72:3-5. Only afterward, in a separate portion of the charge addressing "each substantive count" and "the second object of the conspiracy charged in Count 1," did the Court instruct on the health care fraud elements, which include an interstate-commerce element rather than a wire-transmission element. *Id*. at 73:24-75:6. The wire fraud object thus received the pattern instruction defendant requested, including the very *Takhalov* limitation defendant now invokes elsewhere in his motion — the Court instructed that "[p]roving intent to deceive alone without the intent to cause loss or injury is not sufficient to prove intent to defraud." *Id*. at 73:1-3. There was no duplication, no constructive amendment, and no basis to vacate or limit sentencing on the wire fraud object.

As to defendant's related argument that the Government failed to prove use of interstate wires, the evidence that the DMERx/HealthSplash platform operated as cloud-based software transmitting prescription and claims-related data across state lines, together with the jury's instruction that the Government need not prove "that the defendant personally made the transmission over the wire," Tr. May 12 (PM) at 73:10, readily supports the jury's finding on this element. In any event, the witnesses testified that the claims were submitted through interstate wires. Tr. Apr. 21 (AM) at 116:22-117:1 ("Q. And are you familiar with how those claims are submitted? A. Yes. Q. Is it via paper or via the internet? A. So most claims are submitted

electronically. Both for drugs and for medical claims."); Tr. Apr. 30 (PM) 291:3-8 ("Q. -- that you have described? And in general, when will CHAMPVA pay for a medical good or service? A. [V. Khristoforov] Well, the claims can be submitted throughout the whole country. It comes in through interstate wires, through . . . Electronic Data Interchange.").

## VI. THE PRESENCE OF TIME-BARRED OR CONTESTED OVERT ACTS DOES NOT REQUIRE ACQUITTAL AS TO COUNTS 5 AND 6

Defendant raises a statute of limitations defense after trial that, even if it were valid, would have been waived by his failure to raise it timely. *See Musacchio v. United States*, 577 U.S. 237, 248 (2016) (affirming computer fraud and abuse act convictions and rejecting untimely statute of limitations defense). Moreover, Defendant fails to distinguish controlling authority demonstrating that the charges here were timely filed given that he concedes that multiple overt acts proven to the jury occurred within the limitations period. *See United States v. Butler*, 792 F.2d 1528, 1532–33 (11th Cir. 1986) ("the statute of limitations is satisfied if the last overt act alleged and proved occurs within the limitations period."). This last-ditch claim should be denied.

"Because [Section] 3282(a) does not impose a jurisdictional limit, the failure to raise it at or before trial means that it is reviewable on appeal—if at all—only for plain error." *See Musacchio,* 577 U.S. at 248 *(citing* Fed. R. Crim. Pro. 52(b) (providing for consideration of "[a] plain error that affects substantial rights" even though the error "was not brought to the court's attention")). "We conclude, however, that a district court's failure to enforce an unraised limitations defense under § 3282(a) cannot be a plain error." *Id*. "[A] statute-of-limitations defense becomes part of a case only if the defendant puts the defense in issue." *Id*. "When a defendant fails to press a limitations defense, the defense does not become part of the case and the Government does not otherwise have the burden of proving that it filed a timely indictment. When a defendant

does not press the defense, then, there is no error for an appellate court to correct—and certainly no plain error." *Id*. (upholding circuit's refusal to consider limitations defense on appeal).

Time limitation under Section "3282(a) imposes a nonjurisdictional defense that becomes part of a case only if a defendant raises it in the district court." *Musacchio*, 577 U.S. at 246. "When a defendant introduces the limitations defense into the case, the Government then has 'the right to reply or give evidence' on the limitations." *Id*. Here, Defendant failed to raise this defense until after trial, when the alleged defect is incurable, and when the Government may no longer reply, seek a special verdict form, or give evidence on the limitations. Defendant failed to preserve this argument in any way, but proposing a jury instruction on statute of limitation, a special verdict form identifying the potential limitations issues, or seeking to strike overt acts outside of the statute. Instead, he proposed jury instructions without a limitations guidance and a verdict form that did not identify the issue for the jury. By failing to raise this argument earlier he invited the very alleged error of which he now complains. *See United States v. Souffrant*, 517 F. App'x 803, 817 (11th Cir. 2013) (Defendant "induced or invited the district court to rely on the verdict form and jury instructions that she now claims constructively amended the indictment."). Blackman has thus waived the argument, and it should be rejected.

