UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-20271-CR-LEIBOWITZ

UNITED STATES OF AMERICA,

Plaintiff,

vs.

BRETT BLACKMAN,

Defendant.

_______________________________________/

**BRETT BLACKMAN'S SENTENCING MEMORANDUM**

The right to a jury is fundamental, and jury verdicts must be given meaning at sentencing. A system that requires its citizens to devote nearly a month of their time to resolution of the government's liberty-depriving allegations against its own must also take the nuances of a jury's verdict into account at sentencing, and where applicable, endeavor to honor the work of the jury. The government's sentencing memorandum disregards the acquittals on three counts and one key conspiratorial object which alleged conduct central to the theory argued in the government's sentencing memorandum. The advisory Guidelines range as calculated by Probation likewise does not adequately take acquittals into account. It is essential to consideration at sentencing that the jury rejected core aspects of one of the largest Medicare telemedicine fraud schemes ever *charged*.

The jury sat through fifteen days of evidence, and carefully deliberated before finding Brett Blackman not guilty of allegations that were central to the government's charging theory. It acquitted Blackman of every substantive execution—of every charge that required finding a claim that was fraudulent for which Blackman was responsible. None of the jury's counts of conviction required a finding of actual loss. The jury wrote a note requesting clarification of the material false

statements object on Count 6—and then found *not guilty* as to the government's central theory, finding that by approving the removal of telemedicine from auto-generated language (while not precluding doctors from including such information), Blackman was ***not*** conspiring to make a material false statement. These findings cannot be ignored or cast aside at sentencing.

The government seeks in this case a sentence that is highly disproportionate to the conduct, and to the jury's findings—requesting a statutory maximum on each count, stacked consecutively. The advisory Guidelines as calculated by Probation are inconsistent with the 3553(a) factors and with the record before the Court. "Nothing requires a sentencing court to give the advisory guidelines range as much weight as it gives any other 18 U.S.C. § 3553(a) factor or combination of factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1259 (11th Cir. 2015). In this case, the § 3553(a) factors compel a sentence far lower than the advisory Guideline range as calculated by the Probation Office and far lower than the sentence requested by the government.

Where calculation under the advisory Guidelines leads to a patently unreasonable result, courts have fashioned sentences that focus more on the statutory factors than they do the advisory Guidelines—and this type of fashioning has been deemed appropriate in split verdict cases. *See United States v. Adelson*, 441 F. Supp. 2d 506, (SDNY 2006) (Rakoff, J.) (in a split verdict fraud case, accepting the "most likely reading of the jury's verdict" at sentencing, and imposing a sentence of 42 months where the guidelines were life and the government had argued the Court should impose a sentence somewhere in the range of 15 to 30 years' imprisonment). *See id*. at 510, 512 (combined effect of an added 20 points under the Government's approach represents the kind of "piling-on" of points for which guidelines have frequently been criticized; court felt obligated to add such points but found that what it exposed "more broadly, was the ***utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline***

***calculations can visit on human beings if not cabined by common sense***") (emphasis added); *id*. at 513-14 ( "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at his sentencing, when his very future hangs in the balance"; referring to this as an "elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice"). *See also United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (Rakoff, J.) (imposing no prison time on a guidelines range of 78 to 97 months in a split verdict case; "this Guidelines range does not rationally square with the facts of this case" for both case-specific reasons and because it did not take adequate account of the factors this Court is required by law to consider in imposing sentence).

A statutory maximum sentence is inappropriate in this case. The maximum is the punishment that Congress has reserved for the worst-case scenario. No matter the characterization the government may give the facts, this case does not satisfy that worst-case-scenario standard. *Not a single beneficiary* was called to testify about any harm they suffered as a result of the conduct of conviction. The purported harm to beneficiaries was all hypothetical or theoretical, constructed by the government's own auditors whose entire compensation structure is tied to cost-saving and effective clawback of claims. The conviction was for only agreement. There was simply no evidence of any actual harm to any actual beneficiary—and that fact *must* be taken into account when determining whether a statutory maximum stacked sentence is appropriate.

Rather, the harm even as characterized by the government relates to the draining of government coffers—a draining the jury was not persuaded occurred or could be attributed to Blackman through any concrete claim; and a draining the jury did not need to find to convict on the conspiracy counts. The government effectively asks this Court to impose a sentence on the theory

that notwithstanding the 100 percent not guilty rate on substantive executions, *every other claim was fraudulent*. That approach strains reason.