Even if he could pursue his post-trial time limitations defense, it must be denied because Eleventh Circuit precedent holds that only one alleged overt act must be timely. "In a conspiracy prosecution brought under § 371 the government in order to avoid the bar of the limitation period of § 3282 must show the existence of the conspiracy within the five years prior to the return of the indictment and must allege and prove the commission of *at least one overt act by one of the conspirators within that period* in furtherance of the conspiratorial agreement." *United States v. McNair*, 605 F.3d 1152, 1213 (11th Cir. 2010) (emphasis added). "[C]onspiracy charges which

require listing of overt acts, the statute of limitations is satisfied *if the last overt act alleged and proved* occurs within the limitations period." *Butler*, 792 F.2d at 1532–33. Defendant acknowledges within his motion that at least seven of the fourteen overt acts alleged in Count 5 are timely, and at least two of seven overt acts alleged in Count 6 are timely. D.E. 521 at 28. The government proved these allegations at trial. For this reason alone, his argument must fail.

Defendant further alleges, after trial, that overt acts one and two of Count 5 are legally insufficient. Having failed to move pretrial, this argument is also waived. *See* Fed. R. Crim. Pro. 12(b)(3)(A) (providing that motions alleging a defect in the indictment must be raised by pretrial motion). Even considering the merits, this argument fails. Defendant asserts that these acts are insufficient because they were directed toward a "lawful result." This is not the case. The pattern jury instruction in the Eleventh Circuit, which the Court gave to the jury here, provides that "[a]n 'overt act' is any transaction or event, even one that may be entirely innocent when viewed alone, that a conspirator commits to accomplish some object of the conspiracy." Eleventh Circuit Pattern Jury Instructions (Criminal), Offense Instruction O13.1 (2025); D.E. 463 at 27. Each of the overt acts was aimed at the unlawful objective of purchasing doctors' orders for braces in exchange for kickbacks and bribes to be billed to Medicare through PME Home Health, which was controlled by Defendant.

Overt act 1 of Count 5 provides that:

> On or about March 10, 2015, a co-conspirator emailed BRETT BLACKMAN stating, "We can still run PME. We will take the calls to hit the 50 [doctors' orders] per week, but we have to renegotiate the price. We need to be at $150 instead of $125. We made this price up before we took any of the calls and knew how they converted and what the real cost was. If you want to do this we still can at the new price of $150. If you agree to this we can start this week." BRETT BLACKMAN responded, "That works. Lets g[i]ve it a shot. We will work towards 40 DOs[.]"

Overt act 2 of Count 5 provides that:

> On or about April 27, 2015, a co-conspirator emailed BRETT BLACKMAN sham invoices addressed to PME Home Health that stated that PME Home Health was being billed for "marketing and advertising." However, the email attaching the invoices states that the invoices were for doctors' orders.

D.E. 76 at 18-19 ¶¶ 1 and 2. Each of these acts alleged conduct that furthered the purpose of enriching Defendant by "(a) creating false and fraudulent doctors' orders for DME, prescription creams, and other medical items for beneficiaries; (b) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for signed doctors' orders for DME, prescription creams, and other medical items for beneficiaries; (c) submitting and causing the submission of claims to Federal Health Care Plans for products that were medically unnecessary, ineligible for reimbursement, and procured through the payment of kickbacks and bribes; (d) concealing and causing the concealment of kickbacks and bribes; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud." For the reasons discussed below, Defendant's post-hoc attempt to recast this conduct as legal under out-of-circuit cases *Sorensen, Miles,* and *Marchetti* is unavailing.

The Court should deny this untimely request to incorrectly argue the Superseding Indictment is legally flawed.