The record in this case also warrants practical considerations, where taxpayer loss is the core harm asserted. The PSI reveals that incarcerating Blackman for 30 years would carry a taxpayer-funded price tag of $1.647 million. And that is without accounting for inflation, and assuming that a man imprisoned from his early forties to nearly his seventies develops no *health* issues that run up the taxpayer bill even higher. There are federal programs that do real good for real people at a fraction of that price. For example, the maximum Pell Grant award is fixed at $7,395.[1] A 30-year prison sentence for Blackman is Pell Grants for *222 people*. Or, to put it into public healthcare terms, Medicare's average spending per beneficiary is $18,900.[2] Incarcerating Blackman for 30 years costs the same as paying annual healthcare costs for 87 beneficiaries (or, if stretched out overtime, *87 years of healthcare*).

This combines with the fact that the cost of this investigation and prosecution was surely astronomical; if the government's theory is accepted, then the prosecution of all the separate people with whom the government secured cooperation agreements to prosecute Blackman likewise must be taken into account. The defense too was taxpayer-funded. And the government's allegations were in many ways rejected by the jury. The answer is not yet more spending, but rather the unique facts in this case pose a different question: *Given all of this, is another seven-figure taxpayer expense really necessary*? And more importantly, *is it fair and just*? The answer is no. Thirty

---

[1] *See* https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2025-01-31/2025-2026-federal-pell-grant-maximum-and-minimum-award-amounts-updated-may-29-2025

[2] https://www.kff.org/medicare/the-facts-about-medicare-spending/?entry=table-of-contents-medicare-spending-trends

years' imprisonment is far greater than sufficient but not greater than necessary to accomplish the purposes of sentencing.

The 18 U.S.C. § 3553(a) factors that guide courts in sentencing are designed with principles of punishment but also principles of mercy and justice in mind. *See Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996). And these factors reflect principles of fundamental fairness, aimed at insulating against disparity in various forms and recognizing individual concerns that also must be addressed in achieving punishment that seeks to account for the universe of relevant considerations.

**I. The Nature and Circumstances of the Offense and the Seriousness of the Offense**

In asking for the maximum possible sentence on every count, the government has requested a sentence that one might expect to see in a case where there was record evidence of tangible harm suffered by people as a result of a conspiracy. The jury verdict does not even require a finding that Mr. Blackman's conduct defrauded Medicare of *any* money through any identified claim. There are several relevant and offense-specific considerations that counsel against a particularly lengthy sentence here.

*First*, the offenses of conviction were all conspiratorial. A verdict of this nature justifies restraint at sentencing for several reasons. Conspiracy is an "elastic, sprawling, and pervasive offense." *Krulewitch v. United States*, 336 U.S. 440, 445 (1949) (Jackson, J., concurring). "Its history exemplifies the tendency of a principle to expand itself to the limit of its logic." *Id*. at 445 (internal quotation marks and citations omitted). Justice Jackson there remarked on a "growing habit

to indict for conspiracy in lieu of prosecuting for the substantive offense itself." *Id.* Where the government indicted but the jury *rejected* every allegation as to the substantive offense, these considerations must be taken into account in considering the nature of the offense at sentencing, because "loose practice as to this offense constitutes a serious threat to fairness in our administration of justice." *Id.* at 446.

Even in 1949, and it remains true now, "[t]he modern crime of conspiracy is so vague that it almost defies definition." *Id.* "Despite certain elementary and essential elements, it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid. It is always 'predominantly mental in composition' because it consists primarily of a meeting of minds and intent." *Id.* at 447-48. "When the trial starts, the accused feels the full impact of the conspiracy strategy . . . the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused is often confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself." *Id.* at 453. "In other words, a conspiracy often is proved by evidence that is admissible only upon an assumption that conspiracy existed." *Id.* ("The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction").

Justice Jackson could have been writing about this case. The conspiracy charged here was vague, sprawling, and chameleon-like. Many of the witnesses testified that they had never met or communicated with Blackman. Scores of statements were admitted under a hearsay exception where the government failed at the end of trial to close the loop with respect to tying each and every one to an established conspiracy with Blackman, creating the mass sprawl that Jackson warned against. Notwithstanding how this Court resolves such arguments with respect to the pending post-trial

motions, the same arguments warrant consideration in evaluating the nature of the offense. The sprawling allegations in the Count 1 conspiracy to commit healthcare fraud and wire fraud are such that the jury could have convicted on a ground far narrower than the conspiracy as characterized in the government's filings. This demands leniency in consideration of the nature of the offense factor.

A conspiracy conviction also requires no element of success nor any element of loss. Particularly in the regulatory fraud context, where the line between legal and illegal conduct are themselves confusing (as opposed to say a drug sentencing where an agreement to distribute of a controlled substance is plainly illegal), leniency is warranted where the conviction was only an agreement, which the jury was told could be proved in any number of alternative ways. The government did not request special findings as to the facts alleged in the conspiracy count. It cannot now return around and say that notwithstanding the acquittals (on counts that themselves incorporated the allegations in the Count 1 conspiracy), each and every fact as well as the overarching theory alleged in the conspiracy section must be treated as proven.