## VII. SUBSTANTIAL EVIDENCE SUPPORTS BLACKMAN'S COUNT 5 KICKBACK CONSPIRACY CONVICTION

The Government presented clear, articulate kickback and bribe theories throughout the case, supported by voluminous evidence, and the Court should reject the re-writing of charges and evidence at trial. The Government's theory was that Blackman and his co-conspirators paid kickbacks and bribes to induce marketers and telemedicine companies to refer patients, and to

induce orders for orthotic braces and pain creams, to specific brace suppliers and pharmacies. This theory was supported by a deluge of evidence at trial.

Throughout all of Defendant's lengthy discussion of Count 5 in his Motion, he never addresses the evidence that Defendant personally solicited and received a kickback from Keaton Langston in exchange prescriptions billed to Medicare through Davison Pharmacy. Tr. Apr. 30 at 313:24 – 314:16; Tr. May 4 (AM) 45:14-18. The jury was entitled to convict the defendant for Count 5 on the basis of that testimony alone, and Defendant fails to confront it in any meaningful way.

### *A. Sorensen, Miles, and Marchetti Are Distinguishable and Non-Controlling*

Defendant relies on a series of non-controlling cases to attempt to shoehorn his obvious kickback conspiracy involving deceptive telemarketing into a lawful advertising paradigm. The defense's reliance on *United States v. Sorensen*, 134 F.4th 493 (7th Cir. 2025), *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), and *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024), rests on the premise that HealthSplash was a pure advertising intermediary with no influence over clinicians' independent judgment, comparable to a marketing firm paid a flat fee unrelated to referral volume. The trial evidence permitted the jury to find otherwise. Unlike the marketers in *Sorensen*, *Marchetti,* and *Miles*, HealthSplash controlled the only channel through which the DME suppliers, telemedicine companies, and prescribers in this scheme could access and act on patient leads at all — charging a per-download fee triggered specifically by the generation of a prescription through that channel, a structure functionally distinct from a flat advertising fee untethered to referral activity. This argument fails because it is both legally and factually flawed. Defendant engaged in a worldwide scheme to lure beneficiaries through deceptive mailers and call centers into a system of bribes and kickbacks among telemarketers, telemedicine companies, and brace suppliers/pharmacies. This is not the type of advertising conduct protected under *Sorensen*,

*Miles*, and *Marchetti*, and the Court should reject application of this non-controlling precedent to the obvious kickback conspiracy for which the jury held Defendant to account. Moreover, the Eleventh Circuit has recognized that non-physician marketers fall within the ambit of the Anti-Kickback Statute. *See*, *e.g.*, *States v. Vernon*, 723 F.3d 1234, 1255 (11th Cir. 2013) (upholding convictions where "payments were made to the relevant decisionmaker, [], as she had her own personal and existing relationships with her clients and decided where to fill her clients' prescriptions."); *United States v. Anderson*, No. 24-10059, 2025 WL 26147, at *5 (11th Cir. Jan. 3, 2025) ("Anderson argues that the Anti-Kickback statute proscribes only paying kickbacks to health care providers, and because Hanley is not a health care provider, the Anti-Kickback statute does not apply. But the Anti-Kickback statute prohibits paying remuneration to 'any person' to induce that person to refer an individual for a service payable by Medicare.").

The Fifth Circuit confronted the question of when a payment made to a non-doctor constitutes an illegal kickback in *Miles*. There, the owners of a home health agency paid an advertising company to distribute literature and business cards to doctors' offices and paid the advertising company for each patient who became a home health client. *Id*. at 479. The advertising company, however, had no "authority to act on behalf of a physician in *selecting* the particular home health provider" and thus the Fifth Circuit held that the payments to the advertising company were not made "as an inducement or kickback" for sending patients to the home health company. (citing *Miles*, 360 F.3d at 480). In reaching its decision, the Fifth Circuit explained that where a non-doctor kickback recipient made "the decision as to *which* service provider to contact for the patient" the situation would be different. *Id*. at 480-81 (emphasis in original) (citing *United States v. Polin*, 194 F.3d 863, 865 (7th Cir. 1999)).