*Second*, and also relevant to the "kind of sentences available," the government has repeatedly characterized this as a Medicare fraud scheme. Congress has imposed a statutory maximum of ten years for healthcare fraud offenses. 18 U.S.C. § 1347(a). The same statute makes clear that where healthcare fraud results in "serious bodily injury," the statutory ceiling is then 20 years. The government asks this Court to impose on the healthcare-fraud count of conviction a sentence of 20 years, based only on the fact that it simultaneously charged the generic wire-fraud statute, which carries a 20-year statutory maximum and was enacted outside of the healthcare fraud context; healthcare fraud offenses were dealt with separately in 18 U.S.C. § 1347. Congress has evaluated the "kinds of sentences available" for healthcare fraud, and has deemed 10 years the maximum appropriate where the government does not charge the serious bodily injury enhancement. This

warrants consideration under the 18 U.S.C. § 3553(a) factors, particularly in this case where the jury instructions as given blurred the distinctions between wire fraud and healthcare fraud, and where Blackman was not personally involved in the submission of claims.

*Third*, leniency is warranted to ensure that the sentence imposed does not rope in acquitted conduct. Relevant conduct does not include conduct for which the defendant has been criminally charged and acquitted. Where the substantive executions *incorporated* the manner and means section of the conspiracy, as did the material false statements object of Count 6, distinguishing between what the jury found and what the jury expressly rejected becomes a difficult task. The sentence imposed must take this reality into account, and due process considerations compel leniency in favor of sentencing for acquitted conduct where the distinction is unclear. No matter how the acquittals are viewed, the *least* likely reading of the verdict is the government's: that the jury believed all of the government's allegations, and believed that *all but three* of the claims submitted were fraudulent and attributable to Blackman. This sort of extrapolation does not hold weight against the verdict, and to the extent there is uncertainty as to what the jury found and what it did not (due, again, to the sprawling nature of the conspiracy discussed above), lenity principles and the sufficient-but-not-greater-than-necessary command require that doubts be resolved in favor of the defendant in a split verdict of this nature. The government had an opportunity to prove its claims wholesale, put its case before the jury, and the jury narrowed the government's theory. This is relevant to consideration of the nature of the offense and the seriousness of the offense.

*Fourth*, there is a substantial likelihood that the jury convicted on all counts based only on a finding of a kickback conspiracy or improprieties related to call center conduct, while rejecting the core medical necessity allegations made by the government. There is no evidence that any actual beneficiary did not want or need a brace, no evidence that braces were returned, no patients

who testified that they were unhappy with the braces that they received or they did not need them. The evidence showed patients calling in claiming they wanted a brace. As to each substantive execution, the government's expert testified to the jury about the doctors notes supporting the claims (GX 303, 305, 306) and told the jury the notes did not justify the braces. As to each substantive execution, corresponding with those notes, the jury acquitted—reflecting a rejection of the government's theory as to medical necessity, particularly where read in conjunction with the false statements object of Count 6. That object was the primary vehicle by which the government sought to tie Blackman to the medical necessity theory, pointing to template language, the removal of the telemedicine reference, and the audit redetermination submission. The jury asked for clarification on this object and then swiftly rejected it.

*Fifth*, there is a material difference between classic fraud and hyper-technical regulatory fraud of the kind charged here. This was not a case involving phantom patients, services never rendered, braces billed and never shipped, forged prescriptions, or claims submitted on behalf of deceased beneficiaries. The braces and creams were paid and shipped, and signed by a licensed physician. The government called only *one* physician to testify at trial, and the jury rejected the substantive claims as to that physician. The government in requesting a statutory maximum sentence disregards the distinction between various types of fraud.

Relatedly, the interpretive challenges related to the Anti-Kickback Statute warrant consideration under the nature-of-the-offense factor. The government's kickbacks allegations buttressed its Count 1 conspiracy, meaning the conviction could be based *solely on a finding of a kickbacks conspiracy*, particularly when considered in light of the government's allegations that such kickbacks were "concealed." The statutory maximum for a pure kickbacks conspiracy is 5 years, and the staggering difference between this and the 20-year cap for wire fraud is a factor

important to consider in assessing the seriousness of the offense on this record.