Following *Miles*, the Fifth Circuit clarified that the deciding factor is not whether the kickback recipient has formal authority to effectuate the desired referral or recommendation. Rather, the key distinction is between a "payer's intent to induce 'referrals,' which is illegal, and the intent to compensate advertisers, which is permissible." *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014). In essence, if "advertising facilitates an independent decision to purchase a healthcare good or service" and there is no evidence that the person who received payment "unduly influence[d]" that decision, a payment to an advertiser in return for each purchase, without more, would not violate the Anti-Kickback Statute. *Id*. at 628 (citing *Miles*, 360 F.3d at 480).

This case is nothing like *Miles*. The evidence presented in the Government's case-in-chief demonstrated that Blackman paid Karlick not to advertise PME as a great place to obtain orthotic braces for those medical professionals who needed a referral provider, but for the much more targeted purpose of generating signed orders that would go exclusively to PME. *See* GX 1001 at 2 (directing physician to fax the order to PME only); Tr. Apr. 27. at 73:11-20 ("Q . . . Now, did the doctor have any option to select a different DME company to send the order to based on this order GX 1001, (A. [J. Karlick] Not on this order. Q. And from your perspective, what, if anything, was wrong with that? . . . The WITNESS: . . . the doctor should be able to make his own or her own educated decision.").

In *United States v. Marchetti*, the Fifth Circuit revisited the question of the evidence needed to convict when kickbacks are paid to a non-doctor. The court again framed "the central question" as whether the defendant's payments were "intended to induce referrals," or were "intended to compensate advertisers." 96 F.4th at 826. Payments made based on the value of each referral, without more, will not support an inference that the payments were intended to induce referrals. *Id*. But payments that correspond to the value of the referrals coupled with evidence that the

kickback recipient intended "improperly [to] influence []" doctors make for an "open and shut" case. *Id*. at 827.

Marchetti was the kickback recipient—akin to Karlick or other marketers in Blackman's conspiracy—and he was paid to direct Medicare-reimbursable tests to certain labs that were paying him. *See* 96 F.4th at 821-23. The Fifth Circuit decided that the evidence was insufficient to prove that much of the conduct Marchetti was charged with violated the Anti-Kickback Statute because it provided not "a drop of color" as to what Marchetti's "influence looked like," and the Government was required to show that Marchetti exerted some type of influence over doctors. *Id*. at 827. Marchetti's conviction was upheld, however, because one aspect of the scheme was diverting tests to another lab. In that portion of the scheme, he assumed the role of relevant medical decision-maker directly and was compensated per referral, which is illegal under the Anti-Kickback Statute. *Id*. That is the same position Karlick and other marketers held in Blackman's conspiracy, receiving kickbacks and bribes from Blackman in exchange for directing brace orders to the specific brace supplier Blackman chose: PME Home Health. What's more, while Karlick testified that he participated for a brief period of time in "doc chase" or soliciting the beneficiaries' primary care providers to sign orders, Blackman's broader scheme more often involved telemarketers paying telemedicine doctors to sign prescriptions that were then sent to the pre-selected brace suppliers. At all times during the conspiracy, these prescriptions originated from vulnerable patients calling the phone numbers on the deceptive mailers Blackman sold from NCP.

Defendant also relies on *United States v. Sorensen*, in which the Seventh Circuit held that Sorensen's payments in a scheme to "chase" doctors for prescriptions for orthotic brace prescriptions were not made for "referring" patients within the meaning of the Anti-Kickback Statute. 134 F.4th 493, 496 (7th Cir. 2025). But Sorensen was charged only with paying kickbacks

to induce patient referrals, under section (b)(2)(A) of the Anti-Kickback Statute, unlike Blackman, who was also charged with paying kickbacks to induce orders for, or recommendations to order, orthotic braces under section (b)(2)(B). In addition to this legal distinction, the testimony from witnesses, including Audisho, demonstrated that Blackman's DMERx portal generated false and fraudulent orders and directed them to a chosen brace supplier or pharmacy, and the physicians (and patients) had no choice of whom that brace supplier or pharmacy would be. For instance, Audisho testified that he "had no control over any of the suppliers." When asked "if [he] wanted to send a patient's order to a different supplier that was assigned to the patient, could you?" he answered, "[N]o, not at all." Tr. Apr. 29 (PM) at 23:12-16, 24:2-5. He added that neither he nor the patient chose the other: "We were both assigned to each other through some other party." *Id*. at 24:20-22.