Such considerations are uniquely important where there is a likelihood that the kickback allegations propelled the verdict. The kickbacks statute is so broadly written, and by its plain terms *so vague*, that whether the statute applies to a given set of facts is entirely unclear from a plain reading of the statute. This has yielded the OIG advisory opinion process and given way to an entire cottage industry of healthcare compliance attorneys who *interpret those regulatory opinions*. To the extent that a fraud conviction is buttressed by a healthcare compliance attorney's personal opinion of an OIG advisory opinion, applied to a new set of facts, that is an eminently relevant consideration to the nature of the offense factor and deserving of leniency. That is particularly true here, where the healthcare compliance opinion offered in evidence related to a *different version of the platform that was never used*. Where the purported kickbacks carried the government's allegations (and on the best read of the verdict, the conviction) on the fraud count, the difference between the statutory cap for a kickbacks conspiracy and the statutory cap for a wire fraud conspiracy must be taken into account in considering the seriousness of the offense.

<u>*Sixth*</u>, consecutive stacking is not warranted on this record for reasons relevant to the nature of the offense factor. *See* 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)"). The government conceded at a pre-trial hearing that the exact same conduct underlies the three conspiracy counts in the indictment. Each conspiracy count incorporates the Count 1 conspiracy—and the Count 1 conspiracy includes kickback allegations. This counsels against stacking; "district courts under the Guidelines retain enough flexibility in appropriate cases to take into account the fact that the conduct underlying the offense at issue has previously been taken into

account in sentencing for another offense." *Witte v. United States*, 515 U.S. 389, 405 (1995) (so stating in the context of separate prosecutions). Certain provisions of the advisory Guidelines, related to grouping, remark upon the need to "limit the significance of the formal charging decision" and to "prevent multiple punishment for substantially identical offense conduct." U.S.S.G. § 3D (introductory commentary). The same underlying principles warrant consideration under the nature-of-the offense factor in this case, where the government has conceded that the two five-year conspiracies charge identical factual allegations as the broader one, and that it is just one conspiracy charged via separate subsections of the United States Code. Even if this principle does not apply in every run-of-the-mill case, it carries weight here where the jury acquitted on some objects of the *same alleged conduct* that runs throughout.

If the same conduct underlies Count 1 and Count 6, and the jury acquitted on the material false statement object of Count 6, the government cannot claim that it accepted all of its allegations—further illustrating why stacking is not warranted, because the Count 6 verdict necessarily requires a finding that the jury rejected some of the factual allegations as to Count 1 as well (as the government stated pretrial, the two counts charged identical conduct). Also, because the jury acquitted on the Count 6 object, a statutory maximum consecutive sentence on Count 6 is not warranted: such a sentence is the same statutory maximum sentence this Court could impose if the jury *had* found guilty on the material false statements object. The advisory Guidelines must be balanced against the work of the jury, and imposing a statutory maximum consecutive sentence in this context would wash away the work of the jury.

*Seventh*, Mr. Blackman's role in the offense mitigates against an unduly lengthy sentence that holds him accountable for the conduct of others, particularly where the jury acquitted him in substantive counts charging alleged conduct of others. The same principles that led to the acquittals

warrant consideration under the nature-of-the-offense factor. "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Graham v. Florida*, 560 U.S. 48, 71 (2010), *as modified* (July 6, 2010). In considering the seriousness of the offense, the Court is permitted to "consider whether a lesser role in the offense warrants a variance," and this analysis is wholly separate from the role reduction analysis. *United States v. Dawson*, 542 Fed. App'x 803 (11th Cir. 2013).

Blackman did not personally submit any claims, and he was acquitted of allegations related to conversations about website design (most of which, the trial evidence revealed, occurred outside his presence). He did not receive $52 million, as even the government apparently recognizes in arguing that "companies he controlled took in $52 million." The government's own exhibits make this clear: GX 152 shows $52 million going from a bucket of DMERx-affiliated marketers, suppliers, and pharmacies to "Blackman-controlled accounts." GX 159 shows the same total of $52.1 million*, and reveals that all of that $52.1 million went to National Center for Pain*. GX 149 shows outflows from NCP to Blackman or Blackman-controlled entities totaled $8.4 million. The remaining $39 million went to advertising-related entities such as marketing research groups and mailing companies. Of that $8.4 million, $6.9 million went to Amici holdings. Kris Rogers testified at trial that the money that went from Amici to the Blackman were loans, with notes and terms, and that the amount was roughly $1 million, (Tr.Day8:82); profits from Amici, meanwhile, went to Vanrick Segario. Tr.Day8:51. Any profits that went to Blackman were thus *substantially* less than the government's summary exhibits sought to suggest. The difference between profits and the loss figure calculated by Probation (and objected to by the defense) is so staggering that it warrants substantial consideration under the nature-of-the-offense and seriousness of offense factor when considering Blackman's individual role.