In short, *Sorensen* concerns different conduct charged under a different section of the AKS than Blackman was charged. To the extent *Sorensen* is read to allow for payments in any "doctor chase" scheme, regardless of the influence exerted over doctors, it is inconsistent with Fifth and Eleventh Circuit case law.

For these reasons, *Sorensen*, *Miles*, and *Marchetti* in truth support the jury's verdict as to Count 5, and the Court should reject Defendant's attempt to shoehorn his conduct into the category of lawful advertising.

***B. The Referral Evidence Was Sufficient***

The defense's argument that DMERx's introductions were mere "business-to-business" connections, not patient referrals, ignores that every entity introduced through the platform existed for the sole purpose of generating Medicare-billed brace orders. McNeal's testimony that HealthSplash "referred" marketing agencies and clients to him, and similar testimony from Anjaria

and Cirri, permitted the jury to find that these introductions were not neutral business networking but were integrated into, and served, the referral of Medicare beneficiaries for Medicare-covered items — the functional equivalent of a patient referral under 42 U.S.C. § 1320a-7b(b), given that patient referral was the only business these entities transacted.

Defendant also argues that the payment of the $5 "use fee" is not a kickback. See D.E. 521 at 32-33. But this is yet another strawman created by the Defendant for him to knock down. The government did not allege or argue at trial that this fee was a kickback, although it may very well be one. The government clearly presented evidence that the $5 fee was the means by which Defendant and his co-conspirators profited off of the referral arrangements through which he orchestrated the sale of orders among pharmacies, telemarketers, brace suppliers, and telemedicine companies, each of which paid or received kickbacks. *See* Tr. May 12 (PM) at 58:12-14 (Halverson rebuttal: "And the defendant is making money off of each of these orders. Not just the $5, but he's also making the $5 when the DME supplier downloads it. He's also making money off the marketing."). The government need not prove that every manner, means, or overt act in a kickback conspiracy was itself a kickback, and the Court should reject this strawman argument.

### ***C. A Single Conspiracy and a Timely Overt Act Were Proven***

As with Count 1, the Government's proof of a common fee structure, cross-referrals among the same set of participants, and Blackman's own documented notice of Anti-Kickback Statute risk through Leard's memorandum supports a single, interdependent conspiracy rather than the multiple, unconnected relationships the defense describes. And regardless of how the jury viewed the payment-specific overt acts the defense attacks, the Government need prove only one timely overt act by a co-conspirator in furtherance of the conspiracy;[4] the continued operation and

[4] Overt Acts 11-14 of Count 5 are each payment from a co-conspirator to Blackman's HealthSplash for use of the DMERx platform, made in 2019, well within the statute of limitations.

collection of per-download fees well into the limitations period, after Blackman received actual notice of Anti-Kickback Statute risk, itself supplies that act.

### *D. Blackman's Willful Intent Was Established*

To argue he lacked intent, Blackman builds and attempts to knock down the strawman that "[t]he government's entire theory of knowledge rested on Ms. Leard's memorandum, government exhibit 633." D.E. 521 at 40. Blackman points out several perceived insufficiencies in Leard's warnings about the risk that DMERx would violate the Anti-Kickback Statute. But the willfulness standard requires proof that Blackman knew his conduct was unlawful, not that he possessed a lawyer's technical mastery of the statute's outer boundaries. *See* 42 U.S.C. § 1320a-7b(b); *United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015) ("the defendant need not have known that a specific referral arrangement violated the law"). The Leard memorandum, De Lanoy's "warnings weren't heeded" testimony, and Blackman's approval of sham contracts that concealed the referral relationships between co-conspirators[5] on the DMERx platform together permitted the jury to find the requisite specific intent as to Count 5.

---

*See Butler*, 792 F.2d at 1532–33. When viewed "in the light most favorable to the government," these co-conspirator acts are indisputably in furtherance of Blackman's conspiracy to offer, pay, solicit, and receive kickbacks in exchange for doctors' orders of orthotic braces billed to Medicare as charged in Count 5.