**II. The History and Characteristics of Mr. Blackman**

The history and characteristics of Mr. Blackman warrant leniency. This is his first run-in with the law; he scores zero criminal history points. The attached character letters paint a picture of Mr. Blackman that demonstrate his profound commitment to his family and to his community, the overwhelmingly positive effect that he has had on those around him; and the challenges he has faced and overcome. Collectively, they reveal the following:

*The pressure on Brett to provide for others has been enormous for his entire adult life.* Brett has been responsible for other people since before he was an adult. His then-girlfriend, and now ex-wife with whom he co-parents and remains close, became pregnant while they were both still in high school. Brett did it all. He finished high school, even kept playing football, and spent all his other hours working to provide for his young family, even amid the stress accompanying his first daughter's premature birth. He then went on to earn his bachelor's degree. Tammy Cole, who was a working adult parent when she watched a high school senior forced into growth effectively overnight, writes that the most consistent thing about him across the decades is "how he gives."

Less than ten years after he graduated high school, when he was 26 years old with a young family, Brett lost his father to brain cancer. As his daughter Jillian writes, he was told he was now the patriarch of the family and needed to step up. He had two younger brothers who had just lost their father figure: "Even though he was grieving the loss of his own father, he stepped up for his brothers," his mother, Joyce Lintz, writes. She notes that while his heart was just as broken as theirs, but he found the strength to be there for him. His younger brother Brandon confirms this, recalling Brett helping him move into his college dorm, holding him while he cried, and eventually encouraging him to ask out his now-wife. His stepmother, Kim Bruza, characterizes this loss as "[o]ne of the most difficult experiences of Brett's life"—he was "still a young man, married, and

his third child had just been born." Not long after that, Brett would suffer yet more loss—and incur yet more responsibility. His stepfather died from lung cancer, requiring him to take on a paternal role in caring for his younger sister Kaila. She writes that "losing my dad made me realize even more how important my big brother's presence, guidance, and opinion are to me."

*Brett had a legitimate vision for HealthSplash to expand access to care.* Fraud cases, particularly of this nature, are not always as cut and dry as the government seeks to portray them. As daughter Jillian Bradley writes, Brett carried the patriarchal burden so relentlessly after his father's death that he developed chronic physical pain—a well-documented symptom of trauma and stress. Jillian vividly recalls in her letter "the relief he felt when he found a back brace that allowed him to play outside again." She writes that "he wanted others suffering similar pain to experience that same relief." His other daughter, Elizabeth, traces the vision for the company to her great-grandfather's own illness, writing that Brett "wanted medical information accessible without families waiting weeks for records to be faxed or transferred. He wanted fewer patients falling through the cracks and fewer families facing unnecessary costs because healthcare systems couldn't communicate."

Jillian, his daughter, notes that in building his company, her father "sought advice from family, friends, and lawyers, but struggled with the administrative demands and judgement calls involved." While recognizing—in a remarkable degree of candor—that her father may not be "immune from greed," she describes him as a man who "deeply desires to fight poverty and give generously" and who "regularly donated to our church and bought dinners, gifts, and experiences for people, often giving others opportunities he never had growing up." A daughter whose sentencing letter points out not just his father's strengths but also recognizes his shortcomings displays an honest upbringing and sense of maturity that can be credited at least in part to Brett. His

other daughter, Elizabeth—who checked into an inpatient mental health facility for the duration of his trial—likewise writes not only about the strengths but also the challenges they have faced and overcome in their father-daughter relationship. One of his peers, meanwhile, recalls the profound impact that Brett's high-school-aged son, Malachi, then 8 years old, had on her own "painfully shy" son, displaying a level of kindness to him that brought him out of his shell. Brett's character is reflected in each and every one of his children; Jillian, for example, has pursued a career in working with people with autism spectrum disorder, seeking to help others.

*This is not someone whose primary motivation was greed.* Brett provides even where he is not obligated to do so. One might expect someone who shouldered so much responsibility at a young age to be at capacity when it comes to giving. That is not true of Brett. When Gus, his handyman, was battling cancer, Brett helped to pay for his treatments, his food, and his Christmas gifts for his children. When his friend, Joe Cullor, was underwater with the moving company he operated, Brett offered not only his business acumen but devoted five days each week on his own time to straightening out the company; this allowed Cullor to step aside from the day-to-day and pursue his lifelong dream of becoming a teacher and coach. Greg Cole, a plumber and volunteer firefighter who met Brett at church refers to him as a "second dad" to his three daughters; he has been there under a car, late at night, helping him fix it so he can work the next day. Lauren Gilbert summarizes him as such: "Need a seat? Take mine. Pinched nerve? My chiropractor is magic, here's his number. Car trouble? How can I help? Sad? I have both an ear to listen or a joke, which would you like?" The Gangebins, educators who met Brett through church, write "without hesitation that there are very few people in this world who have the heart that Brett has," describing him as a "true servant to everyone around him." Mike Hedgecock notes that he gives not just to family and friends, but also to his church and to multiple charities. Alyssa Cole, his friend's

daughter, writes that when her parents moved away during her college years, Brett stepped in during that time of my life without me ever asking, and opened his home and heart to children who were not biologically his own. His longtime friend Phillip Adam, an assistant superintendent for an inner-city charter school district, recalls a particularly difficult week in his own life where he reached out to Brett because he was struggling. "Brett drove approximately three hours from Arkansas to Kansas City just to make sure I was okay. He expected nothing in return. He simply wanted to be present for someone he cared about," Adam writes. Friend Cass Gilbert notes that he has observed in Brett a vulnerability "seldom expressed" and notes that he has had long conversations with Brett about "the challenges of raising daughters into young women" and "teaching them that they deserve respect from all their males in their lives."