[5] It is undisputed that Blackman approved the contracts. *See, e.g.*, GX 1221. Schreck testified at length as to the false nature of the contracts and their ability to conceal the referral relationships in DMERx. *See* Tr. May 4 (AM) at 137:21-138:3, 141:5-142:6, 143:19-144:2. At least three counterparties also testified that the HealthSplash agreements described an open marketplace that never existed. *See* Cirri, Tr. Apr. 22 (AM) at 91:3-4; McNeal, Tr. Apr. 30 at 184:13-14; Anjaria, Tr. May 6 (AM) at 50:24-25.

## VIII. SUBSTANTIAL EVIDENCE SUPPORTS BLACKMAN'S COUNT 6 DEFRAUD-CLAUSE CONSPIRACY CONVICTION

### *A. The Government Proved Specific Intent to Impede a Lawful Government Function*

*United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998) requires proof that impeding an agency's lawful function was an object of the agreement, not merely an incidental effect of otherwise lawful conduct. That standard is satisfied here. Blackman's personal approval of stripping telemedicine references from the orders — conduct one witness described, without contradiction, as "deceitful," undertaken specifically because "Medicare busts their chops over telemed encounters;" Tr. April 28 (AM) at 138:19-20, is direct evidence that concealment from Medicare's contractors, not merely accurate recordkeeping, was an object of the conduct. That is materially different from *Adkinson*, where the record contained no comparable admission that concealment of information from a federal agency was a purpose of the defendants' conduct, as opposed to an incidental byproduct of business decisions made for other reasons. *Adkinson*, 158 F.3d at 1154–57. The two overt acts the defense highlights as reflecting suppliers or prescribers pushing back against improper practices do not negate this evidence; they show, at most, that the scheme's concealment was imperfect, not that concealment was never its object.

### *B. The Jury Instructions Did Not Constructively Amend the Indictment*

Defendant's constructive-amendment argument rests on the false premise that the Court never instructed the jury it had to find that Blackman intended to impede a federal agency's lawful function. The actual charge with which the Court instructed the jury, which closely mirrored the 11th Circuit pattern instruction, refutes that premise. *Compare* Tr. May 12 (PM) at 82:12-18; *with* Pattern Crim. Jury Instr. 11th Cir. OI O13.6 (2025). As the Pattern recommends, and before reciting the four numbered elements defendant quotes out of context, the Court specifically defined the object of the Count 6 defraud-clause conspiracy: "Count 6 charges the defendant with

conspiring or agreeing with someone else to defraud the United States or any of its agencies. To defraud the United States means to cheat the government out of property or money or to interfere with any of its lawful governmental functions by deceit, craft, or trickery." *Id*. That definition — the settled formulation this Circuit uses for section 371 defraud-clause conspiracies — supplied exactly the intent-to-impede requirement *Adkinson* provides, and it was given to the jury immediately before, and as the interpretive framework for, the four elements defendant excerpts. *See United States v. Harmas*, 974 F.2d 1262, 1267 (11th Cir. 1992) ("A conspiracy to defraud the United States is defined as 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'") (citation omitted). Defendant again declines to engage with the complete record, and cherry picks out-of-context remarks to serve his baseless argument. Jury instructions, however, must be viewed in their entirety, not parsed sentence by sentence in isolation from the surrounding charge. *See United States v. Guerrero*, 935 F.2d 189, 193–94 (11th Cir. 1991) (jury instructions should be "read as a whole."). Read as a whole, the charge required the jury to find that Blackman agreed to cheat the United States out of money or property, or to interfere with the lawful functions of Centers for Medicare and Medicaid Services (CMS) and its contractors, "by deceit, craft, or trickery" — not, as defendant suggests, that he merely intended to accomplish any unlawful plan whatsoever. Tr. May 12 (PM) at 82:17.

Nor did the Court's use of the phrase "the United States or any of its agencies," rather than a narrower reference to agencies administering the Federal Health Care Plans, broaden the basis for conviction. The proof and argument at trial were confined, without exception, to CMS and its contractors' administration of Medicare and the other federal health care programs at issue; no evidence or argument invited the jury to convict based on interference with any other federal function. An instruction that recites the general definition of the defraud clause in slightly broader

terms than the indictment's specific factual allegations, where the trial proof was never directed at any broader theory, does not constructively amend the indictment. *United States v. Keller*, 916 F.2d 628, 634-35 (11th Cir. 1990) (amendment requires that the proof and instructions permit conviction on a materially different factual basis than the one charged). No such broadening occurred here, and the conviction on Count 6 should stand.