*Brett has always prioritized service to the community.* He previously served on the board of directors of a church-operated halfway house in his community. He started Journey International Church in his own basement; it later expanded. He has demonstrated a particular commitment to youth service, and he has been actively involved in coaching various youth teams. He donated his time to coaching a high school girls' club volleyball team—and his free labor enabled girls who otherwise could not afford to play sports at such a level to be awarded scholarships on the team, allowing them to travel all over to compete, potentially paving the way for collegiate athletic scholarships. He was active in the local Boy Scouts with his son. He has been active in his church for decades. He ran a local youth sports group—and when he learned of a young man whose dad was incarcerated and whose mom was having a tough time, he called all the fathers who run the group and managed to bring the young man into the group, even though it sometimes required driving all the boys down to the area where this young man lived.

*Even at his darkest times, Brett continues to help people.* Brett was taken into custody last

spring, and has since resided at the Federal Detention Center in Miami. The challenges of adjusting to life in a pretrial detention facility that has been doubling as an immigration facility are enough to plunge any person into a deep depression. When he was first taken into custody, he had *no water for two straight days*—not a sip. This is obviously inhumane. Since then, he has experienced a three-day stint of no running water at the Federal Detention Center, and countless other roadblocks in access to basic needs.

Brett, however, has once again met adversity with a spirit of giving. He has been active in expanding a church group at the prison and even "helped establish a framework for their church so it can continue after the current men are gone," his daughter Elizabeth writes. He "spends his time serving in the prison church, helping other inmates navigate their legal struggles, and even learning to play the guitar." When Brett was first incarcerated, this church group consisted of only 8 people. It has since expanded to 25 people, who gather nightly for religious services. And, most significantly, Brett learned from the challenges he faced in entering an incarcerative environment and he used that knowledge to help others. He organized the church group to purchase basic necessities from the commissary to give to incoming inmates. Inmates who enter their unit are now provided, by Brett and his church group, a care package with the necessities they need to get through their first couple of days of incarceration.

Brett's cellmate, Gregori Arzumanov, writes that Brett "always tries to help those who are in need"; "sincerely shares what he knows and what he has, and his happy when he sees that his help is useful." Upon incarceration, brother Kyle Blackman writes, Brett realized "how hard it was to obtain basic necessities and understand the facility's rules." To give just one example, for a prolonged period of time early in his incarceration, Brett's unit was missing a clippers—when he came downstairs for his PSI interview, he apologized to the Probation Officer for his overgrown

beard and pointed out to counsel (quite correctly, in this instance) that the missing clippers was a matter of basic hygiene. He quickly figured out how to make use of the administrative process, and this resulted in clippers being returned to the unit—benefitting all the inmates. He since has helped other inmates navigate the often obscure BOP process for making basic requests and asserting their rights. As his brother, Kyle, writes: "Brett recognized that others around him faced the same difficulties—particularly those affected by language barriers or limited reading abilities," and immediately got to work helping them to understand the facility's processes and the process for drafting written requests to the BOP to ensure protection and adequate treatment. This included as discussed above the developing new-arrival kits of basic necessities for incoming detainees. This is a valuable public service, and demonstrates that Brett's giving spirit shines through even in his loneliest times. Given the allegations in this case, his role in providing basic necessities to inmates has a near poetic quality to it. However one may read the intricacies of the verdict, Brett's desire to expand access to care has proven to be true even where he stands to gain nothing.

This is the type of character that has been recognized as mitigating—indeed, as warranting of a substantial downward variance in a split-verdict case. It amounts to "illustrations of [Brett's] big heart and helping hand, which he extended without fanfare or self-promotion, to all with whom he came into contact." *United States v. Gupta*, 904 F.Supp.2d 349, 353 (SDNY 2012), *affirmed*, 747 F.3d 111 (2d Cir. 2014). Brett has demonstrated repeatedly, since long before his brain fully developed, that whatever bandwidth he has, he will devote to others. He is overwhelmingly deserving of leniency. He can be rehabilitated. He can be not only a productive but an exceptional member of society.