## IX. VENUE WAS PROVEN BY MORE THAN A PREPONDERANCE

Constructing yet another strawman argument, Defendant claims that venue in this case was "based on the allegations in the substantive counts" of which he was acquitted. That argument fails first because venue was much broader than the three substantive counts, and second, because evidence related to the substantive counts may still be used to prove venue for the conspiracy of which the substantive counts (Counts 2-4) were part.

Venue need be proven only by a preponderance of the evidence, *see United States v. Wuagneux*, 683 F.2d 1343, 1356-57 (11th Cir. 1982), and the Court draws all reasonable inferences in the Government's favor in assessing it. Venue in a conspiracy prosecution is proper in any district in which an overt act in furtherance of the conspiracy was committed. *United States v. Bradley*, 644 F.3d 1213, 1253-55 (11th Cir. 2011).

The trial record contains ample evidence connecting the charged conduct to the Southern District of Florida. Defendant's companies at the center of the conspiracy were based in Miami. *See* GX 900 (NCP bank statements listing Miami address); GX 715 (Amici Holdings LLC bank statements listing same address as NCP). This oversight by Defendant underscores his overarching disregard for the record as reflected throughout the instant motion. Moreover, Jordan Karlick testified extensively about his business Mojo Media that purchased mailers from Blackman to direct calls to Herb Kimble's foreign call centers. Karlick testified that Mojo Media was based in

Boca Raton, Florida, which is in the Southern District of Florida. Tr. Apr. 27 at 76:21-23. These mailers were a central part of the conspiracies because they drove Medicare beneficiaries into Kimble's call centers which input the beneficiaries' data in the DMERx to generate orders.

The Government also presented testimony identifying Medicare beneficiaries whose orders were generated through the platform as residing in Fort Lauderdale, Florida, and identifying Sunrise Medical Inc., a telemedicine company paying doctors to sign false claims generated through the platform, as located in the Southern District of Florida. GX 108, GX 109. The Government also admitted the Sunrise Medical Inc. contract with DMERx into evidence, GX 230. That evidence, together with the platform's use by numerous South Florida-based participants throughout the conspiracy, is more than sufficient to establish venue by a preponderance, particularly given the deferential standard of review and the requirement that all reasonable inferences be drawn in the Government's favor. And more still, the Government presented significant evidence of other Southern District of Florida co-conspirators' participation in the scheme aside from the substantive health care fraud counts. For instance, McNeal testified about a marketing company called RAS Marketing in Pompano Beach, Florida (which is in the Southern District of Florida). *See* Tr. Apr. 30 at 196:2-13. Other evidence submitted to the jury demonstrated that company sold numerous brace orders to brace suppliers through DMERx. *See*, *e.g.*, GX 634 (compendium of emails summarizing orders including from RAS Marketing as a "Top 10 to 15" company).

Further, that the three substantive counts were not attributed to Blackman directly, does not negate the evidence of those counts for purposes of the conspiracy to commit those crimes for which he was convicted. *See Alonso*, 740 F.2d at 870–71 ("An acquittal on a substantive offense

does not preclude a verdict of guilty on a count charging a conspiracy to commit such a substantive offense."). Thus, the jury was permitted to consider the venue evidence related to Counts 2-4.

Taken together, this is well beyond sufficient evidence to establish venue for the conspiracies charged in Counts 1, 5, and 6.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Defendant's Motion for a Judgment of Acquittal in its entirety.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

*<u>/s/ Darren C. Halverson</u>*
DARREN C. HALVERSON
Florida Special Bar No. A5503082
REGINALD CUYLER JR.
Florida Bar No. 0114062
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 880-2233
Tel: (202) 748-3024
Email: Darren.Halverson@usdoj.gov
Email: Reginald.Cuyler.Jr.@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 17, 2026, I electronically filed the foregoing document with the Clerk of Court via CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record.

*/s/ Darren C. Halverson*
Darren C. Halverson
Trial Attorney