Sentencing hearings require courts to consider a defendant's full history and characteristics. A trial court does not err in giving "substantial weight to a defendant's history and characteristics

over other factors discussed at sentencing." *United States v. Ramirez*, 2025 U.S. App. LEXIS 6769 (11th Cir. Mar. 24, 2025). The counts of conviction do not render Mr. Blackman's important contributions to others and to his community irrelevant; rather these traits not only mitigate but help give context to the conviction, and to understanding what has driven him for his entire adult life.

**III. Leniency is consistent with deterrence principles.**

Leniency in this case is consistent with both general and specific deterrence principles.

General Deterrence: General deterrence is a unique factor in cases where there is a fine line between legal and illegal conduct. Cooperating witness Toni DeLanoy's testimony revealed that witnesses the government used against Brett signed plea agreements with at least one individual who never realized that intent was required to be guilty of conspiracy. The logical effect of this is that future hypothetical defendants, perhaps those who are engaging in such conduct now, may have no idea their conduct is illegal—and thus will not be deterred by any sentence. The length of the sentence here will have minimal if any general deterrent effect given the hyper-technical and regulatory nature of the prosecution. A sentence of far less than 30 years is sufficient but not greater than necessary to accomplish the aims of general deterrence. Meanwhile, a too severe sentence could have the chilling effect of deterring conduct that is not illegal, particularly where the line separating legal and illegal conduct in this context is thin and often difficult to parse. Also relevant to general deterrence is the fact that the vast majority of Operation Brace Yourself defendants were not repeat offenders; the length of time required to accomplish deterrence in this context counsels in favor of leniency, as any prison time is likely to deter someone in such circumstances.

*Specific deterrence*.

Brett's stepmother, who has been a mom to him since he was younger than 5, writes that "during his incarceration, I have witnessed genuine change. I have seen humility, personal growth,

and a willingness to accept responsibility for his actions and the consequences that followed." Brett has been fundamentally shaped and corrected by this experience already. He has friends in law enforcement; he has spent his adult years as a law abiding citizen. He has seen an entirely different side of our justice system through this experience, and he has learned from it. He has reflected immensely and at length on his own conduct. During the trial, Brett already had to suffer the punishment of seeing his own daughter check into an inpatient mental health facility. He has seen the effect this experience has on his family—and for someone who cares about his family as much as Brett does, that is a harsh enough punishment to accomplish specific deterrence. Any prison time will take him away from his family and render him incapable of providing for them. That is a substantial punishment. Additionally, Brett has zero criminal history points. The Sentencing Commission itself recognizes that criminal history is "closely correlated with recidivism rates"; by the same logic, specific deterrence can be accomplished more easily in this instance. *See* U.S.S.C., Recidivism Among Federal Offenders: A Comprehensive Overview, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (last accessed October 12, 2026).

As to both specific and general deterrence, the sentence requested by the government is far greater than necessary to accomplish the deterrence principles that guide courts at sentencing. *See United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (Rakoff, J.) (in insider trading case, as to general deterrence, "common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not"; as to specific deterence, it seems "obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result").

**IV. Leniency is warranted to avoid unwarranted sentencing disparities**

The sentence requested by the government is not in line with sentences that have been imposed in other Operation Brace Yourself cases. Indeed, the 30 years requested appears to be the longest sentence imposed in an Operation Brace Yourself case. The evidence at trial does not support a sentence of this length; rather, such a a sentence will create unwarranted disparities.

First, it will create unwarranted disparities to sentence Mr. Blackman to twice the amount of time that Gary Cox received. Mr. Cox was acquitted across the board on all counts; Mr. Blackman, however, beat core allegations in the government's case, and the difference in verdicts must be reflected in the respective sentences. While Mr. Blackman recognizes that Cox received a downward variance due to his age, the difference in verdicts means that Mr. Blackman should receive at the very most the same sentence as Mr. Cox. Sentencing him to more time than Mr. Cox received will create unwarranted disparities; sentencing him to less time than Mr. Cox receives appropriately recognizes the differences in the two verdicts.

Second, Mr. Blackman should not receive more time than Minal Patel. Mr. Patel was convicted of *ten* counts—more than three times as many as Blackman. He was convicted of conspiracy to commit wire fraud and healthcare fraud, three counts of substantive healthcare fraud, conspiracy to defraud the United States and pay healthcare kickbacks, four counts of payment of healthcare kickbacks, and one count of conspiracy to commit money laundering (both concealment money laundering and laundering proceeds over $10,000). Mr. Patel owned a Medicare-enrolled lab and the government argued at sentencing *he himself* billed over $463 million in claims, and then was found to have laundered the money he received. In the *Patel* case, the government argued at sentencing that "whoever controls the billing is at the top of the pyramid. If you know the numbers and you know how to bill, you're the one who gets the money[.]" *United States v. Patel*, No. 19-cr-

80181-Ruiz, DE:527. Mr. Blackman had *no role whatsoever* in billing Medicare, nor did he receive any benefit from the successful payment of claims; his compensation structure was a $5 use fee and his platform did not submit any claims to Medicare. The sentence imposed on Mr. Blackman must be substantially less than that imposed on Patel to avoid unwarranted sentencing disparities where Patel was convicted of a much broader conspiracy, spanning ten counts, as well as seven substantive crimes, that far exceeded the severity of what the jury found here.

Mr. Blackman also should receive a sentence of substantially less than Herb Kimble, who recently pleaded to a sentence of "between 15 and 20 years' imprisonment." *See* USAO, "International Fugitive Pleads Guilty to Healthcare Fraud Conspiracy and Failure to Appear", available at: https://www.justice.gov/usao-sc/pr/international-fugitive-pleads-guilty-healthcare-fraud-conspiracy-and-failure-appear (last accessed October 12, 2026). The government cites Herb Kimble in its sentencing memorandum as DMERx's highest volume customer. The trial evidence revealed, however, particularly in the testimony from Willie McNeal, that Mr. Kimble was engaging in fraud off the platform; using the platform in a manner that it was not supposed to use; and hiding all of that from the platform. After hearing this evidence, the jury acquitted Blackman of the substantive counts linked to Mr. McNeal's company. Mr. Kimble's fraud was far greater and wider than anything found by the jury here; it was not limited to his use of the DMERx platform but operated independently and expansively of it. Mr. Kimble was one of the earliest defendants to cooperate—but then he fled the country. During trial in this case, the defense made a *Brady* demand for information regarding his whereabouts and any deals the government had made with him. The government did not call Mr. Kimble as a witness, and the defense thus was not able to cross-examine him about all the fraud that he engaged in unrelated to the platform. Weeks after the verdict, Mr.

Kimble was back in the country. He then pleaded to 15 to 20 years, despite having been a fugitive for years. Blackman complied with his bond for years, showed up for trial, and was acquitted of several counts and a conspiratorial object that was central to the government's theory of the case. Sentencing him to more time than Herb Kimble will create unwarranted sentencing disparities and will unduly punish the exercise of a trial right in contrast to a cooperating defendant who took advantage of the government's extension of leniency.

The government also cites the since-vacated sentence in *United States v. Agresti*, No. 18-cr-80124-Ruiz. Dr. Agresti was sentenced to 100 months after he was convicted at trial of a charged scheme allegedly involving the billing of over $100 million in medically unnecessary claims related to drug testing of sober home residents. His conviction was vacated after it was revealed that the government put on perjured testimony by a cooperator. His case is now scheduled for retrial in early 2027. To the extent that this Court views, as the government requests, a now-vacated sentence as relevant to the disparity consideration, Dr. Agresti's previously imposed sentence of 100 months (where he was not acquitted of any counts in the first trial, due to the cooperator's perjury) counsels in favor of, and not against, a sentence of 120 to 180 months here. It counsels against a sentence of 360 months here.

A sentence of 120 to 180 months will avoid unwarranted sentencing disparities. A sentence of 360 months will create such disparities. The disparity analysis *must* look to more than simply the government's claimed loss amount.

Finally, it is relevant to the disparity factor that the government asks for a sentence that is higher than the mean and median sentences imposed on murder defendants. Federal sentencing statistics from the 2025 Fiscal Year reveal that individuals sentenced for murder received an average sentence of 286 months. The government asks for a sentence that is *nearly 100 months longer than*

*that which the average murder defendant receives*. *See* United States Sentencing Commission, Annual Report 2025, https://www.ussc.gov/about/annual-report-2025 (last accessed October 12, 2026). The average federal sentence for sexual abuse, meanwhile, was 230 months. *Id*. The average federal sentence for kidnapping was 183 months. *Id*.

Mr. Blackman should be sentenced to far less time, and not to far more time, than the average federal defendant who commits murder, sexual abuse, or kidnapping. Imposing a sentence here that doubles the average federal kidnapping sentence and exceeds by roughly 100 months the average federal murder and sexual abuse sentence would create unwarranted disparities.

## CONCLUSION

For the foregoing reasons, and those to be further addressed at the sentencing hearing, Mr. Blackman requests that this Court impose a sentence between 120 and 180 months.

Respectfully submitted,

**KLUGH WILSON LLC**

By: */s/Jenny Wilson*
Jenny Wilson, Esq.
Klugh Wilson LLC
Florida Bar No. 1031758
40 N.W. 3rd Street, PH-1
Miami, Florida 33128
Tel: 305-536-1191
E-Mail Address: jenny@klughwilson.com